ORIGINAL FILED 07 DEC 21 PM 2:50 RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

James A. Quadra (SBN 131084)
MOSCONE, EMBLIDGE & QUADRA, LLP
Mills Tower
220 Montgomery Street, Ste. 2100
San Francisco, California 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006
Email: quadra@meqlaw.com

Michael W. Sobol (SBN 194857)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com

Jonathan D. Selbin (SBN 170222)
Rebecca Bedwell-Coll (SBN 184468)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
Email: jselbin@lchb.com
Email: rbcoll@lchb.com

*Attorneys for Plaintiffs and proposed Class*

WHA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO / OAKLAND DIVISION

| | |
|---|---|
| CREATE-A-CARD, INC.; AGSJ, INC.; and PHILANTHROPIC FOCUS, LLC, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTUIT, Inc.,<br><br>Defendant. | Case No. CV 07 6452<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Create-A-Card, Inc. AGSJ, Inc. and Philanthropic Focus, LLC ("Plaintiffs") allege, on behalf of themselves and all those similarly situated, as follows:

**PARTIES**

1. Plaintiff Create-A-Card, Inc. is a corporation with its primary place of business located in the State of New York.

2. Plaintiff AGSJ, Inc. is a corporation with its primary place of business located in the State of California.

3. Plaintiff Philanthropic Focus, LLC is a limited liability company offering advice and consultation to foundations and charities, with its primary place of business located in the State of Florida.

4. Defendant Intuit, Inc. ("Intuit") is a Delaware corporation doing business in the State of California and nationwide, with its primary place of business and headquarters at 2700 Coast Avenue, Mountain View, California 94043. The events and practices described herein were performed in and emanated from Intuit's offices in California.

**FACTUAL ALLEGATIONS**

5. Intuit markets and sells accounting software called QuickBooks Pro. QuickBooks Pro is marketed to and designed to be used by small and mid-sized businesses. Plaintiffs and the proposed Class own QuickBooks Pro ("QuickBooks") for Macintosh users.

6. Like many software companies, as part of its business practice, Intuit sends customers notifications of available updates to its QuickBooks programs, which appear on the customer's desktop upon opening QuickBooks. The customer can accept such updates for download or not accept the updates for download.

7. On Saturday, December 15, 2007, through a series of events the precise nature of which are still unknown, Intuit sent a faulty code to all QuickBooks for Macintosh users, including Plaintiffs. This code, which entered users' computers upon opening QuickBooks, caused the wholesale deletion of not only the user's QuickBooks data, but also all other files and data that was stored on the user's desktop.

8. Though the cause of the faulty code sent out by Intuit is still unclear, the impact on users was uniform—upon opening QuickBooks, users received a message that an update was available, and were asked whether the user wished to download the update. Regardless of whether the user clicked “yes” or “no,” the damage had already been done—the faulty code had already deleted all files on the user’s desktop. Intuit has represented that there was no update available, and that its server simply sent out a code. Intuit has provided no explanation for why the code was sent out from its servers.

9. The resulting loss of data was catastrophic to members of the Class. Users not only lost months’ worth of accounting and billing records, but also original and critical work product relating to their businesses. Faced with the end of the accounting year, Christmas orders, vacation schedules of employees, and looming tax deadlines, Macintosh QuickBooks users panicked.

10. On Sunday, December 16, 2007 at 1:40 a.m., users began leaving urgent messages on Intuit’s message board in droves, pleading for help recovering their lost data, and trying to do what Intuit was failing to do via email-- warn people not to open QuickBooks. Samples of these messages illustrate the impact on businesses around the country:

a. “I opened QuickBooks and it said there's an update. It started trying to download it automatically but then said it couldn't…. Then I noticed that all the icons on my desktop had disappeared. I checked, and all my files in my Desktop (there were quite a few) had disappeared.”

b. “This is beyond ridiculous. There is NO way that a piece of software like this SHOULD DELETE GIGS WORTH OF DATA OFF MY HARD DRIVE.”

