1   James A. Quadra (SBN 131084)
    Rebecca Bedwell-Coll (SBN 184468)
2   Robert D. Sanford (SBN 129790)
    MOSCONE, EMBLIDGE & QUADRA, LLP
3   Mills Tower
    220 Montgomery Street, Ste. 2100
4   San Francisco, California 94104
    Telephone:  (415) 362-3599
5   Facsimile:  (415) 362-2006
    Email:  quadra@meqlaw.com
6   Email:  bedwell-coll@meqlaw.com
    Email:  sanford@meqlaw.com
7

8   Michael W. Sobol (SBN 194857)
    Kristen E. Law, (SBN 222249)
9   LIEFF, CABRASER, HEIMANN &
        BERNSTEIN, LLP
10  275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
11  Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
12  Email:  msobol@lchb.com
    Email:  klaw@lchb.com
13

    Jonathan D. Selbin (SBN 170222)
14  LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
15  780 Third Avenue, 48th Floor
    New York, NY  10017-2024
16  Telephone:    (212) 355-9500
    Facsimile:    (212) 355-9592
17  Email:  jselbin@lchb.com

18  *Attorneys for Plaintiffs and proposed Class*

19              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
20           SAN FRANCISCO / OAKLAND DIVISION

21  CREATE-A-CARD, INC.; AGSJ, INC.;        Case No.  3:07-CV-06452-WHA
    and PHILANTHROPIC FOCUS, LLC, on
22  behalf of themselves and all those similarly
    situated,                               **CLASS ACTION**
23
                      Plaintiffs,           **FIRST AMENDED COMPLAINT**
24
                                            **DEMAND FOR JURY TRIAL**
25          v.

26  INTUIT, Inc.,

27                    Defendant.

28

1    Plaintiffs Create-A-Card, Inc. AGSJ, Inc. and Philanthropic Focus, LLC

2    ("Plaintiffs") allege, on behalf of themselves and all those similarly situated, as follows:

3                                    **PARTIES**

4          1.    Plaintiff Create-A-Card, Inc. is a corporation with its primary place of

5    business located in the State of New York.

6          2.    Plaintiff AGSJ, Inc. is a corporation with its primary place of business

7    located in the State of California.

8          3.    Plaintiff Philanthropic Focus, LLC is a limited liability company offering

9    advice and consultation to foundations and charities, with its primary place of business located in

10   the State of Florida.

11         4.    Defendant Intuit, Inc. ("Intuit") is a Delaware corporation doing business

12   in the State of California and nationwide, with its primary place of business and headquarters at

13   2700 Coast Avenue, Mountain View, California 94043.  The events and practices described

14   herein were performed in and emanated from Intuit's offices in California.

15                              **FACTUAL ALLEGATIONS**

16         5.    Intuit markets and sells accounting software called QuickBooks Pro.

17   QuickBooks Pro is marketed to and designed to be used by small and mid-sized businesses.

18   Plaintiffs and the proposed Class owned and used QuickBooks Pro 2006 for Macintosh or

19   QuickBooks New User Edition 2006 for Macintosh (collectively, "2006 QuickBooks for

20   Macintosh").

21         6.    The 2006 QuickBooks for Macintosh software has a built in automatic

22   update mechanism that is activated when the program is launched.  When users start using the

23   program, 2006 QuickBooks for Macintosh automatically contacts Intuit's server via the Internet

24   to download any available updates to the program.  The 2006 QuickBooks for Macintosh

25   software contains a defect which is triggered when it searches for updates to download but does

26   not receive the anticipated response.  When this happens, the defective program overwrites and

27   eliminates data on the user's desktop.

28

7.  On Saturday, December 15, 2007, as a result of Intuit's server's failure to send a proper program update, beginning at about 10:30 p.m. PST, the defect in the 2006 QuickBooks for Macintosh's automatic-update mechanism caused the deletion of all files on the computer desktops of users who launched the program.  Although many QuickBooks users immediately advised Intuit of the file deletion, Intuit did not take action to stop the file deletion until approximately 10:00 a.m. PST on Monday, December 17, 2007.  Intuit subsequently sent out a "patch" to users that disabled the automatic update mechanism in the 2006 QuickBooks for Macintosh program, thus eliminating a valuable feature of the program.