c. “I JUST HAD THE SAME THING HAPPEN TO ME. I JUST FLEW CROSS-COUNTRY TO PHOTOGRAPH A JOB, DOWNLOADED THE IMAGES AND WENT TO SEND AN INVOICE. NOW MY JOB IS GONE.”

d. “Same here. $500 of billable work gone! Not to mention many other files. Tried every utility I have and can't find files. Gone forever?”

e. “Everything has been erased from my desktop and anything on the desktop at the time was erased from the hard drive…. INTUIT...we need a fix QUICK. I want an answer from Intuit.”

f. “I have had the same thing happen. All the discussions so far indicate this just started happening today, and now the desktop volume is gone. Has anyone heard anything yet from QuickBooks?”

g. “Mine happened somewhere between 1:30 & 2:00am , about the same time as OP so it started at least 14 hours ago as of now. Now I'm frantically trying to contact all my clients that use 2006 so that they don't lose their data. Some people keep Everything on their desktops. This is major! …INTUIT???????”

h. “Please, Please help. I am desperate and need these desktop files back.”

i. “I have lost HOURS of this week's work that was not backed up yet. HELP!!!!!!!!!!”

j. “I feel sick...lost my desktop files this evening. All my biz and personal stuff gone in seconds...how can this be? We need answers QB and soon!”

k. “Can't believe this has been happening for at least several hours now and no one has done anything about it!!! This just happened to me too. EXACTLY the same thing. I had NO idea - the whole thing took me completely by surprise and deleted VERY crucial data. Intuit KNEW about this happening for hours and didn't warn anyone?!?!?”

l. "I'm in the same boat. I'm a photographer and lost work that I have been editing for months. I have the files backed up, but not the edited portion, so I'd have to go back and do everything all over again. I lost a few jobs and a ton of personal work that wasn't backed up, I'm still trying to figure out what was on my desktop.

11. Users experiencing data loss contacted Intuit on December 16, 2007 and advised Intuit of the data destruction disaster. Intuit was thus aware of these dire events on December 16, 2007, but failed to warn users via email not to open QuickBooks, and failed to shut down its server to prevent further catastrophic losses, despite pleas from users to do that very thing, such as this posting on Intuit's message board:

**INTUIT -- CLOSE YOUR SERVER IMMEDIATELY**

Dec 17, 2007 04:27 am

It just occurred to me that in an hour and a half from now the East Coast wakes up for business. Perhaps thousands of people will run Quickbooks Pro 2006 and 2007 for the Macintosh as a part of their daily business routine. We have already seen that hundreds of people have had their desktop folder destroyed by this Quickbooks automatic update bug. That was on a SUNDAY. The amount of damage that will happen in just a short time on MONDAY may be inestimable.

The only immediate solution to this is that whatever server is sending the update notice to Quickbooks MUST BE IMMEDIATELY SHUT DOWN!

Intuit, I suggest that to so anything less than this would be not just inappropriate but irresponsible. Thank you.

12. Intuit was aware of this post and ignored it. As predicted, on Monday, December 17, 2007, thousands of Macintosh QuickBooks users started their computers, opened QuickBooks, and immediately suffered the loss of all files stored on the desktops of their computers. Intuit still did not shut down its server and still did not take steps to notify its users of the problem. Contacting Intuit about the problem resulted in a recorded announcement, "We can't find a support plan associated with your account at this time. If you need immediate technical assistance with Quickbooks, a support professional can help you for a fee. Just stay on the line for the next available representative."