8.  In January 2008, the defect in the 2006 QuickBooks for Macintosh software caused another incident in which at least one user lost computer files and data.  On that occasion, the data loss was triggered by a user opening QuickBooks via an Internet "wi-fi hotspot."  The program automatically searched the Internet for an update to download from Intuit's server.  However, due to the restricted access to the Internet at the hotspot, the user did not receive a proper update response.  Instead, the response triggered the defect and data was destroyed.

9.  The impact of the QuickBooks software defect on users was uniform—in December 2007.  Upon opening QuickBooks, users received a message that an update was available, and were asked whether the user wished to download the update.  Regardless of whether the user clicked "yes" or "no," the damage had already been done—the defective automatic update mechanism had already reached out to the Intuit server, received an incorrect response and deleted all files on the user's desktop.

10.  The resulting loss of data was catastrophic to members of the Class.  Users not only lost months' worth of accounting and billing records, but also original and critical work product relating to their businesses.  Faced with the end of the accounting year, Christmas orders, vacation schedules of employees, and looming tax deadlines, Macintosh QuickBooks users panicked.

11.  On Sunday, December 16, 2007 at 1:40 a.m., users began leaving urgent messages on Intuit's message board in droves, pleading for help recovering their lost data, and

1    trying to do what Intuit was failing to do via email-- warn people not to open QuickBooks.

2    Samples of these messages illustrate the impact on businesses around the country:

3                  a.    "I opened QuickBooks and it said there's an update. It started trying

4                       to download it automatically but then said it couldn't…. Then I

5                       noticed that all the icons on my desktop had disappeared. I checked,

6                       and all my files in my Desktop (there were quite a few) had

7                       disappeared."

8                  b.    "This is beyond ridiculous. There is NO way that a piece of

9                       software like this SHOULD DELETE GIGS WORTH OF DATA

10                      OFF MY HARD DRIVE."

11                 c.    "I JUST HAD THE SAME THING HAPPEN TO ME. I JUST

12                      FLEW CROSS-COUNTRY TO PHOTOGRAPH A JOB,

13                      DOWNLOADED THE IMAGES AND WENT TO SEND AN

14                      INVOICE. NOW MY JOB IS GONE."

15                 d.    "Same here. $500 of billable work gone! Not to mention many

16                      other files. Tried every utility I have and can't find files. Gone

17                      forever?"

18                 e.    "Everything has been erased from my desktop and anything on the

19                      desktop at the time was erased from the hard drive…. INTUIT...we

20                      need a fix QUICK.  I want an answer from Intuit."

21                 f.    "I have had the same thing happen. All the discussions so far

22                      indicate this just started happening today, and now the desktop

23                      volume is gone.   Has anyone heard anything yet from

24                      QuickBooks?"

25                 g.    "Mine happened somewhere between 1:30 & 2:00am , about the

26                      same time as OP so it started at least 14 hours ago as of now.  Now

27                      I'm frantically trying to contact all my clients that use 2006 so that

28

1    they don't lose their data. Some people keep Everything on their

2    desktops. This is major! …INTUIT???????"

3    h.    "Please, Please help. I am desperate and need these desktop files

4    back."

5    i.    "I have lost HOURS of this week's work that was not backed up

6    yet. HELP!!!!!!!!!!"

7    j.    "I feel sick...lost my desktop files this evening. All my biz and

8    personal stuff gone in seconds...how can this be? We need answers

9    QB and soon!"

10    k.    "Can't believe this has been happening for at least several hours

11    now and no one has done anything about it!!! This just happened to

12    me too. EXACTLY the same thing. I had NO idea - the whole thing

13    took me completely by surprise and deleted VERY crucial data.

14    Intuit KNEW about this happening for hours and didn't warn

15    anyone?!?!?"

16    l.    "I'm in the same boat. I'm a photographer and lost work that I have

17    been editing for months. I have the files backed up, but not the

18    edited portion, so I'd have to go back and do everything all over

19    again. I lost a few jobs and a ton of personal work that wasn't

20    backed up, I'm still trying to figure out what was on my desktop.