13. On Tuesday, December 18, 2007, in an Intuit Message Board exchange with an Intuit employee, Jennifer Fisher, the founding editor of MacUser Magazine pointed out the obvious:

> 1) There is nothing on the main www.intuit.com page about this and at this point in time that is not excusable.
>
> 2) Intuit has not been at all proactive in getting the word out to the media. Instead various of the media have ferretted out the story but what is clearly lacking is a press release from Intuit fully explaining the problem. Is there a press release coming soon?
>
> 3) Along those lines why has Intuit not emailed all registered users with notice of this? There are probably thousands of people who have been hit by this but are not here.
>
> 4) Intuit keeps implying they are going to help with data recovery. When may we expect an announcement of what you plan? I suggest you contact a Data Recovery software vendor and buy a few tens of thousands of licenses for downloading freely to affected people along with a pdf instruction file and a well-staffed and free tech support number
> …
>
> 7) Why was this allowed to go past Sunday night? At 7am Monday morning EDT I did leave a thread on this Forum entitled "INTUIT -- CLOSE YOUR SERVER IMMEDIATELY." I said then that in a couple hours businesses would open on the East Coast and run QB. I pointed out that hundreds seem to have been hit on a Sunday so why not stop it from happening on a MONDAY? I was amazed and still am that the faulty server was allowed to continue to run on the web. All they had to do was either pull the plug (literally) or shut down a few of the ports. That might have saved thousands of people.
>
> 8) Is Intuit going to re-examine their use of offshore support which, in this case for sure, has proven to be absolutely useless and even offensive to most users? Would not a USA-based support team have worked better? Or does Intuit feel that Customer Service is a revenue stream before it is an obligation?
>
> 9) What exactly does Intuit feel is their culpability and their obligation (if any) in this matter?

14. Intuit did not respond to the foregoing post as of the date of the filing of this Complaint.

15. On Wednesday, December 19, 2007, Intuit sent email messages to persons who had contacted Intuit regarding this issue. Intuit's email message suggested making an

appointment at an Apple Store through its Genius Bar program, and offered to reimburse users for a $99 data recovery software program. Intuit made no offer to reimburse any user for the cost of spending thousands of dollars in technical support fees attempting to recover data on Sunday, Monday, Tuesday, or Wednesday. It made no offer to compensate any users for the time they spent attempting to recover their own data, or attempting to reach Intuit to obtain assistance. It made no offer to compensate users for charges incurred at the Apple Store through the Genius Bar program. Finally, it made no offer to compensate users for data and work product that could not be recovered. As a result Plaintiffs and the Class have been left holding thousands of dollars in attempted data recovery costs, as well as the cost of replacement of the data that could not be recovered.

**Plaintiff Create-A-Card, Inc.**

16. Plaintiff Create-A-Card, Inc. is a corporation providing professional marketing tools for the transportation industry.

17. On Monday, December 17, 2007, at approximately 8:00 a.m. EST, Arthur Messina, the President of Plaintiff Create-A-Card, Inc. started his company computer. As is his custom, Mr. Messina first checked his email messages.

18. At approximately 8:50 a.m., after reviewing his email messages, Mr. Messina opened his QuickBooks Pro 2006 for Macintosh program. He received a message that updates were available for QuickBooks. Mr. Messina clicked “yes” to download the update, and received a message that he had insufficient space to download the update. Mr. Messina then realized the entire contents of his desktop had been deleted. Among other desktop folders and files, Create-A-Card lost all of its invoicing, sales reports, customer files, day to day working files, Create-A-Card’s customer catalog, samples to send to clients, pre-designed forms used on a daily basis, and photographs.

19. Mr. Messina immediately contacted his Macintosh tech support person, who came to Create-A-Card and spent hours unsuccessfully trying to recover Create-A-Card’s data. Mr. Messina himself spent at least seven hours of his own time attempting to understand why his data had been lost and how it could be recovered.

20. Mr. Messina had a copy of his QuickBooks data through October 10, 2007 saved on a different computer, but had no copy of data after that date. Thus, Mr. Messina had to manually replace all of his data from what was his company's busiest two months in over 21 years, at great expense.

21. If Intuit had shut down its server or sent an email to its users on Sunday, Mr. Messina's damage would have been avoided.