21    12.    Users experiencing data loss contacted Intuit on December 16, 2007 and

22    advised Intuit of the data destruction disaster.  Intuit was thus aware of these dire events on

23    December 16, 2007, but failed to warn users via email not to open QuickBooks, and failed to shut

24    down its server to prevent further catastrophic losses, despite pleas from users to do that very

25    thing, such as this posting on Intuit's message board:

26

27

28

---

**INTUIT -- CLOSE YOUR SERVER IMMEDIATELY**

Dec 17, 2007 04:27 am

It just occurred to me that in an hour and a half from now the East Coast wakes up for business. Perhaps thousands of people will run Quickbooks Pro 2006 and 2007 for the Macintosh as a part of their daily business routine. We have already seen that hundreds of people have had their desktop folder destroyed by this Quickbooks automatic update bug. That was on a SUNDAY. The amount of damage that will happen in just a short time on MONDAY may be inestimable.

The only immediate solution to this is that whatever server is sending the update notice to Quickbooks MUST BE IMMEDIATELY SHUT DOWN!

Intuit, I suggest that to so anything less than this would be not just inappropriate but irresponsible. Thank you.

13.    Intuit was aware of this post and ignored it.  As predicted, on Monday, December 17, 2007, Macintosh QuickBooks users started their computers, opened QuickBooks, and immediately suffered the loss of all files stored on the desktops of their computers.  Intuit still did not shut down its server and still did not take steps to notify its users of the problem. Contacting Intuit about the problem resulted in a recorded announcement, "We can't find a support plan associated with your account at this time. If you need immediate technical assistance with QuickBooks, a support professional can help you for a fee.  Just stay on the line for the next available representative."

14.    On Tuesday, December 18, 2007, in an Intuit Message Board exchange with an Intuit employee, Jennifer Fisher, the founding editor of MacUser Magazine pointed out the obvious:

1) There is nothing on the main www.intuit.com page about this and at this point in time that is not excusable.

2) Intuit has not been at all proactive in getting the word out to the media. Instead various of the media have ferreted out the story but what is clearly lacking is a press release from Intuit fully explaining the problem. Is there a press release coming soon?

3) Along those lines why has Intuit not emailed all registered users with notice of this? There are probably thousands of people who have been hit by this but are not here.

4) Intuit keeps implying they are going to help with data recovery.

When may we expect an announcement of what you plan? I suggest you contact a Data Recovery software vendor and buy a few tens of thousands of licenses for downloading freely to affected people along with a pdf instruction file and a well-staffed and free tech support number

…

7) Why was this allowed to go past Sunday night? At 7am Monday morning EDT I did leave a thread on this Forum entitled "INTUIT -- CLOSE YOUR SERVER IMMEDIATELY." I said then that in a couple hours businesses would open on the East Coast and run QB. I pointed out that hundreds seem to have been hit on a Sunday so why not stop it from happening on a MONDAY? I was amazed and still am that the faulty server was allowed to continue to run on the web. All they had to do was either pull the plug (literally) or shut down a few of the ports. That might have saved thousands of people.

8) Is Intuit going to re-examine their use of offshore support which, in this case for sure, has proven to be absolutely useless and even offensive to most users? Would not a USA-based support team have worked better? Or does Intuit feel that Customer Service is a revenue stream before it is an obligation?

9) What exactly does Intuit feel is their culpability and their obligation (if any) in this matter?

15.     Intuit did not respond to the foregoing post as of the date of the filing of the Complaint.

16.     On Wednesday, December 19, 2007, Intuit sent email messages to persons who had contacted Intuit regarding this issue. Intuit's email message suggested making an appointment at an Apple Store through its Genius Bar program, and offered to reimburse users for a $99 data recovery software program. Intuit made no offer to reimburse any user for the cost of spending thousands of dollars in technical support fees attempting to recover data on Sunday, Monday, Tuesday, or Wednesday. It made no offer to compensate any users for the time they spent attempting to recover their own data, or attempting to reach Intuit to obtain assistance. It made no offer to compensate users for charges incurred at the Apple Store through the Genius Bar program. Finally, it made no offer to compensate users for data and work product that could not be recovered. As a result Plaintiffs and the Class have been left holding thousands of dollars in attempted data recovery costs, as well as the cost of replacement of the data that could not be recovered.

**Plaintiff Create-A-Card, Inc.**

17.     Plaintiff Create-A-Card, Inc. is a corporation providing professional marketing tools for the transportation industry.

18.     On Monday, December 17, 2007, at approximately 8:00 a.m. EST, Arthur Messina, the President of Plaintiff Create-A-Card, Inc. started his company computer.  As is his custom, Mr. Messina first checked his email messages.