22. On December 19, 2007, Mr. Messina called Intuit to inquire about reimbursement for his costs associated with attempting to recover his data. After being transferred, placed on hold, and attempting to receive service for over an hour, Mr. Messina received a "case number" from an overseas representative, who stated Mr. Messina would receive a call back "within two days."

23. Mr. Messina has not been able to recover his critical business data.

**Plaintiff AGSJ, Inc.**

24. Plaintiff AGSJ, Inc. is a corporation that owns and operates a bar located in Burlingame, California and known as the Vinyl Room.

25. On Sunday, December 16, 2007, at approximately 3:45 p.m. PST, Juan Loredo, the President of Plaintiff AGSJ, Inc., opened his QuickBooks Pro 2006 for Macintosh program. Intuit had not warned Mr. Loredo not to open QuickBooks, nor had it shut down its server.

26. Upon opening QuickBooks, Mr. Loredo received a message that updates were available for QuickBooks, and immediately received various error messages. Mr. Loredo then realized the entire contents of his desktop had been deleted. Among other desktop folders and files, AGSJ, Inc. lost all of its invoicing, sales reports, day to day working files, pictures, and many files containing financial information. The files lost represent hundreds of hours of work.

27. Mr. Loredo immediately contacted a Macintosh technical support person, who came to his office, located at AGSJ's Vinyl Room, and tried to locate the problem. The support person spent hours unsuccessfully trying to recover AGSJ's data. The technical support

person found a Macintosh/Apple forum that indicated that the deletion of AGSJ's desktop files was caused by a problem created by Intuit in connection with its QuickBooks Pro program.

28. On Monday, December 17, 2007, at approximately 10:00 a.m. PST, Mr. Loredo called QuickBooks to ask for assistance. He was placed on a "call back" list as the support manager said that it had been "escalated to a support team" and that he could not help Mr. Loredo. An Intuit representative called Mr. Loredo later that afternoon to simply state that Intuit was concerned about the problem and someone would be calling Mr. Loredo back within 24 hours. However, Mr. Loredo did not receive a call.

29. On Wednesday, December 19, 2007, Intuit emailed Mr. Loredo suggesting he attempt to recover the lost data using data recovery software and to email Intuit if that did not work. The Macintosh technical support person that Mr. Loredo had worked with had already attempted to do this to no avail. Mr. Loredo emailed Intuit providing this information. Intuit did not respond.

30. As of the date of this complaint, Intuit has not called Mr. Loredo back as promised.

**Plaintiff Philanthropic Focus, LLC**

31. Plaintiff Philanthropic Focus, LLC is a limited liability company offering advice and consultation to foundations and charities, with its primary place of business located in the State of Florida.

32. On Sunday, December 16, at 3:00 p.m., Philip Flynn, the founder of Philanthropic Focus, LLC, opened his QuickBooks program in order to record deposits, print checks, and balance accounts for Philanthropic Focus. Mr. Flynn had not been warned about the catastrophic result of opening QuickBooks.

33. Upon opening QuickBooks, Mr. Flynn received a message that an update was available. Mr. Flynn did not click on "yes" or "no," but the code did its damage anyway. In seconds Mr. Flynn's entire contents of his desktop had been deleted. Among other desktop folders and files, Philanthropic Focus had lost client contracts, research, PowerPoint presentations, excel files, video presentations, photographs, receipts of banking transactions, and

contact information. Mr. Flynn personally lost videotapes of his children, photographs, birthdates, and personal tax information.

34. Mr. Flynn immediately attempted to reach Intuit by telephone and was unable to do so.

35. On Monday, December 17, 2007, Mr. Flynn attempted to but was unable to reach Intuit by telephone. He sent an email message to Intuit's customer support.

36. On Tuesday, December 18, 2007, Intuit called Mr. Flynn and took information about his computer. Mr. Flynn asked if Intuit would reimburse him for the costs of the charges he incurred in attempting to recover his files. The Intuit representative responded that she had "no information about that." Mr. Flynn gave Intuit his technical support person's telephone number to obtain full information about his computer, and the Intuit representative agreed to (but did not) call the technical support person.