19.     At approximately 8:50 a.m., after reviewing his email messages, Mr. Messina opened his QuickBooks Pro 2006 for Macintosh program.  He received a message that updates were available for QuickBooks.  Mr. Messina clicked "yes" to download the update, and received a message that he had insufficient space to download the update.  Mr. Messina then realized the entire contents of his desktop had been deleted.  Among other desktop folders and files, Create-A-Card lost all of its invoicing, sales reports, customer files, day to day working files, Create-A-Card's customer catalog, samples to send to clients, pre-designed forms used on a daily basis, and photographs.

20.     Mr. Messina immediately contacted his Macintosh technical support person, who came to Create-A-Card and spent hours unsuccessfully trying to recover Create-A-Card's data.  Mr. Messina himself spent at least seven hours of his own time attempting to understand why his data had been lost and how it could be recovered.

21.     Mr. Messina had a copy of his QuickBooks data through October 10, 2007 saved on a different computer, but had no copy of data after that date.  Thus, Mr. Messina had to manually replace all of his data from what was his company's busiest two months in over 21 years, at great expense.

22.     If Intuit had shut down its server or sent an email to its users on Sunday, Mr. Messina's damage would have been avoided.

23.     On December 19, 2007, Mr. Messina called Intuit to inquire about reimbursement for his costs associated with attempting to recover his data.  After being transferred, placed on hold, and attempting to receive service for over an hour, Mr. Messina

1    received a "case number" from an overseas representative, who stated Mr. Messina would receive

2    a call back "within two days."

3         24.    As of the time the original complaint was filed, Intuit had not called Mr.

4    Messina back.

5    **Plaintiff AGSJ, Inc.**

6         25.    Plaintiff AGSJ, Inc. is a corporation that owns and operates a bar located in

7    Burlingame, California and known as the Vinyl Room.

8         26.    On Sunday, December 16, 2007, at approximately 3:45 p.m. PST, Juan

9    Loredo, the President of Plaintiff AGSJ, Inc., opened his QuickBooks Pro 2006 for Macintosh

10   program. Intuit had not warned Mr. Loredo not to open QuickBooks, nor had it shut down its

11   server.

12        27.    Upon opening QuickBooks, Mr. Loredo received a message that updates

13   were available for QuickBooks, and immediately received various error messages. Mr. Loredo

14   then realized the entire contents of his desktop had been deleted. Among other desktop folders

15   and files, AGSJ, Inc. lost all of its invoicing, sales reports, day to day working files, pictures, and

16   many files containing financial information. The files lost represent hundreds of hours of work.

17        28.    Mr. Loredo immediately contacted a Macintosh technical support person,

18   who came to his office, located at AGSJ's Vinyl Room, and tried to locate the problem. The

19   support person spent hours unsuccessfully trying to recover AGSJ's data. The technical support

20   person found a Macintosh/Apple forum that indicated that the deletion of AGSJ's desktop files

21   was caused by a problem created by Intuit in connection with its QuickBooks Pro program.

22        29.    On Monday, December 17, 2007, at approximately 10:00 a.m. PST, Mr.

23   Loredo called QuickBooks to ask for assistance. He was placed on a "call back" list as the support

24   manager said that it had been "escalated to a support team" and that he could not help Mr.

25   Loredo. An Intuit representative called Mr. Loredo later that afternoon to simply state that Intuit

26   was concerned about the problem and someone would be calling Mr. Loredo back within 24

27   hours. However, Mr. Loredo did not receive a call.

28

---

30.     On Wednesday, December 19, 2007, Intuit emailed Mr. Loredo suggesting he attempt to recover the lost data using data recovery software and to email Intuit if that did not work.  The Macintosh technical support person that Mr. Loredo had worked with had already attempted to do this to no avail.  Mr. Loredo emailed Intuit providing this information.  Intuit did not respond.

31.     As of the time of the filing of the original complaint, Intuit had not called Mr. Loredo back as promised.

**Plaintiff Philanthropic Focus, LLC**

32.     Plaintiff Philanthropic Focus, LLC is a limited liability company offering advice and consultation to foundations and charities, with its primary place of business located in the State of Florida.

33.     On Sunday, December 16, at 3:00 p.m., Philip Flynn, the founder of Philanthropic Focus, LLC, opened his QuickBooks program in order to record deposits, print checks, and balance accounts for Philanthropic Focus.  Mr. Flynn had not been warned about the catastrophic result of opening QuickBooks.