37. On Wednesday December 19, 2007, Mr. Flynn received a mass email suggesting Mr. Flynn go to the Genius Bar at an Apple Store, and purchase data recovery software, for which Intuit would reimburse Mr. Flynn. Mr. Flynn's Apple technical support person, who had been servicing his Apple computers for years, had already purchased data recovery software and had attempted for many hours to recover the company's data without success. Therefore, it would have simply caused additional useless time and expense for Mr. Flynn to send his own Apple expert to the Apple store to continue data recovery attempts.

38. Nevertheless, Mr. Flynn called the Genius Bar at the Apple Store and inquired whether Intuit had made arrangements to pay for the labor required to restore his files. The Genius Bar representative advised Mr. Flynn that Mr. Flynn would have to pay for Genius's labor costs, at $125 per hour. Knowing that his own Apple technician was more knowledgeable and experienced than the technicians available at the Apple store, Mr. Flynn opted not to spend several hundred dollars more attempting to recover data that could not be recovered.

39. Mr. Flynn continued to wait for Intuit to contact his technical support person, but Intuit never did.

**CLASS ALLEGATIONS**

40. The Plaintiff class is defined as follows:

> All individuals and entities whose files or data became inaccessible or were damaged, corrupted, or lost, whether temporarily or permanently, as a result of opening QuickBooks and receiving Intuit's December 2007 faulty code.

Collectively, all these persons will be referred to as "Plaintiffs" or "Plaintiff Class. Excluded from the Plaintiff Class are:

A. Defendant and any entities in which Defendant has a controlling interest;

B. Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Defendant;

C. The Judge to whom this case is assigned and any member of the Judge's immediate family;

D. Claims for personal injury, wrongful death and/or emotional distress; and,

E. All persons or entities that properly execute and timely file a request for exclusion from the Class.

41. Plaintiff reserves the right to modify the Class definitions after discovery and at any time up to and including trial.

42. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1-4) and (b)(1).

43. The Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable. The exact number or identification of Class members is presently unknown to Plaintiffs, but it is believed that Class members number at least in the thousands. The identity of Class members is ascertainable. Class members may be informed of the pendency of this Class action by email, posting on the internet, and publication.

44. Common questions of fact and law exist as to all members of the Class, which predominate over questions affecting only individual members of the Class. These include, but are not limited to, the following:

    A. Whether Intuit took proper steps to avoid catastrophic data losses for its customers.

    B. Whether Intuit trespassed by creating and allowing its code to enter users' computers and destroy data and files.

    C. Whether Intuit breached warranties of merchantability and fitness for a particular purpose.

    D. Whether Intuit's failure to warn its users to avoid opening QuickBooks or Intuit's failure to shut down its server before catastrophic losses constituted an unfair business practice

    E. Whether Intuit's creation of a code that destroyed data on users' desktops, its allowing such code to intrude into users' computers without the consent of the users, its failure to warn its users to avoid opening QuickBooks or its failure to shut down its server before catastrophic losses, constituted negligence

    F. Whether Intuit is liable under a theory of products liability for its creation of a code that destroyed data on users' desktops, its allowing such code to intrude into users' computers without the consent of the users, its failure to warn its users to avoid opening QuickBooks or its failure to shut down its server before catastrophic losses.

45. Plaintiffs' claims are typical of claims of the members of the Plaintiff Class, all of whom suffered damages as a result of Intuit's reckless or intentional actions. Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and for all other class members

46. Plaintiffs are adequate representatives of the Plaintiff Class because Plaintiffs are members of the Plaintiff Class and Plaintiffs' interests do not conflict with the interests of the members of the Class Plaintiffs seek to represent. Plaintiffs are represented by experienced and able counsel that have litigated numerous class actions, and intend to prosecute this action vigorously for the benefit of the entire Plaintiff Class. Plaintiffs and Plaintiffs' counsel can fairly and adequately protect the interests of the members of the Plaintiff Class.