34.     Upon opening QuickBooks, Mr. Flynn received a message that an update was available.  Mr. Flynn did not click on "yes" or "no," but the QuickBooks's automatic update mechanism reached out for the update anyway and when it did not receive the correct response improperly accessed Mr. Flynn's desktop files.  In seconds the entire contents of Mr. Flynn's desktop had been deleted.  Among other desktop folders and files, Philanthropic Focus had lost client contracts, research, PowerPoint presentations, excel files, video presentations, photographs, receipts of banking transactions, and contact information.  Mr. Flynn personally lost videotapes of his children, photographs, birthdates, and personal tax information.

35.     Mr. Flynn immediately attempted to reach Intuit by telephone and was unable to do so.

36.     On Monday, December 17, 2007, Mr. Flynn attempted to but was unable to reach Intuit by telephone.  He sent an email message to Intuit's customer support.

37.     On Tuesday, December 18, 2007, Intuit called Mr. Flynn and took information about his computer.  Mr. Flynn asked if Intuit would reimburse him for the costs of the charges he incurred in attempting to recover his files.  The Intuit representative responded that she had "no information about that."  Mr. Flynn gave Intuit his technical support person's telephone number to obtain full information about his computer, and the Intuit representative agreed to (but did not) call the technical support person.

38.     On Wednesday December 19, 2007, Mr. Flynn received a mass email suggesting Mr. Flynn go to the Genius Bar at an Apple Store, and purchase data recovery software, for which Intuit would reimburse Mr. Flynn.  Mr. Flynn's Apple technical support person, who had been servicing his Apple computers for years, had already purchased data recovery software and had attempted for many hours to recover the company's data without success.  Therefore, it would have simply caused additional useless time and expense for Mr. Flynn to send his own Apple expert to the Apple store to continue data recovery attempts.

39.     Nevertheless, Mr. Flynn called the Genius Bar at the Apple Store and inquired whether Intuit had made arrangements to pay for the labor required to restore his files.  The Genius Bar representative advised Mr. Flynn that Mr. Flynn would have to pay for Genius's labor costs, at $125 per hour.  Knowing that his own Apple technician was more knowledgeable and experienced than the technicians available at the Apple store, Mr. Flynn opted not to spend several hundred dollars more attempting to recover data that could not be recovered.

40.     Mr. Flynn continued to wait for Intuit to contact his technical support person.  As of the time of the filing of the original complaint, Intuit had not contacted the technical support person.

## CLASS ALLEGATIONS

41.     The Plaintiff class is defined as follows:

All United States users of QuickBooks Pro 2006 for Macintosh or QuickBooks New User Edition 2006 for Macintosh whose data or files became inaccessible or were damaged, corrupted, or lost, whether temporarily or permanently, as a result of a malfunction of the software's auto-update mechanism.

Collectively, all these persons will be referred to as "Plaintiffs" or "Plaintiff Class.  Excluded

from the Plaintiff Class are:

  A. Defendant and any entities in which Defendant has a controlling interest;

  B. Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Defendant;

  C. The Judge to whom this case is assigned and any member of the Judge's immediate family;

  D. Claims for personal injury, wrongful death and/or emotional distress; and,

  E. All persons or entities that properly execute and timely file a request for exclusion from the Class.

  42. Plaintiff reserves the right to modify the Class definitions after discovery and at any time up to and including trial.

  43. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1-4) and (b)(1).

  44. The Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable.  The exact number or identification of Class members is presently unknown to Plaintiffs, but it is believed that Class members number at least in the thousands.  The identity of Class members is ascertainable.  Class members may be informed of the pendency of this Class action by email, posting on the internet, and publication.

  45. Common questions of fact and law exist as to all members of the Class, which predominate over questions affecting only individual members of the Class.  These include, but are not limited to, the following:

  A. Whether the 2006 QuickBooks for Macintosh automatic update mechanism is defective and caused data loss to its users.

1        B.     Whether Intuit took proper steps to avoid catastrophic data losses

2              for its customers.

3        C.     Whether Intuit trespassed by creating and allowing improper

4              messages from its server in conjunction with its defective

5              QuickBooks software to destroy data and files stored on users'

6              desktops.

7        D.     Whether Intuit breached warranties of merchantability and fitness

8              for a particular purpose.