47. The class action is the best available method for the efficient adjudication of this litigation because individual litigation of the Plaintiff Class claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## JURISDICTION AND VENUE

48. This Court has subject matter jurisdiction over this action.

a. This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) there are 100 or more members in the Named Plaintiffs' proposed class; (2) at least some members of the proposed class have a different citizenship from Intuit; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

b. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims, because those claims derive from a common nucleus of operative fact.

49. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

50. The Northern District of California has personal jurisdiction over Intuit because Intuit has qualified with the California Secretary of State to do business and is doing business in California, and in this district, and because many of the acts complained of occurred in this State and this district and gave rise to claims alleged.

51. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Intuit resides in this district and because a substantial part of the events giving rise to the claims occurred in this district.

52. Pursuant to Northern District of California's Local Rules 3-2 and 3-5, Plaintiffs request assignment to the San Francisco Division of the Northern District of California. Defendant Intuit maintains its corporate headquarters in Mountain View, California, and a substantial part of the events which give rise to the claims occurred in Santa Clara County.

**CHOICE OF LAW**

53. California law applies to all of the claims and issues asserted herein. California's interest in this action, which seeks to protect the rights and interests of customers of Intuit, a corporation which has its primary place of business in California, is greater than that of any other state. Intuit's conduct in creating the faulty code, sending it out to users, failing to warn users about the code, failing to take steps to avoid further damage, and failing to adequately assist in data recovery emanated from Intuit's primary place of business in California. In addition, Plaintiff AGSJ, Inc. has its primarily place of business in the State of California, and was injured in the State of California, as were many members of the Class.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**(Negligence)**

54. Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

55. Intuit had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing and design of its computer codes.

56. Intuit also had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care to refrain from creating potentially harmful codes that could enter computers belonging to Plaintiffs and the Class without permission.

57. Intuit also had a duty to Plaintiffs and the Class exercise reasonable and ordinary care in taking steps to prevent catastrophic data losses to Plaintiffs and the Class once

Intuit's own code began invading unsuspecting businesses' computers and wiping out valuable data and files belonging to Plaintiffs and the Class.

58.  Intuit breached its duty to Plaintiffs and the Class by (a) creating or allowing the creation of a code which entered of entering the computers of Plaintiffs and the Class and causing severe damage to the computer files of Plaintiffs and the Class, (b) allowing such code to enter the computers of Plaintiffs and the Class without permission, causing damage, (c) failing to warn users not to open QuickBooks, even after it was fully aware of the impact of its code, which would have mitigated the damage of Plaintiffs and the Class, and (d) failing to shut down its server to prevent further destruction, even after it was fully aware of the impact of its code on the computers of Plaintiffs and the Class.

59.  As a direct and proximate cause of Defendant's negligence, Plaintiffs and the Class have suffered actual damages in that they lost valuable property, including business data and files, incurred costs in attempts to recover such data, and lost substantial amounts of time in attempting to reach Intuit to obtain help in recovering their data, and in attempting to recover their own data.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(Strict Products Liability)**

60.  Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

61.  At all relevant times, Intuit was engaged in the business of creating computer code and manufacturing and sale of software. Intuit created and sold software that included as part of the product periodic product updates that were delivered through Intuit computer code sent to customers over the Internet.

62.  Intuit's software and computer codes were expected to and did reach Plaintiffs and the Class without substantial change to the condition in which they were created and sold or disseminated by Intuit.

63. Intuit's software and computer codes were and are defective and unfit for their intended use in that they interacted with one another in a manner that caused damage to Plaintiffs and the Class. The interaction of Intuit's software with Intuit's codes has caused and will continue to cause property damage to Plaintiffs and the Class.

64. Intuit's failure to perform in accordance with the reasonable expectations of Plaintiffs, the Class, and ordinary consumers, and the benefits of the design of Intuit's software and computer codes do not outweigh the risks of their failure.