9        E.     Whether Intuit's failure to warn its users to avoid opening

10           QuickBooks or Intuit's failure to shut down its server before

11           catastrophic losses constituted an unfair business practice.

12        F.     Whether Intuit's creation of a software program that destroyed data

13           on users' desktops, its allowing defective software to intrude into

14           users' computers without the consent of the users, its failure to

15           warn its users to avoid opening QuickBooks or its failure to shut

16           down its server before catastrophic losses, constituted negligence

17        G.     Whether Intuit is liable under a theory of products liability for its

18           creation of software that destroyed data on users' desktops, its

19           allowing such defective software to intrude into users' computers

20           without the consent of the users, its failure to warn its users to avoid

21           opening QuickBooks or its failure to shut down its server before

22           catastrophic losses.

23     46.     Plaintiffs' claims are typical of claims of the members of the Plaintiff

24 Class, all of whom suffered damages as a result of Intuit's reckless or intentional actions.

25 Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for

26 themselves and for all other class members

27     47.     Plaintiffs are adequate representatives of the Plaintiff Class because

28 Plaintiffs are members of the Plaintiff Class and Plaintiffs' interests do not conflict with the

1  interests of the members of the Class Plaintiffs seek to represent.  Plaintiffs are represented by

2  experienced and able counsel that have litigated numerous class actions, and intend to prosecute

3  this action vigorously for the benefit of the entire Plaintiff Class.  Plaintiffs and Plaintiffs' counsel

4  can fairly and adequately protect the interests of the members of the Plaintiff Class.

5         48.     The class action is the best available method for the efficient adjudication

6  of this litigation because individual litigation of the Plaintiff Class claims would be impracticable

7  and individual litigation would be unduly burdensome to the courts.  Further, individual litigation

8  has the potential to result in inconsistent or contradictory judgments.  A class action in this case

9  presents fewer management problems and provides the benefits of single adjudication, economies

10  of scale, and comprehensive supervision by a single court.

11  **JURISDICTION AND VENUE**

12         49.     This Court has subject matter jurisdiction over this action.  This Court has

13  original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d),

14  because this is a class action in which: (1) there are 100 or more members in the Named

15  Plaintiffs' proposed class; (2) at least some members of the proposed class have a different

16  citizenship from Intuit; and (3) the claims of the proposed class members exceed $5,000,000 in

17  the aggregate.

18         50.     This Court is empowered to issue a declaratory judgment pursuant to 28

19  U.S.C. §§ 2201 and 2202.

20         51.     The Northern District of California has personal jurisdiction over Intuit

21  because Intuit has qualified with the California Secretary of State to do business and is doing

22  business in California, and in this district, and because many of the acts complained of occurred

23  in this State and this district and gave rise to claims alleged.

24         52.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

25  Intuit resides in this district and because a substantial part of the events giving rise to the claims

26  occurred in this district.

27         53.     Pursuant to Northern District of California's Local Rules 3-2 and 3-5,

28  Plaintiffs request assignment to the San Francisco Division of the Northern District of California.

FIRST AMENDED CLASS ACTION COMPLAINT      - 13 -     CASE NO. 3:07-CV-06452-WHA

1 | Defendant Intuit maintains its corporate headquarters in Mountain View, California, and a

2 | substantial part of the events which give rise to the claims occurred in Santa Clara County.

3 | **<u>CHOICE OF LAW</u>**

4 | 54.     California law applies to all of the claims and issues asserted herein.

5 | California's interest in this action, which seeks to protect the rights and interests of customers of

6 | Intuit, a corporation which has its primary place of business in California, is greater than that of

7 | any other state.  Intuit's conduct in creating defective software, failing to warn users about the

8 | defect, failing to take steps to avoid further damage, and failing to adequately assist in data

9 | recovery emanated from Intuit's primary place of business in California.  In addition, Plaintiff

10 | AGSJ, Inc. has its primarily place of business in the State of California, and was injured in the

11 | State of California, as were many members of the Class.

12 | **CLAIMS FOR RELIEF**

13

14 | **FIRST CLAIM FOR RELIEF**<br>**<u>(Negligence)</u>**

15 | 55.     Plaintiffs incorporate each and every preceding paragraph stated above,

16 | inclusive, as though the same were fully set forth hereafter.

17 | 56.     Intuit had a duty to Plaintiffs and the Class to exercise reasonable and

18 | ordinary care in the formulation, testing and design of its computer software.