65. By reason of the foregoing, Intuit is strictly liable to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**Trespass to Chattels**

66. Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

67. Intuit intentionally created computer codes that had the ability and purpose of entering users' computers.

68. In December 2007, one of Intuit's codes entered the computers of Plaintiffs and the Class and without authorization interfered with plaintiffs' possessory interest in their computer systems, and in their data.

69. Intuit's unauthorized access to the computers of Plaintiffs and the Class legally resulted in damage to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Breach of Implied Warranty**

70. Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

71. At all times relevant herein, Intuit was in privity with Plaintiffs and the Class, and impliedly warranted in a uniform manner to Plaintiffs and the Class that the codes,

notifications and updates it sent to Plaintiffs and the Class were of merchantable quality, and were safe and fit for their intended use as methods of keeping up to date with the best software Intuit had available to Plaintiffs and the Class. Intuit also impliedly warranted that its software, when opened, would not interact with a code from Intuit itself in a manner that would destroy Plaintiffs' computer files.

72. Contrary to Intuit's implied warranties, the QuickBooks Pro 2006 software and the code disseminated by Intuit in December 2007 were not of merchantable quality, as they were not fit for the ordinary purposes for which such goods are used, and/or do not conform to the promises or affirmations of fact made by Intuit. Intuit's QuickBooks Pro 2006 software and Intuit's computer code that was disseminated in December 2007 have inherent defects which are substantially certain to result in malfunction during the useful life of the products.

73. As a direct and legal result of the breach of implied warranties by Intuit, Plaintiffs and the members of the Class sustained economic damages in an amount to be determined according to proof at time of trial.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**FIFTH CLAIM FOR RELIEF**
**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*,**

74. Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

75. Intuit engaged in unfair business practices by (a) marketing its QuickBooks products with the promise to users of updates to improve the program but instead created or allowing the creation of a code which entered the computers of Plaintiffs and the Class and causing severe damage to the computer files of Plaintiffs and the Class, (b) allowing such code to enter the computers of Plaintiffs and the Class without permission, causing damage, (c) failing to warn users not to open QuickBooks, even after it was fully aware of the impact of its code, which would have mitigated the damage of Plaintiffs and the Class, and (d) failing to shut down its server to prevent further destruction, even after it was fully aware of the impact of its code on the computers of Plaintiffs and the Class.

76. Plaintiffs and the Class lost money or property as a result of Intuit's unfair business practices.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for relief as follows:

1. Certification of the Class and any subclasses the Court deems appropriate;

2. Compensatory damages in an amount sufficient to compensate all Class members for lost data, and time and money spent attempting to recover lost data, according to proof;

3. An injunction requiring Intuit to take institute policies and practices to (a) prevent codes such as the December 2007 QuickBooks code from being disseminated to the public, and (b) immediately address any further catastrophic data loss events, through warning customers or shutting down its server.;

4. Prejudgment interest at the maximum legal rate;

5. Punitive damages according to proof;

6. Reasonable costs and attorney fees, as allowed by law, and/or from the common fund and for all costs associated with administration of the common fund;

7. A declaration of financial responsibility on the part of Intuit for the costs of class notification regarding the defective QuickBooks software and the December 2007 destruction code, and for the costs of repair and replacement of all affected files; and

8. Such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.


Respectfully submitted,

Dated: December 21, 2007

By: ______________________
Michael W. Sobol

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com

By: ______________________
James A. Quadra

MOSCONE, EMBLIDGE & QUADRA, LLP
Mills Tower
220 Montgomery Street, Ste. 2100
San Francisco, California 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006
Email: quadra@meqlaw.com

Jonathan D. Selbin (SBN 170222)
Rebecca Bedwell-Coll (SBN 184468)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
Email: jselbin@lchb.com
Email: rbcoll@lchb.com

*Attorneys for Plaintiffs and the proposed Plaintiff Class*