19 | 57.     Intuit also had a duty to Plaintiffs and the Class to exercise reasonable and

20 | ordinary care to refrain from creating potentially harmful software and codes that could, without

21 | permission, access files on computers belonging to Plaintiffs and the Class.

22 | 58.     Intuit also had a duty to Plaintiffs and the Class exercise reasonable and

23 | ordinary care in taking steps to prevent catastrophic data losses to Plaintiffs and the Class once

24 | Intuit's own software began invading the desktop files of unsuspecting businesses' computers and

25 | wiping out valuable data and files belonging to Plaintiffs and the Class.

26 | 59.     Intuit breached its duty to Plaintiffs and the Class by (a) creating or

27 | allowing the creation of defective software that accessed Plaintiffs and the Class' computer

28 | desktop and caused severe damage to the computer desktop files of Plaintiffs and the Class, (b)

1    allowing such defective software to access computer files of Plaintiffs and the Class without

2    permission, causing damage, (c) disseminating such defective software, (d) failing to warn users

3    not to open QuickBooks, even after it was fully aware of the impact of its defective software,

4    which would have mitigated the damage of Plaintiffs and the Class, and (e) failing to shut down

5    its server to prevent further destruction, even after it was fully aware of the impact of the

6    incorrect signal sent by the server in response to QuickBooks' attempt to access automatic

7    updates.

8           60.    As a direct and proximate cause of Defendant's negligence, Plaintiffs and

9    the Class have suffered actual damages in that they lost valuable property, including business data

10   and files, incurred costs in attempts to recover such data, and lost substantial amounts of time in

11   attempting to reach Intuit to obtain help in recovering their data, and in attempting to recover their

12   own data.

13          WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

14                    **SECOND CLAIM FOR RELIEF**
                      **(Strict Products Liability)**
15
             61.    Plaintiffs incorporate each and every preceding paragraph stated above,
16
     inclusive, as though the same were fully set forth hereafter.
17
             62.    At all relevant times, Intuit was engaged in the business of creating
18
     computer code and manufacturing and sale of software.  Intuit created and sold software that
19
     included as part of the product periodic product updates that were delivered through Intuit
20
     computer code sent to customers over the Internet.
21
             63.    Intuit's software and computer codes were expected to and did reach
22
     Plaintiffs and the Class without substantial change to the condition in which they were created
23
     and sold or disseminated by Intuit.
24
             64.    Intuit's software and computer codes were and are defective and unfit for
25
     their intended use in that they interacted with one another in a manner that caused damage to
26
     Plaintiffs and the Class.  The interaction of Intuit's defective software with Intuit's product update
27
     codes has caused and will continue to cause property damage to Plaintiffs and the Class.
28

---

65.     Intuit's failure to perform in accordance with the reasonable expectations of Plaintiffs, the Class, and ordinary consumers, and the benefits of the design of Intuit's software and computer codes do not outweigh the risks of their failure.

66.     By reason of the foregoing, Intuit is strictly liable to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**THIRD CLAIM FOR RELIEF**
**Trespass to Chattels**

67.     Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

68.     Intuit intentionally created computer codes that had the ability and purpose of entering users' computers.

69.     Intuit's defective QuickBooks software allowed a faulty signal to enter Plaintiffs and the Class' computers without permission, and further accessed Plaintiffs and the Class' desktop files, and without authorization interfered with plaintiffs' possessory interest in their computer systems, and in their data.

70.     Intuit's unauthorized access to the computers of Plaintiffs and the Class legally resulted in damage to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract**

71.     Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

72.     Plaintiffs are informed and believe, and on that basis allege, that Plaintiffs purchased the QuickBooks software, including any "updates or maintenance releases," from Intuit pursuant to a written Software License Agreement, a copy of which is attached as Exhibit A and incorporated herein by reference ("Agreement"), which provides that California law governs.

73.     Plaintiffs performed all of their obligations under the Agreement.

74.     Intuit breached the Agreement by providing defective software to Plaintiffs that deleted files on Plaintiffs' computer desktops as alleged above.  Intuit's breach was so total and fundamental, that any provisions limiting remedies or disclaiming warranties in the Agreement have failed of their essential purpose, so that the provisions are ineffective pursuant to California Commercial Code §2719 or are otherwise unconscionable.

75.     As a result of Intuit's breach, Plaintiffs have been damaged in an amount to be proven at trial.  The extent of Plaintiffs' damages is so great, and not part of the bargained-for allocation of risk under the Agreement, so that Plaintiffs are entitled to all remedies available under the Commercial Code, including recovery of all consequential damages.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## FIFTH CLAIM FOR RELIEF
### Breach of Implied Warranty

76.     Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

77.     At all times relevant herein, Intuit was in privity with Plaintiffs and the Class, and impliedly warranted in a uniform manner to Plaintiffs and the Class that the 2006 QuickBooks for Macintosh programs it sent to Plaintiffs and the Class were of merchantable quality, and were safe and fit for their intended use as accounting software, and for their intended use of keeping up to date with the best software Intuit had available to Plaintiffs and the Class. Intuit also impliedly warranted that its software, when opened, would not operate to access, alter, or destroy Plaintiffs' computer files.  Any disclaimer of the implied warranty by Intuit is unconscionable and unenforceable.

78.     Contrary to Intuit's implied warranties, the 2006 QuickBooks for Macintosh programs were not of merchantable quality, as they were not fit for the ordinary purposes for which such goods are used, and/or do not conform to the promises or affirmations of fact made by Intuit.  Intuit's 2006 QuickBooks for Macintosh software has inherent defects which are substantially certain to result in malfunction during the useful life of the products.

79.     As a direct and legal result of the breach of implied warranties by Intuit, Plaintiffs and the members of the Class sustained economic damages in an amount to be determined according to proof at time of trial.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## SIXTH CLAIM FOR RELIEF
### (California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*,

80.     Plaintiffs incorporate each and every preceding paragraph stated above, inclusive, as though the same were fully set forth hereafter.

81.     Intuit engaged in unfair business practices by (a) marketing its QuickBooks products with the promise to users of updates to improve the program but instead created and sold defective software that caused severe damage to the computer files of Plaintiffs and the Class, (b) allowing its QuickBooks software to access files stored on users' desktop and without permission destroy the data contained in these files, (c) failing to warn users not to open QuickBooks, even after it was fully aware of the impact of its defective software, which would have mitigated the damage of Plaintiffs and the Class, and (d) failing to shut down its server to prevent further destruction, even after it was fully aware of the impact of the incorrect signal by the server in response to QuickBooks' attempt to access automatic updates.

82.     Plaintiffs and the Class lost money or property as a result of Intuit's unfair business practices.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for relief as follows:

1.     Certification of the Class and any subclasses the Court deems appropriate;

2.     Compensatory damages in an amount sufficient to compensate all Class members for lost data, and time and money spent attempting to recover lost data, according to proof;

3.     An injunction requiring Intuit to institute policies and practices to (a)

1  prevent the creation, marketing and sale of defective software such the 2006 versions of

2  QuickBooks for Macintosh; (b) prevent its server from sending incorrect information to users'

3  computers instead of proper automatic software updates, and (b) immediately address any further

4  catastrophic data loss events, through warning customers or shutting down its server.;

5          4.     Prejudgment interest at the maximum legal rate;

6          5.     Punitive damages according to proof;

7          6.     Reasonable costs and attorney fees, as allowed by law, and/or from the

8  common fund and for all costs associated with administration of the common fund;

9          7.     A declaration of financial responsibility on the part of Intuit for the costs of

10  class notification regarding the defective QuickBooks software, and for the costs of repair and

11  replacement of all affected files; and

12          8.     Such other and further relief as the Court deems just and appropriate.

13  **<u>DEMAND FOR JURY TRIAL</u>**

14          Plaintiffs hereby demand a jury trial on all causes of action and claims with respect

15  to which they have a right to jury trial.

16          Respectfully submitted,

17

18  Dated:  March 31, 2008        By:_____/s/_____

                                 James A. Quadra

19

20                             MOSCONE, EMBLIDGE & QUADRA, LLP
                           Mills Tower

21                             220 Montgomery Street, Ste. 2100
                           San Francisco, California 94104

22                             Telephone:  (415) 362-3599
                           Facsimile:  (415) 362-2006

23                             Email:  quadra@meqlaw.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael W. Sobol
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email:  msobol@lchb.com
Email:  jsagafi@lchb.com

Jonathan D. Selbin
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017-2024
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
Email:  jselbin@lchb.com
Email:  rbcoll@lchb.com

*Attorneys for Plaintiffs and the proposed Plaintiff*
*Class*

742821.2