1  James A. Quadra (SBN 131084)
   Rebecca Bedwell-Coll (SBN 184468)
2  MOSCONE, EMBLIDGE & QUADRA, LLP
   220 Montgomery Street, Ste. 2100
3  San Francisco, California 94104
   Telephone:  (415) 362-3599
4  Facsimile:  (415) 362-2006
   Email:  quadra@meqlaw.com
5
   Michael W. Sobol (SBN 194857)
6  Kristen E. Law (SBN 222249)
   LIEFF, CABRASER, HEIMANN &
7      BERNSTEIN, LLP
   275 Battery Street, 30th Floor
8  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
9  Facsimile:  (415) 956-1008
   Email:  msobol@lchb.com
10
   Jonathan D. Selbin (SBN 170222)
11 LIEFF, CABRASER, HEIMANN &
       BERNSTEIN, LLP
12 780 Third Avenue, 48th Floor
   New York, NY  10017-2024
13 Telephone:   (212) 355-9500
   Facsimile:   (212) 355-9592
14 Email:  jselbin@lchb.com
   Email:  rbcoll@lchb.com
15
   *Attorneys for Plaintiffs and Proposed Class*
16

17              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
18            SAN FRANCISCO / OAKLAND DIVISION

19 CREATE-A-CARD, INC.; AGSJ, INC.;          Case No.  CV-07-6452 WHA
   and PHILANTHROPIC FOCUS, LLC, on
20 behalf of themselves and all those similarly
   situated,                                 **CLASS ACTION**
21
                    Plaintiffs,              **PLAINTIFFS' OPPOSITION TO MOTION
22                                           TO DISMISS**
            v.
23
   INTUIT, Inc.,
24
                    Defendant.
25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ISSUES TO BE DECIDED ............................................................................................. 1

FACTS ............................................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.    PLAINTIFFS HAVE PROPERLY PLED THEIR BREACH OF
      CONTRACT AND IMPLIED WARRANTY CLAIMS ................................... 6

      A.    Intuit Breached its Agreement with Plaintiffs By Delivering A
            Defective and Destructive Product ........................................................ 6

      B.    The Disclaimer Of Implied Warranties Is Unenforceable ....................... 8

            1.    The Disclaimer Is Unconscionable ............................................. 9

                  a.    The Agreement Is Procedurally Unconscionable ............ 9

                  b.    The Agreement Is Substantively Unconscionable .......... 10

            2.    Enforcing The Disclaimer Would Undermine The
                  Legislative Intent Of The California Commercial Code ............. 12

      C.    The Limited Remedy Fails Of Its Essential Purpose ............................. 12

      D.    The Prohibition On Consequential Damages Is Unenforceable .............. 14

            1.    The Failure Of The Limited Remedy Removes The Bar On
                  Consequential Damages ........................................................... 14

            2.    The Bar On Consequential Damages Is Unconscionable ............. 16

II.   THE COURT SHOULD DENY INTUIT'S MOTION TO DISMISS
      PLAINTIFFS' TORT CLAIMS .................................................................... 17

      A.    The Economic Loss Doctrine Does Not Bar Plaintiffs' Claims For
            Negligence, Strict Products Liability, Or Trespass To Chattels .............. 17

            1.    Intuit's Argument That Computer Files Cannot Be
                  "Property" Fails ...................................................................... 17

            2.    Intuit's "Component Part" Argument Fails ................................. 18

      B.    Plaintiffs' First Claim For Negligence Survives ................................... 20

      C.    Plaintiffs' Second Cause Of Action For Strict Products Liability
            Survives ............................................................................................. 21

      D.    Plaintiffs' Third Claim For Relief For Trespass To Chattels
            Survives ............................................................................................. 21

III.  THE COURT SHOULD DENY INTUIT'S MOTION TO DISMISS
      PLAINTIFFS' SIXTH CLAIM FOR RELIEF UNDER BUSINESS &
      PROFESSIONS CODE SECTION 17200 ........................................................ 22

CONCLUSION ............................................................................................................... 25

- i -

# TABLE OF AUTHORITIES

**Page**

### Cases

*Adams v. J. I. Case Co.*,
127 Ill.App.2d 388 (1970) ........................................................................ 15

*America Online v. St. Paul Mercury Insurance Co.*,
207 F.Supp.2d 459 (E.D.Va. 2002) .......................................................... 20

*America Online, Inc. v. LCGM, Inc.*,
46 F.Supp.2d 444 (E.D.Va. 1998) ................................................ 18, 21, 22

*Appalachian Ins. Co.* 214 Cal.App.3d 1, 34-35 (1989) ................................ 12

*Armendariz v. Foundation Health PsychCare Svcs. Inc.*,
24 Cal.4th 83 (2000) ................................................................................... 9

*Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*,
116 Cal.App.4th 1375, 11 Cal.Rptr.3d 412 (2004) ..................................... 6

*Austin v. Terhune*,
367 F.3d 1167 (9th Cir. 2004) ...................................................................... 6

*Bardin v. Daimlerchrysler Corp.*,
136 Cal.App.4th 1255 (2006) ................................................................... 23

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ................................................................................. 6

*Cahill v. Liberty Mut. Ins. Co.*,
80 F.3d 336 (9th Cir. 1996) .......................................................................... 6

*Camacho v. Automobile Club of Southern California*,
142 Cal.App.4th 1394 (2006) ................................................................... 23

*Cel-Tech Comms. v. L.A. Cellular Tel. Co.*,
20 Cal.4th 163 (1999) .......................................................................... 23, 24

*Chirico v. Merrill Lynch*,
1999 U.S. Dist. LEXIS 20180 (N.D. Cal 1999) ..................................... 7, 8

*Committee on Children's Television v. General Foods Corp.*,
35 Cal.3d 197 (1983) ................................................................................. 25

*CompuServe, Inc. v. Cyber Promotions, Inc.*,
962 F. Supp. 1015 (S.D. Ohio 1997) ............................................ 18, 21, 22

*Conley v. Gibson*,
355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) ........................................ 6

*County of Santa Clara v. Atlantic Richfield Co.*,
137 Cal.App.4th 292 (2006) ..................................................................... 22

*Croman Corp. v. General Electric Co.*,
2005 WL 2219261 (E.D.Cal. 2005) .......................................................... 19

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*,
479 F.3d 1099 (9th Cir. 2007) ................................................................... 24

*Datalex Ltd. v. PSA, Inc.*,
2003 U.S. Dist. LEXIS 27563 (2003) ....................................................... 16

# TABLE OF AUTHORITIES
### (continued)

Page

*Discover Bank v. Superior Court of Los Angeles*,
  36 Cal.4th 148 (2005) ........................................................................... 9, 11

*Dorman v. International Harvester Co.*,
  46 Cal.App.3d 11 (1975) ..................................................................... 10, 16

*East River Steamship Corp v. Transamerica Delaval Inc.*,
  476 U.S. 858 (1986) .................................................................................. 20

*Ferguson v. Countrywide Credit Indus., Inc.*,
  298 F.3d 778 (9th Cir. 2002) ................................................................... 16

*Fibreboard Corp. v. Hartford Accident & Indemnity Co.*,
  16 Cal.App.4th 492 (1993) ....................................................................... 22

*Gregory v. Albertson's, Inc.*,
  104 Cal.App.4th 845, 128 Cal.Rptr.2d 389 2002) .................................... 23

*Intel Corp. v. Hamidi*,
  30 Cal.4th 1342 (2003) .................................................................. 18, 21, 22

*Inter-Mark v. Intuit*,
  2008 U.S. Dist. LEXIS 18834 (2008) ....................................................... 11

*Jimenez v. Superior Court*,
  29 Cal.4th 473 (2002) .............................................................................. 19

*KB Home v. Superior Court (Consolidated Industries Corp.)*,
  112 Cal.App.4th 1076 (2003) ................................................................... 19

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal.4th 1134 (2003) ............................................................................ 24

*Lozano v. AT & T Wireless Services, Inc.*,
  504 F.3d 718 (9th Cir. 2007) ................................................................... 23

*MAI Systems Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (1993) ................................................................................. 17

*Marr Enters., Inc. v. LewisRefrigeration Co.*,
  556 F.2d 951 (9th Cir. 1977) ................................................................... 21

*Maynard v. Walker*,
  175 Cal.App.2d 145 (1959) ...................................................................... 22

*McKell v. Washington Mut., Inc.*,
  142 Cal.App.4th 1457 (2006) ................................................................... 23

*Nagrampa v. Mailcoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006) ................................................................ 9, 10

*National Rural Telecommunications Cooperative v. DIRECTV*,
  319 F.Supp.2d 1040 (C.D.Cal., 2003) ...................................................... 13

*Nunes Turfgrass v. Vaughan-Jacklin Seed Co., Inc.*,
  200 Cal.App.3d 1518 (1998) .................................................................... 21

*O'Neill v. U.S.A.*,
  50 F.3d 677 (9th Cir. 1995) ..................................................................... 12

*Parks Sch. Of Business v. Symington*,
  51 F.3d 1480 (9th Cir. 1995) ..................................................................... 6

1

# TABLE OF AUTHORITIES
## (continued)

2

Page

3  *Parrish v. NFLPA*,
   534 F.Supp.2d 1081 (N.D. Cal 2007) ............................................................... 7

4  *Perfect 10, Inc. v. Amazon.com, Inc.*,
5    508 F.3d 1146 (9th Cir. 2007) ..................................................................... 17

   *Rejects Skate Magazine, Inc. v. Acutrack, Inc.*,
6    2006 WL 2458759 (N.D.Cal. 2006) ............................................................. 19

7  *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*,
   53 F.3d 195 (8th Cir. 1995) ......................................................................... 20

8  *RRX Industries, Inc. v. Lab-Con, Inc.*,
   772 F.2d 543 (9th Cir. 1985) ....................................................................... 16

9  *S.M. Wilson & Co. v. Smith Intern., Inc.*,
10   587 F.2d 1363 (9th Cir. 1978) ......................................................... 13, 14, 15

   *Sacramento Regional Transit Dist. V. Grumman Flexible*,
11   158 Cal.App.3d 289 (1984) ......................................................................... 20

12 *Salyards ex rel. Salyards v. Metso Minerals Tamper OY*,
   2005 WL 3021959 (E.D.Cal.) ...................................................................... 12

13 *Schnall v. Hertz Corp.*,
   78 Cal.App.4th 1144 (2000) ........................................................................ 25

14 *Scripps Clinic v. Superior Court*,
15   108 Cal.App.4th 917 (2003) ........................................................................ 23

16 *Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.*,
   11 F.Supp.2d 1150 (N.D. Cal. 1998) ........................................................... 20

17 *Seely v. White Motor Co.*,
   63 Cal.2d 9 (1965) ....................................................................................... 20

18 *Shroyer v. New Cingular Wireless Services, Inc.*,
   498 F.3d 976 (9th Cir. 2007) .................................................................... 9, 11

19
20 *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal.App.4th 861 (1999) ..................................................................... 22, 23

21 *Standard Platforms, Ltd. v. Document Imaging Systems Corp.*,
   1995 U.S. Dist. LEXIS 22238 (N.D. Cal. Nov. 15, 1995) ........................... 20

22 *Teknekron Customer Information Solutions, Inc. v. Watkins*,
   1994 WL 11726 (N.D.Cal. 1994) .................................................................. 8

23 *Textainer Equipment Management (U.S.) Ltd. v. TRS Inc.*,
   2007 WL 1795695 (N.D.Cal.) ....................................................................... 6

24 *The Missing Link, Inc. v. eBay, Inc.*,
25   2008 WL 1994886 (N.D.Cal. May 5, 2008) ................................................ 24

26 *Transport Corp. of Am., Inc. v. IBM*,
   30 F.3d 953 (8th Cir. 1994) ......................................................................... 20

27 *United States v. Redwood City*,
   640 F.2d 963 (9th Cir. 1981) ......................................................................... 6

28 *Ward General Ins. Svs. v. The Employers Fire Ins. Co.*,
   114 Cal.App.4th 548 (2003) ........................................................................ 20

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Western Emulsions, Inc. v. BASF Corp.*,
  2006 WL 4599673 (C.D.Cal.) ............................................................ 8, 10

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......................................................... 22, 25

California Commercial § 2301 ............................................................... 23

California Commercial § 2314 ............................................................... 23

California Commercial Code § 2316(2) ..................................................... 12

California Commercial Code § 2719(2) ................................................. 12, 14

California Commercial Code § 2719(3) ..................................................... 16

Civil Code §1770(a)(7) ........................................................................ 24

**Treatises**

1 White & Summers, Uniform Commercial Code,
  § 12-10 ........................................................................................ 13

Jonathan Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of U.C.C.
  Section 2-719(2)*, 65 Calif.L.Rev. 28 (1977) ............................................ 13

## INTRODUCTION

This is a class action against Defendant Intuit for marketing and selling accounting software, QuickBooks for Mac, which suddenly and without warning reached out into users' desktops and deleted all files and data, whether related to QuickBooks or not.   Users lost customer lists, chapters of books they were writing, photo shoots they had been paid to complete, logos they had designed, months of billing and other valuable work product.

Intuit's arguments, more properly addressed in a Motion for Summary Judgment, fail to justify dismissal of this action.  This case is not about a product that merely failed to work.  Instead, the product in this case deleted Plaintiffs' files and data without regard to whether the data was related to the software or not, as if Plaintiffs' central filing rooms had suffered fires or floods.  Moreover, Intuit's "patch" to protect from further data deletion eliminated the program updates Intuit promised in its licensing agreement, further breaching Intuit's licensing agreement.

Intuit's attempt to limit its liability in a one-sided, after purchase licensing agreement fails because Intuit's attempted disclaimers of liability are procedurally and substantively unconscionable, and because Intuit's limited remedy fails of its essential purpose.  Moreover, the "economic loss" rule does not allow Intuit to avoid tort liability for its product's sweeping destruction of "other property" unrelated to the software it sold.  Finally, Intuit's conduct in failing to properly test its product and in deliberately failing to shut down its server or warn users of the file destruction even after it was flooded with complaints constituted an unfair, unlawful and fraudulent business practice.

## ISSUES TO BE DECIDED

1.      Whether Plaintiffs have stated a cause of action as to each claim in their First Amended Complaint.

2.      Whether Plaintiffs should be granted leave to amend their complaint in the event the Court finds it deficient in any manner.

## FACTS

Intuit sells accounting software called QuickBooks Pro to small and mid-sized businesses. (First Amended Complaint ("FAC") ¶5.)  QuickBooks Pro 2006 for Macintosh and QuickBooks

New User Edition 2006 for Macintosh (collectively, "2006 QuickBooks for Macintosh") has a built in "automatic update" mechanism that is activated when the program is launched. (FAC ¶6.) When users start using the program, QuickBooks automatically contacts Intuit's server via the Internet to download any available updates to the program. (*Id.*) The 2006 QuickBooks for Macintosh software contains a defect which is triggered when it searches for updates to download but does not receive the anticipated response. (*Id.*) When this happens, the defective program deletes all files on the user's desktop. (*Id.*)

On Saturday, December 15, 2007, as a result of Intuit's server's failure to send a proper program update, the defect in the 2006 QuickBooks for Macintosh's automatic update mechanism caused the deletion of all files on the computer desktops of users who launched the program. (FAC ¶7.) Although many QuickBooks users immediately advised Intuit of the file deletion, Intuit wrongfully failed to take action to stop the file deletion until approximately 10:00 a.m. PST (1:00 p.m. EST) on Monday, December 17, 2007. (*Id.*) Intuit subsequently sent out a "patch" to users that simply disabled the automatic update mechanism in the 2006 QuickBooks for Macintosh program, thus eliminating a valuable feature of the program and breaching Intuit's software licensing agreement. (*Id.*)

In January 2008, the defect in the 2006 QuickBooks for Macintosh software caused another incident in which at least one user lost computer files and data. On that occasion, the data loss was triggered by a user opening QuickBooks via an Internet "wi-fi hotspot." (FAC ¶8.) The program automatically searched the Internet for an update to download from Intuit's server. (*Id.*) However, due to the restricted access to the Internet at the hotspot, the user did not receive a proper update response. Instead, the response triggered the defect and data was destroyed. (*Id.*)

The impact of the QuickBooks software defect was uniform. (FAC ¶9.) Upon opening QuickBooks, users received a message that an update was available, and were asked whether the user wished to download the update. (*Id.*) Regardless of whether the user clicked "yes" or "no," the damage had already been done—the defective automatic update mechanism had already reached out to the Intuit server, received an incorrect response and deleted all files on the user's desktop. (*Id.*)

1    The resulting loss of data was catastrophic to members of the Class.  (FAC ¶ 10.)  Users

2    not only lost months' worth of accounting and billing records, but also original and critical work

3    product relating to their businesses.  (*Id*.)  Faced with the end of the accounting year, Christmas

4    orders, vacation schedules of employees, and looming tax deadlines, Macintosh QuickBooks

5    users panicked.  (*Id.*)

6    On Sunday, December 16, 2007 at 1:40 a.m., users began leaving urgent messages on

7    Intuit's message board in droves, pleading for help recovering their lost data, and trying to do

8    what Intuit was failing to do via email-- warn people not to open QuickBooks.  (FAC ¶ 11.)

9    Samples of these messages illustrate the impact on businesses around the country:

10   a. "I opened QuickBooks and it said there's an update. It started
     trying to download it automatically but then said it couldn't....

11   Then I noticed that all the icons on my desktop had disappeared. I
     checked, and all my files in my Desktop (there were quite a few)

12   had disappeared."

13   b. "This is beyond ridiculous. There is NO way that a piece of
     software like this SHOULD DELETE GIGS WORTH OF DATA

14   OFF MY HARD DRIVE."

15   c. "I JUST HAD THE SAME THING HAPPEN TO ME. I JUST
     FLEW CROSS-COUNTRY TO PHOTOGRAPH A JOB,

16   DOWNLOADED THE IMAGES AND WENT TO SEND AN
     INVOICE. NOW MY JOB IS GONE."

17

18   d. "Same here. $500 of billable work gone! Not to mention many
     other files. Tried every utility I have and can't find files. Gone

19   forever?"

20   e. "Everything has been erased from my desktop and anything on
     the desktop at the time was erased from the hard drive....

21   INTUIT...we need a fix QUICK. I want an answer from Intuit."

22   f. "I have had the same thing happen. All the discussions so far
     indicate this just started happening today, and now the desktop

23   volume is gone. Has anyone heard anything yet from
     QuickBooks?"

24   g. "Mine happened somewhere between 1:30 & 2:00am , about the
     same time as OP so it started at least 14 hours ago as of now. Now

25   I'm frantically trying to contact all my clients that use 2006 so that
     they don't lose their data. Some people keep Everything on their

26   desktops. This is major! …INTUIT???????"

27   h. "Please, Please help. I am desperate and need these desktop files

28

- 3 -

i. "I have lost HOURS of this week's work that was not backed up yet. HELP!!!!!!!!!!"

j. "I feel sick...lost my desktop files this evening. All my biz and personal stuff gone in seconds...how can this be? We need answers QB and soon!"

k. "Can't believe this has been happening for at least several hours now and no one has done anything about it!!! This just happened to me too. EXACTLY the same thing. I had NO idea - the whole thing took me completely by surprise and deleted VERY crucial data. Intuit KNEW about this happening for hours and didn't warn anyone?!?!?"

l. "I'm in the same boat. I'm a photographer and lost work that I have been editing for months. I have the files backed up, but not the edited portion, so I'd have to go back and do everything all over again. I lost a few jobs and a ton of personal work that wasn't backed up, I'm still trying to figure out what was on my desktop.

Users experiencing data loss contacted Intuit on December 16, 2007 and advised Intuit of the data destruction disaster.  (FAC  ¶12.)  Intuit was thus aware of these dire events on December 16, 2007, but failed to warn users via email not to open QuickBooks, and failed to shut down its server to prevent further catastrophic losses, despite pleas from users to do that very thing, such as this posting on Intuit's message board:

> **INTUIT -- CLOSE YOUR SERVER IMMEDIATELY**
> Dec 17, 2007 04:27 am
> It just occurred to me that in an hour and a half from now the East Coast wakes up for business. Perhaps thousands of people will run Quickbooks Pro 2006 and 2007 for the Macintosh as a part of their daily business routine. We have already seen that hundreds of people have had their desktop folder destroyed by this Quickbooks automatic update bug. That was on a SUNDAY. The amount of damage that will happen in just a short time on MONDAY may be inestimable.
> The only immediate solution to this is that whatever server is sending the update notice to Quickbooks MUST BE IMMEDIATELY SHUT DOWN!
> Intuit, I suggest that to so anything less than this would be not just inappropriate but irresponsible. Thank you.

(FAC ¶12.)

Intuit was aware of this post and ignored it.  (FAC ¶13.)  As predicted, on Monday, December 17, 2007, Macintosh QuickBooks users started their computers, opened QuickBooks, and immediately suffered the loss of all files stored on the desktops of their computers.  (*Id.*)

1  Intuit still did not shut down its server and still did not take steps to notify its users of the

2  problem.  (*Id*.)  Contacting Intuit about the problem resulted in a recorded announcement, "We

3  can't find a support plan associated with your account at this time.  If you need immediate

4  technical assistance with QuickBooks, a support professional can help you for a fee. Just stay on

5  the line for the next available representative."  (*Id*.)

6      On Tuesday, December 18, 2007, an Intuit Message Board exchange with an Intuit

7  employee asked the obvious:

8      7) Why was this allowed to go past Sunday night? At 7am Monday
        morning EDT I did leave a thread on this Forum entitled "INTUIT -
9      - CLOSE YOUR SERVER IMMEDIATELY." I said then that in a
        couple hours businesses would open on the East Coast and run QB.
10     I pointed out that hundreds seem to have been hit on a Sunday so
        why not stop it from happening on a MONDAY? I was amazed and
11     still am that the faulty server was allowed to continue to run on the
        web. All they had to do was either pull the plug (literally) or shut
12     down a few of the ports. That might have saved thousands of
        people.
13

14  (FAC ¶ 14)  Intuit did not respond to this post.  (*Id*. ¶15.)

15      On Wednesday, December 19, 2007, Intuit sent email messages to persons who had

16  contacted Intuit regarding this issue.  Intuit's email message suggested making an appointment at

17  an Apple Store through its Genius Bar program, and offered to reimburse users for a $99 data

18  recovery software program.  (FAC ¶16.)  Intuit made no offer to reimburse any user for the cost

19  of spending thousands of dollars in technical support fees attempting to recover data on Sunday,

20  Monday, Tuesday, or Wednesday. (*Id*.)  It made no offer to compensate any users for the time

21  they spent attempting to recover their own data, or attempting to reach Intuit to obtain assistance.

22  (*Id*.)  It made no offer to compensate users for charges incurred at the Apple Store through the

23  Genius Bar program. (*Id*.)  Finally, it made no offer to compensate users for data and work

24  product that could not be recovered.  (*Id*.)  As a result Plaintiffs and the Class have been left

25  holding thousands of dollars in attempted data recovery costs, as well as the cost of replacement

26  of the data that could not be recovered.  (*Id*.; *see also* FAC ¶¶17-40.)

27              **LEGAL STANDARD**

28      A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

- 5 -

1    alleged in the complaint.  *See Parks Sch. Of Business v. Symington*, 51 F.3d 1480, 1484 (9th Cir.

2    1995).  All material allegations of the complaint are taken as true and construed in the light most

3    favorable to the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 340 (9th Cir.

4    1996).  A court must not dismiss a complaint for failure to state a claim unless "it appears beyond

5    doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

6    relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *see also*

7    *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).  As the Supreme Court

8    recently explained, "[W]e do not require heightened fact pleading of specifics, but only enough

9    facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 127 S.

10    Ct. 1955, 1974 (2007).  Under these liberal standards, each of Plaintiffs' causes of action

11    survives Defendant's challenges.

**ARGUMENT**

12

13    **I.    PLAINTIFFS HAVE PROPERLY PLED THEIR BREACH OF CONTRACT AND
        IMPLIED WARRANTY CLAIMS**

14

15          **A.    Intuit Breached its Agreement with Plaintiffs By Delivering A Defective and
                Destructive Product**

16          "A cause of action for damages for breach of contract is comprised of the following

17    elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance,

18    (3) defendant's breach, and (4) the resulting damages to plaintiff." *Textainer Equipment*

19    *Management (U.S.) Ltd. v. TRS Inc.*, 2007 WL 1795695 at *2 (N.D.Cal.) (J.Alsup) (quoting

20    *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, n. 6, 11

21    Cal.Rptr.3d 412 (2004)).

22          Intuit's sole dispute with Plaintiffs' breach of contract claim is that Plaintiffs have failed

23    to plead Intuit's breach with the required level of specificity.  However, "[p]leadings need suffice

24    only to put the opposing party on notice of the claim ... Specific legal theories need not be

25    pleaded so long as sufficient factual averments show that the claimant may be entitled to some

26    relief." *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) (citations omitted).  Plaintiffs

27    easily cross this low threshold.

28          The Agreement at issue here contemplates the exchange of Intuit's QuickBooks software

1  in consideration for the purchase price.  There is no dispute that a contract existed or that

2  Plaintiffs fully performed their obligations under it.  As Plaintiffs specifically allege, however,

3  Intuit failed to hold up its end of the bargain.  (FAC ¶¶6-10.)  For its part, Intuit delivered

4  software with a latent, inherent, "time bomb" defect that, once activated by Intuit's server,

5  destroyed every file on the Plaintiffs' desktops.  (FAC ¶¶6-8.)  After the defect manifested and

6  destroyed Plaintiffs' files, Intuit sought to prevent recurrence of the defect by issuing a "patch"

7  that prevented the software from communicating with Intuit's server to receive automatic updates.

8  (FAC ¶7.)  By disabling the software's ability to receive updates, Intuit breached the Agreement's

9  express promise to provide the software and "any updates thereto" (see Agreement at 1) and

10  failed to deliver goods of merchantable quality that were fit for their intended purpose.[1]

11  Intuit's reliance on *Parrish v. NFLPA*, 534 F.Supp.2d 1081 (N.D. Cal 2007) and

12  *Chirico v. Merrill Lynch*, 1999 U.S. Dist. LEXIS 20180 (N.D. Cal 1999) for the notion that

13  Plaintiffs' claims lack the required specificity to state a claim for breach of contract is misplaced.

14  Unlike here, plaintiffs in *Parrish* and *Chirico* failed to satisfy the threshold question of whether a

15  contract existed, making the issue of which provision was breached a secondary consideration.

16  In *Parrish*, Plaintiff retired professional football players alleged that the defendant

17  breached a contract to represent the players in licensing agreements.  *Parrish*, 534 F. Supp. at

18  1086-87.  Plaintiffs complained that they had not been paid royalties due to them pursuant to the

19  contract.  *Id.*  Plaintiffs failed, however, to allege the *existence* of a contract within the statute of

20  limitations period and further failed to point to any provision that would have guaranteed

21  royalties to players who executed the contract.  *Id.* at 1095.

22  Likewise, in *Chirico*, the plaintiff brought an age discrimination claim following the

23  termination of his employment.  *Chirico*, 1999 U.S. Dist. LEXIS 20180 at *1-2.  Plaintiff failed

24  to establish the existence of an employment contract, relying solely on forms completed by the

25  defendant at the time of the termination.  *Id.* at *3-4.  While the court took the extra step of

26  analyzing the termination papers for any provision that might have been breached, the failure to

27  _____

28  [1] As detailed in Sections I.B, I.C, and I.D below, the implied warranty disclaimer and limited
remedies provision of the Agreement are unenforceable.

1   establish a threshold issue regarding existence of a contract was dispositive. *Id.* at *4-5.

2         Here, the existence of the Agreement is undisputed.  Moreover, unlike *Parrish* and

3   *Chirico*, which involved contracts for promotional services and employment respectively,

4   Plaintiffs' straightforward Agreement with Intuit promised delivery of a functional computer

5   program and any subsequent updates.  Agreement at 1.  Plaintiffs have specifically alleged that

6   the product was not only defective, but also affirmatively destructive, ruining every data file on

7   their desktops at the time the defect was activated. (FAC ¶¶7,9.)  In addition, unlike plaintiffs in

8   *Parrish* and *Chirico*, Plaintiffs have specifically alleged that Intuit's effort to address the defect

9   prevented them from receiving updates as promised by the Agreement.  (Agreement at 1.)  Should

10  this Court deem it necessary, Plaintiffs respectfully request leave to amend their Complaint to

11  allege breach with increased specificity regarding the element of breach.

12      **B.**    **The Disclaimer Of Implied Warranties Is Unenforceable**

13        As Judge Patel of this Court has made clear, a motion to dismiss is not the proper vehicle

14  for addressing the fact-intensive inquiry required to determine the enforceability of an implied

15  warranty disclaimer:

16          Again, [enforceability of the implied warranty disclaimer] is not a
    matter that can be disposed of on a motion to dismiss. Watkins is
17          entitled to present evidence that enforcing Teknekron's purported
    disclaimer of implied warranties would be unconscionable. There
18          are factual issues as to whether Watkins was "surprised" by the
    disclaimer, a procedural component of unconscionability, and
19          factual issues as to whether the agreement entered into by the
    parties deprived one of the contracting parties of meaningful
20          choice, the substantive component of unconscionability. The Ninth
    Circuit has held that "even if the face of the pleadings indicates that
21          recovery is very remote, the claimant is still entitled to offer
    evidence to support its claims.... [I]t is only the extraordinary case
22          in which dismissal is proper." Thus, Teknekron's motion to dismiss
    Watkins' counterclaim for breach of implied warranty must be
23          denied.

24  *Teknekron Customer Information Solutions, Inc. v. Watkins*, 1994 WL 11726 at *5 (N.D.Cal.

25  1994) (J. Patel) (internal citations omitted); *see also Western Emulsions, Inc. v. BASF Corp.*,

26  2006 WL 4599673 (C.D.Cal.) ("At the very least, the Court concludes that these issues [regarding

27  the enforceability of an implied warranty disclaimer] are best left for resolution after full briefing

28  on a subsequent motion for summary judgment.").

Assuming *arguendo* that this Court is inclined to consider the enforceability of the disclaimer on the pleadings, Plaintiffs request leave to amend their Complaint to make specific allegations of unenforceability as set forth in detail below.

### 1.    The Disclaimer Is Unconscionable

As a general matter, the doctrine of unconscionability in California has both a procedural and a substantive element. *Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976 (9th Cir. 2007) (quoting *Discover Bank v. Superior Court of Los Angeles*, 36 Cal.4th 148, 160 (2005)). Procedural and substantive unconscionability need not both be present to the same degree. *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (quoting *Armendariz v. Foundation Health PsychCare Svcs. Inc.*, 24 Cal.4th 83, 114 (2000)). "Even where evidence of procedural unconscionability is slight, strong evidence of substantive unconscionability will tip the scale and render the [contract] provision unconscionable." *Id*. at 1281. The implied warranty disclaimer at issue here is procedurally and substantively unconscionable.

### a.    The Agreement Is Procedurally Unconscionable

Procedural unconscionability focuses on "oppression or surprise due to unequal bargaining power." *Shroyer*, 498 F.3d at 982 (quoting *Discover Bank*, 36 Cal.4th at 160). The California Supreme Court has consistently reiterated that "[t]he procedural element of an unconscionable contract generally takes the form of a contract of adhesion…" *Discover Bank v. Sup. Ct.*, 36 Cal.4th 148, 160 (Cal. 2005).[2]

Here, the contract was both oppressive and surprising. While it is unclear under California law whether a contract of adhesion is inherently oppressive or whether oppression is a separate factor to be considered, "both standards for procedural unconscionability are satisfied by a finding that the [contractual] provision was presented on a take it or leave it basis and that it was oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an

---

[2] The licensing agreement provides that California law applies to the claims in this matter. *See* FAC, Exhibit A, p. 4. Intuit's heavy reliance on the California Commercial Code indicates that Intuit does not dispute that California law applies.

1   absence of meaningful choice.'" *Nagrampa*, 469 F.3d at 1281 (citations omitted).  Here, each of

2   the Plaintiffs purportedly agreed to be bound by the licensing Agreement by engaging in the

3   transaction to purchase the QuickBooks software from Intuit.  That Plaintiffs here are small

4   businesses rather than individuals is of no moment.  Intuit offered the contract on a purely take it

5   or leave it basis with no room whatsoever to negotiate.  Thus, the implied warranty disclaimer is

6   adhesive, and therefore oppressive.

7        The implied warranty disclaimer was also a surprise to Plaintiffs, as none of them saw the

8   Agreement or knew its limitations before they purchased the software.[3]  California law is clear

9   that warranty disclaimers made after the sale and without negotiation are invalid.  As the

10  California Court of Appeal has explained:

11          A disclaimer of warranties must be specifically bargained for so
            that a disclaimer in a warranty given to the buyer after he signs the
12          contract is not binding. A limitation of warranties to be effective
            must have been bargained for so that a limitation stated in printed
13          matter given by the seller to the buyer after the sale was completed
            is not binding; as where the automobile dealer, after the sale, gave
14          the buyer the manufacturer's printed material which contained the
            warranty limitation. The disclaimer of consequential damages
15          which was included in the manufacturer's standard warranty is also
            not binding and cannot be invoked to prevent appellant from
16          introducing evidence as to his consequential damages.

17  *Dorman v. International Harvester Co.*, 46 Cal.App.3d 11, 19-20 (1975) (internal citations

18  omitted); *see also Western Emulsions, Inc. v. BASF Corp.* 2007 WL 1839718 at *6 (C.D.Cal.

19  2007) (citing *Dorman* for the holding that "any disclaimers contained [in written materials shared

20  with the buyer for the first time after the sale] are void since these disclaimers were not bargained

21  for in the agreement between the parties.").

22       Here, Plaintiffs purchased QuickBooks before they ever received the licensing Agreement

23  containing the implied warranty disclaimer, because the licensing agreement was not even

24  available for review until after money had been paid.  On these facts, which Plaintiffs respectfully

25  request to add to their Complaint by amendment, the warranty disclaimer is unenforceable.

26

27  _____
    [3] If the Court deems it necessary, Plaintiffs request leave to amend their Complaint to allege that
28  they did not execute the Agreement prior to purchase of QuickBooks software but rather, received
    the Agreement after the transaction was complete.

b.    **The Agreement Is Substantively Unconscionable**

The substantive component of unconscionability involves a showing that enforcement of a contractual provision would have "overly harsh or one-sided results." *Shroyer*, 498 F.3d at 982 (quoting *Discover Bank*, 36 Cal.4th at 160). Here, the implied warranty disclaimer has the one-sided effect of eliminating altogether Intuit's liability for an inherent defect that, once activated, destroyed every data file on Plaintiffs' and class members' desktops. (FAC ¶¶7, 9-11.) As drafted, the implied warranty disclaimer purports to absolve Intuit of liability for any defect in its product, leaving Plaintiffs and Class members with no warranty claim whatsoever and without meaningful relief arising from claims sounding in contract. As detailed above, Plaintiffs and Class members had no opportunity to negotiate the terms of the contract generally, nor the implied warranty disclaimer specifically, and they gained nothing in the bargain for waiving their right to implied warranties of fitness and merchantability. Intuit's self-serving assertion within the Agreement that "the limitations of damages…are fundamental elements of the basis of the bargain" (see Agreement at 3) does not evidence mutuality, negotiation, or any benefit accruing to the Plaintiffs in exchange for the disclaimer.[4]

Because the implied warranty disclaimer was offered on a take it or leave it basis after the sale and provides a one-sided benefit to the party with superior bargaining power, the disclaimer is unconscionable and unenforceable.

Nothing in *Inter-Mark v. Intuit*, 2008 U.S. Dist. LEXIS 18834 (2008) counsels to the contrary. In *Inter-Mark*, the plaintiff complained that the software at issue performed too slowly and restricted access to multiple users despite express promises to the contrary. *Inter-Mark*, 2008 U.S. Dist. LEXIS 18834 at *5-6. The *Inter-Mark* case differs materially from the present matter in two ways. First, the plaintiff complained only that the software itself failed to perform as promised. Plaintiffs here contend that the defective software was actively destructive, ruining data stored on Plaintiffs' desktops. As discussed in section I.B.2, below, the legislative intent underlying the Commercial Code does not support enforcement of an implied warranty disclaimer

---

[4] Should the Court so require, Plaintiffs respectfully request the opportunity to amend their Complaint to add specific allegations of substantive unconscionability.

1   where the defective product damages property other than itself.  Second, the plaintiff in *Inter-*

2   *Mark* never alleged that the Software License Agreement, which contained an implied warranty

3   disclaimer, was unenforceable on any grounds.  *Id.* at *24-25.  Absent such a contention, the

4   *Inter-Mark* court found that the Agreement was enforceable.  Here, Plaintiffs have already alleged

5   that the disclaimer is unenforceable on unconscionability grounds and can, if permitted to do so,

6   amend their Complaint to plead unconscionability with the increased specifically outlined above.

### 2.    Enforcing The Disclaimer Would Undermine The Legislative Intent Of The California Commercial Code

California Commercial Code § 2316(2) provides that the implied warranties of

merchantability and fitness may be limited or excluded in writing, so long as the language of the

exclusion is conspicuous.  Section 2316 "seeks to protect a buyer from unexpected and

unbargained language of disclaimer by ... permitting the exclusion of implied warranties only by

conspicuous language or other circumstances which protect the buyer from surprise." *Salyards ex*

*rel. Salyards v. Metso Minerals Tamper OY*, 2005 WL 3021959 at *10 (E.D.Cal.) (quoting

*Appalachian Ins. Co.*, 214 Cal.App.3d 1, 34-35 (1989)).  Here, the Plaintiffs experienced

precisely the kind of surprise the Code seeks to prevent.  In a case like *Inter-Mark*, where

plaintiffs complained that the product at issue did not perform as promised and there was no

argument that the implied warranty disclaimer was unconscionable, no injustice results from

limiting plaintiffs to the terms of the express warranty, which governs the manufacturer's liability

for mere product failure.  Where, as here, the product failed in an unexpected way that destroyed

other property, enforcing the implied warranty disclaimer would prejudice Plaintiffs by shifting

the liability for a wholly unanticipated event to the buyer.  Such a result runs afoul of the purpose

of section 2316 and should not be permitted here.

### C.    The Limited Remedy Fails Of Its Essential Purpose

California Commercial Code § 2719(2) states "[w]here circumstances cause an exclusive

or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."

Cal. Comm. Code § 2719(2).  This section becomes operative when a party is deprived of its

contractual remedy. *O'Neill v. U.S.A.*, 50 F.3d 677, 687 (9th Cir. 1995).  "A limited remedy fails

1    its essential purpose when the circumstances existing at the time of the agreement have changed

2    so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all."

3    *National Rural Telecommunications Coop. v. DIRECTV*, 319 F.Supp.2d 1040, 1055 (C.D.Cal.,

4    2003).  However, an aggrieved party "[o]rdinarily ... must provide [the other] a reasonable

5    opportunity to carry out the exclusive or limited remedy before ... successfully [arguing] failure of

6    essential purpose." 1 White & Summers, Uniform Commercial Code, § 12-10 at 661.

7        In determining whether a limited repair warranty for a piece of commercial machinery

8    failed of its essential purpose, the Ninth Circuit in *S.M. Wilson & Co. v. Smith Intern., Inc.*,

9    587 F.2d 1363 (9th Cir. 1978), looked to Jonathan Eddy, *On the "Essential" Purposes of Limited*

10   *Remedies: The Metaphysics of U.C.C. Section 2-719(2)*, 65 Calif.L.Rev. 28 (1977), who

11   addressed failure of essential purpose as follows:

12           This rosy picture of the limited repair warranty, however, rests
             upon at least three assumptions: that the warrantor will diligently
13           make repairs, that such repairs will indeed "cure" the defects, and
             that consequential loss in the interim will be negligible. So long as
14           these assumptions hold true, the limited remedy appears to operate
             fairly and, as noted above, will usually withstand contentions of
15           "unconscionability." But when one of these assumptions proves
             false in a particular case, the purchaser may find that the substantial
16           benefit of the bargain has been lost.

17   *Id*. at 63.

18       In *Wilson*, the Court concluded that two of Eddy's three assumptions were not satisfied.

19   *Id*. In light of that finding, the Court further concluded that the limited warranty did fail of its

20   essential purpose.  *Id*.  The same conclusion is warranted here.

21       Intuit's Agreement unilaterally limits Plaintiffs' remedy to replacement of the defective

22   Software or a refund of the purchase price for a period of 60 days from purchase. (Agreement at

23   2.)  Plaintiffs have alleged that Intuit's defective software deleted all of the data files housed on

24   Plaintiffs' and Class members' desktops at the time the defect was activated.  (FAC ¶¶ 7, 9-11.)

25   Thus, two of Eddy's three assumptions are not satisfied.  First, the defect was activated more than

26   60 days after the Plaintiffs purchased their software.[5]  Thus, any attempt to invoke the limited

---

[5] While it is undisputed that the defect manifested outside the 60-day warranty period, the defect
was activated well within the expected useful life of the software.  Plaintiffs contend that the
expected useful life of the software is at least three years and request leave to amend their

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CV-07-6452 WHA

1    protections of the warranty would have been moot.  Even if the defect had manifested within the

2    first 60 days after purchase, Intuit's limited offer of a replacement or refund does not "cure the

3    defects" (*i.e.* restore Plaintiffs' lost data).  Second, the consequential losses suffered as a result of

4    the defect are not negligible.  Plaintiff Create-A-Card lost all invoicing, sales reports, customer

5    files, day to day working files, its customer catalog, samples, pre-designed forms, and

6    photographs from its two busiest months in over 21 years.  (FAC ¶¶19, 21.)  Plaintiff AGSJ lost

7    all of its invoicing, sales reports, day to day working files, pictures, and many files containing

8    financial information, representing hundreds of hours of work.  (FAC ¶27.)  ; and Plaintiff

9    Philanthropic Focus, LLC lost client contracts, research, PowerPoint presentations, excel files,

10   video presentations, photographs, receipts of banking transactions, and contact information as a

11   result of the catastrophic defect in the QuickBooks software.  (FAC ¶34)

12        Because Intuit's QuickBooks software deleted or made desktop files inaccessible, neither

13   replacement nor a refund of the purchase price of the Software could correct—or even address—

14   the havoc wreaked by the unanticipated defect.  Thus, the limited remedy fails of its essential

15   purpose.[6]

16        **D.        The Prohibition On Consequential Damages Is Unenforceable**

17             **1.        The Failure Of The Limited Remedy Removes The Bar On
                         Consequential Damages**

18
     Where, as here, the limited remedy fails of its essential purpose, the limited remedy is

19   invalidated, and the wronged party is entitled to the damages available under the California

20   Commercial Code.  Cal. Comm. Code § 2719(2).  While the Code typically allows sophisticated

21   parties of equal bargaining power to include a contractual prohibition on consequential damages,

22   such a bar may be unenforceable where, as here, the bar was imposed in an adhesive contract

23   offered after the sales transaction by the party with superior bargaining power.  *See Wilson*, 587 F.

24   2d at 1374-76.

25        The *Wilson* case is instructive.  In *Wilson*, the plaintiff, a sophisticated corporate entity,

26

27   ─────────────────────────
     Complaint to allege expected useful life with specificity if the Court deems it necessary.
     [6] Plaintiffs respectfully request leave to amend their Complaint to add specific allegations, if
28   needed, illustrating that the limited remedy failed of its essential purpose.

1   purchased a custom-made tunnel-boring machine for use in the construction of a mine shaft. *Id.*

2   at 1365-66. The defendant agreed to design, build, and deliver the machine to suit the plaintiff's

3   purposes. *Id.* at 1366. In the contract, the manufacturer limited its liability to for any breach of

4   warranty to repair or replacement of defective parts and excluded any liability for consequential

5   damages. *Id.* The machine subsequently failed to perform as expected, boring slower than

6   promised, overheating, breaking down, and wearing out blades more quickly than projected. *Id.*

7   at 1368. Despite the defendant's efforts, the machine could not be repaired. *Id.* As a result of the

8   machine's failure, plaintiff suffered more than $1.8 million in consequential damages. *Id.*

9        In determining whether the consequential damages bar should be invalidated, the Ninth

10  Circuit considered a family of cases, deriving from *Adams v. J. I. Case Co.*, 127 Ill.App.2d 388

11  (1970), which "supports unanimously" the proposition that failure of the limited remedy to serve

12  its essential purpose removes a bar to recovery of consequential damages. *Id.* at 1374-76. While

13  the *Wilson* court held that the consequential damages bar would stand in the case before it, the

14  court took care to limit its holding to the specific factual scenario presented:

15           In reaching this conclusion we are influenced heavily by the
             characteristics of the contract between Smith and Wilson set forth
16           in Part I of this opinion. Parties of relatively equal bargaining
             power negotiated an allocation of their risks of loss. Consequential
17           damages were assigned to the buyer, Wilson. The machine was a
             complex piece of equipment designed for the buyer's purposes. The
18           seller Smith did not ignore his obligation to repair; he simply was
             unable to perform it. This is not enough to require that the seller
19           absorb losses the buyer plainly agreed to bear. Risk shifting is
             socially expensive and should not be undertaken in the absence of a
20           good reason. An even better reason is required when to so shift is
             contrary to a contract freely negotiated. The default of the seller is
21           not so total and fundamental as to require that its consequential
             damage limitation be expunged from the contract.
22
             Our holding is based upon the facts of this case as revealed by the
23           pleadings and record and is not intended to establish that a
             consequential damage bar always survives a failure of the limited
24           repair remedy to serve its essential purpose. Each case must stand
             on its own facts.
25

26  *Id.* at 1375-76.

27        Contrary to Intuit's argument, the *Wilson* court did not establish a blanket rule that the

28  consequential damages bar would be invalidated only where breach of the contract is "total" or

1    "fundamental." *See* Motion at footnote 8.  Moreover, nothing in the opinion suggests, much less

2    holds, that a consequential damages bar will stand where, as here, the party with superior

3    bargaining power foists the bar on the weaker party in an adhesive contract offered after the sale

4    and without the benefit of negotiation.  Indeed, the Ninth Circuit has invoked the reasoning in

5    *Wilson* to invalidate a consequential damages bar where, as here, the limited remedies provided

6    for in the contract fail of their essential purpose.  *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d

7    543, 547 (9th Cir. 1985) (invalidating consequential damages bar where software manufacturer

8    could not provide a software system that worked or was free from bugs).

9         In this case, no relief whatsoever is available to the Plaintiffs due to the limited temporal

10   scope and remedy provided in the Agreement.  Moreover, the activation of the QuickBooks

11   defect constituted a total and fundamental failure of the product in that the defect deleted every

12   file on the Plaintiffs' desktops—including the QuickBooks files themselves.  As a result, the

13   Court would be justified in finding that the remedy fails of its essential purpose and invalidating

14   the consequential damages bar.

15              **2.        The Bar On Consequential Damages Is Unconscionable**

16        "Consequential damages may be limited or excluded unless the elimination or exclusion is

17   unconscionable." Cal. Comm. Code § 2719(3).  In order to find such an exclusion

18   unconscionable, there must be both procedural and substantive unconscionability.  *Datalex Ltd. v.*

19   *PSA, Inc.*, 2003 U.S. Dist. LEXIS 27563 (2003) at *7 (2003) (citing *Ferguson v. Countrywide*

20   *Credit Indus., Inc.*, 298 F.3d 778, 783 (9th Cir. 2002)).  For the reasons set forth in detail in

21   section B.1 above, the consequential damages provision is both procedurally and substantively

22   unconscionable.  Specifically, the provision was included in a contract of adhesion, offered after

23   the sale, that provides a one-sided benefit to the party with superior bargaining power.  Where, as

24   here, a consequential damages bar is included in written materials made available to the buyer

25   only after the purchase is complete, the bar is unenforceable.  *Dorman v. International Harvester*

26   *Co.*, 46 Cal.App.3d 11, 19-20 (1975) (holding a consequential damages bar unenforceable where

27   the exclusion was disclosed to the buyer after the sale was completed).  If the Court deems it

28   necessary, Plaintiffs respectfully request leave to amend their Complaint to allege

1  unconscionability with specify.

2  **II.    THE COURT SHOULD DENY INTUIT'S MOTION TO DISMISS PLAINTIFFS'**
3  **TORT CLAIMS.**

4  **A.    The Economic Loss Doctrine Does Not Bar Plaintiffs' Claims For Negligence,**
   **Strict Products Liability, Or Trespass To Chattels**

5  Intuit incorrectly claims that the "economic loss" doctrine allows Intuit to avoid tort

6  liability because its defective software did not damage "other property." Intuit is incorrect.

7  Intuit's defective software did cause damage to "other property." The QuickBooks software

8  reached out into users' computers and deleted files unrelated to QuickBooks, causing the same

9  damage to computer files that a fire or flood would cause to paper files. The fact that the "files"

10 in this case were located in computer systems does not change this analysis.

11 **1.    Intuit's Argument That Computer Files Cannot Be "Property" Fails**

12 Intuit's argument that the computer files are not "property" is incorrect. The Ninth Circuit

13 has held that a computer file constitutes a material object, as if it were written on real paper, for

14 purposes of copyright law. *See MAI Systems Corp. v. Peak Computer, Inc*., 991 F.2d 511, 517-18

15 (1993) (finding that a copy of a document in a computer's RAM constitutes a "material object"

16 under copyright law); *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1160-62 (9th Cir.

17 2007) (an image stored on a computer is a "copy" of the work for purposes of copyright law).

18 Intuit's argument that information stored on computers should not constitute "property" is

19 disingenuous. It is doubtful that Intuit would take the same attitude toward electronic information

20 if its own software had been destroyed in the development phase. Though its software could be

21 construed to be only "information," Intuit would likely argue that its software is property with

22 value which can be damaged, despite the fact that it resides as information on computer chips.

23 Intuit's own licensing agreement prohibits copying the software, (*see* FAC, Exhibit A, p. 1), and

24 Intuit's brief admits that the software is a product falling under the California Commercial Code,

25 (*see* Motion, pp. 2, 7, 8, 10). Thus, arguing that information contained in computers is not

26 "property" is contrary to Intuit's own reasoning.

27 Moreover, the California Supreme Court has held that a tort cause of action is properly

28 stated where, as here, transmission of electronic signals caused impairment of the functioning of

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CV-07-6452 WHA

1   computers, technical problems, and lost revenue. *See, Intel Corp. v. Hamidi,* 30 Cal.4th 1342,

2   1353-55 (2003), distinguishing but citing with approval *America Online, Inc. v. LCGM, Inc.*,

3   46 F.Supp.2d 444, 451-52 (E.D.Va. 1998) (sustaining cause of action for trespass to chattels

4   where defendants transmitted unwelcome electrical signals through a computer network) and

5   *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1020-21 (S.D. Ohio 1997)

6   (cause of action for trespass to chattels supported injunction where defendant's electronic

7   transmissions drained the power of plaintiff's computer equipment, making the equipment's full

8   resources unavailable to plaintiff's subscribers, and decreasing the value of the equipment to

9   plaintiff even though it was not physically damaged). The "transmission of electrical signals

10  through a computer network is sufficiently 'physical' contact to constitute a trespass," and harm

11  to business goodwill and interest in computer equipment as a result of such intrusion is actionable

12  in tort. *See America Online v. LCGM*, 46 F.Supp.2d at 449.

13      In this case, Intuit's defective QuickBooks software allowed a faulty signal and/or

14  defective software to enter the Class' computers without permission, interfere with plaintiffs'

15  possessory interest in their computer systems and data, and cause damage. (FAC ¶¶68-70). The

16  defective software and/or Intuit's server invaded the users' computers, deleting data and files

17  from all parts of the computer desktop, whether related to QuickBooks or not. (*See id.*; *see also*

18  FAC ¶6; FAC ¶¶55-66.) Such allegations are sufficient to state causes of action in tort against

19  Intuit. *See Hamidi*, 30 Cal.4th at 1353-55; *CompuServe*, 962 F. Supp. at 1020-21; *America*

20  *Online v. LCGM*, 46 F.Supp.2d at 451-52.

21          **2.    Intuit's "Component Part" Argument Fails**

22      Intuit also incorrectly argues that the software did not cause damage to "other property"

23  because the software was merely a component part of users' computers. The licensing agreement

24  in this case provides that California law applies to the claims in this matter, and no California

25  case has held that computer software is a "component of a computer." *See FAC, Exhibit A, p. 4.

26  Moreover, even if the software could be construed to be a component of a computer, if that

27  component damages files on the computer then Intuit is liable in tort. Intuit omits from its

28  briefing the California Supreme Court's explicit ruling in 2002 that the "economic loss" rule does

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CV-07-6452 WHA

1    not void tort liability where a component part damages other parts of the same object or structure.

2    *See Jimenez v. Superior Court*, 29 Cal.4th 473, 483-84 (2002), rehearing denied Jan. 22, 2003.

3    "California decisional law has long recognized that the economic loss rule does not necessarily

4    bar recovery in tort for damage that a defective product…causes to other portions of a larger

5    product…into which the former has been incorporated." *Id.* (internal quotations and citations

6    omitted).

7         In *Jimenez*, the California Supreme Court found that a manufacturer of windows installed

8    in a mass-produced home during its construction could be strictly liable in tort for injuries to

9    other parts of the structure in which the defective windows were installed. *Jiminez*, 29 Cal.4th at

10   476. The Supreme Court noted that "the concept of recoverable physical injury or property

11   damage has over time expanded to include damage to one part of a product caused by another,

12   defective part.' " *Id.*; *see also Croman Corp. v. General Electric Co*., 2005 WL 2219261, *1

13   (E.D.Cal. 2005) (denying motion to dismiss on "economic loss rule" grounds where plaintiff

14   alleged component parts were defective and contributed to loss of helicopter in crash); *Rejects

15   Skate Magazine, Inc. v. Acutrack, Inc.,* 2006 WL 2458759, **4-6 (N.D.Cal. 2006) (denying

16   motion to dismiss on "economic loss rule" grounds where company that agreed to manufacture

17   copies of DVDs to be distributed with youth magazine negligently loaded pornographic images

18   on the DVDs, causing the loss of revenue and ultimate demise of magazine); *see also KB Home v.

19   Superior Court (Consolidated Industries Corp.)*, 112 Cal.App.4th 1076, 1087 (2003) (finding it a

20   question of fact for a jury whether defective part is "a sufficiently discrete element of the larger

21   product that it is not reasonable to expect its failure invariably to damage other portions of the

22   finished product").

23        In this case, the QuickBooks software is a sufficiently discrete element that its failure

24   would not "invariably damage other portions" of the computer, or the data contained on the

25   computer. *See KB Home*, 112 Cal.App.4th at 1087. Intuit's software did not just fail to operate

26   as promised. It unforeseeably reached out and damaged data unrelated to the software's intended

27   purpose and function. Therefore, the data and files that users lost is "other property" for purposes

28   of the "economic loss" rule.

1    None of the California cases cited by Intuit involve a situation where a damaged party

2  seeks recovery where the defendant's defective product causes damage to the plaintiff's "other

3  property." The *Sacramento* case that Intuit relies upon specifically distinguished a situation

4  where a defective product causes damage to nondefective portions of the same product. *See*

5  *Sacramento Regional Transit Dist. V. Grumman Flexible*, 158 Cal.App.3d 289, 296 (1984). The

6  other cases relied upon by Intuit similarly emphasized the fact that the damage done was to the

7  product itself, and not to "other property." *See East River Steamship Corp v. Transamerica*

8  *Delaval Inc.*, 476 U.S. 858, 871-72 (1986) (emphasizing damage done was to the product itself);

9  *Standard Platforms, Ltd. v. Document Imaging Systems Corp.*, 1995 U.S. Dist. LEXIS 22238, fn.

10  1 (N.D. Cal. Nov. 15, 1995) (noting the economic loss rule applies where there is not damage to

11  "other property"); *Seely v. White Motor Co.*, 63 Cal.2d 9, 24 (1965) (noting that a defendant *could*

12  be liable in strict liability under the economic loss rule if there is proof that the defect caused

13  physical damage); *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 198 (8th Cir.

14  1995) (only "damage" done was to defective computer system itself); *Transport Corp. of Am.,*

15  *Inc. v. IBM*, 30 F.3d 953 (8th Cir. 1994) (part of computer system hardware sold to company

16  caused inoperability of system). The remainder of cases cited by Intuit take place in the insurance

17  context, which is not applicable here. *See America Online v. St. Paul Mercury Insurance Co.*,

18  207 F.Supp.2d 459 (E.D.Va. 2002); *Ward General Ins. Svs. v. The Employers Fire Ins. Co.*,

19  114 Cal.App.4th 548, 556 (2003); *Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.*,

20  11 F.Supp.2d 1150 (N.D. Cal. 1998).

21    Because Plaintiffs have adequately alleged that Intuit's QuickBooks software caused

22  damage to "other property," the economic loss rule does not apply and Plaintiffs' tort causes of

23  action survive.

24    **B.    Plaintiffs' First Claim For Negligence Survives**

25    Intuit incorrectly claims that Plaintiffs' negligence claim fails because the License

26  Agreement disclaimed damages arising out of negligence. For the reasons set forth in Section I,

27  *supra*, this disclaimer is not valid and does not exempt Intuit from liability for negligently

28  making, marketing, and distributing a defective product. Intuit's citation to *Marr Enters* is not

1    applicable because the defective refrigeration unit in that case merely failed to work—it did not

2    reach out to unrelated objects and destroy them.  *See Marr Enters., Inc. v. LewisRefrigeration*

3    *Co.*, 556 F.2d 951, 956 (9th Cir. 1977). Intuit's citation to *Nunes Turfgrass* is also inapposite. See

4    *Nunes Turfgrass v. Vaughan-Jacklin Seed Co., Inc.*, 200 Cal.App.3d 1518, 1534 (1998).  The trial

5    court in that case specifically found that the limitation in the contract was not unconscionable,

6    and that the plaintiff in that case in fact used a similar clause in its own commercial contracts.  In

7    this case, the limitations on Intuit's liability in the licensing agreement are unconscionable for the

8    reasons set forth in Section I.  Therefore, Intuit cannot disclaim liability for its negligence.

9            **C.    Plaintiffs' Second Cause Of Action For Strict Products Liability Survives**

10           Intuit rehashes its "other property" argument in support of its faulty request that the Court

11    dismiss Plaintiffs' strict products liability claim.  Intuit's argument fails for the reasons set forth

12    in Section IIA, *supra*—Intuit's software did cause damage to "other property."  Intuit's addition

13    of the *Greenman* case to this section advances the argument of plaintiffs, not of Intuit.  The

14    *Greenman* case held that in order to establish strict liability a plaintiff only need to prove "that he

15    was injured while using the Shopsmith in a way it was intended to be used as a result of a defect

16    in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for

17    its intended use."  *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 63-64.  In this case,

18    Plaintiffs have met the *Greenman* standard by alleging that they were injured while using Intuit's

19    software as a result of a defect in Intuit's software and computer codes.  (FAC, ¶¶63-64.)  Intuit's

20    software and computer codes were and are defective and unfit for their intended use in that they

21    interacted with one another in a manner that caused the sweeping file deletion. The interaction of

22    Intuit's defective software with Intuit's product update codes has caused and will continue to

23    cause property damage to Plaintiffs, and Plaintiffs should be compensated for it.

24           **D.    Plaintiffs' Third Claim For Relief For Trespass To Chattels Survives**

25           Electronic signals causing damage to the functioning of computer equipment constitutes a

26    trespass to chattels.  *See Hamidi, supra,* 30 Cal.4th at 1353-55; *CompuServe, Inc.*, *supra,* 962 F.

27    Supp. at 1020-21; *America Online, Inc. v. LCGM, supra*, 46 F.Supp.2d at 451-52.  Intuit

28    incorrectly argues that it is not liable for trespass to chattels because Plaintiffs themselves

- 21 -

1    purchased and installed its defective software on Plaintiffs' computers.  Plaintiffs never agreed,

2    however, that the software could enter applications unrelated to QuickBooks and delete all data

3    and files stored therein.  Just as a person may become a trespasser when straying into

4    unauthorized areas or deviating from the understood purpose of a visit, so QuickBooks became a

5    trespasser when it invaded Plaintiffs' computers and sweepingly destroyed every file on

6    Plaintiffs' desktops.  *See Maynard v. Walker*, 175 Cal.App.2d 145, 147-48 (1959) ("one who

7    exceeds the scope of his invitation ceases to enjoy the status of an invitee").

8         Intuit's citations to *Fibreboard Corp. v. Hartford Accident & Indemnity Co.*,

9    16 Cal.App.4th 492, 512 (1993) and *County of Santa Clara v. Atlantic Richfield Co.*,

10   137 Cal.App.4th 292, 314-315 (2006) do not change this analysis.  First, in *Fibreboard* and

11   *Atlantic Richfield*, the plaintiffs owned the defective products.  In this case, the defective product

12   was merely "licensed" to Plaintiffs.  See Software License Agreement, FAC, Exhibit A.  Second,

13   there was no "code" or interaction with the outside world in either *Fibreboard* or *Atlantic*

14   *Richfield* directing the asbestos to invade the other parts of the property.  Here, Intuit's server

15   interacted with (or failed to properly respond to) the software, causing the software to believe it

16   was directed to delete the files on users' desktops.  Intuit's server is neither owned by nor in the

17   control of QuickBooks users.  Intuit's server was an additional external force that caused the

18   sudden invasion of and destruction of Plaintiffs'' computer files.  Such interference with

19   computer systems states a cause of action for trespass to chattels.  *See Hamidi, supra,* 30 Cal.4th

20   at 1353-55; *CompuServe, Inc.*, *supra,* 962 F. Supp. at 1020-21; *America Online, Inc. v. LCGM,*

21   *supra*, 46 F.Supp.2d at 451-52.  Therefore, Plaintiffs' cause of action for trespass to chattels

22   should survive.

23   **III.    THE COURT SHOULD DENY INTUIT'S MOTION TO DISMISS PLAINTIFFS'**
         **SIXTH CLAIM FOR RELIEF UNDER BUSINESS & PROFESSIONS CODE**
24       **SECTION 17200**

25       California's Unfair Competition Law prohibits business acts and practices that are unfair,

26   unlawful, or fraudulent.  Cal. Bus. & Prof. Code § 17200.  Each prong of the UCL— unfair,

27   unlawful, and fraudulent— is a separate and distinct theory of liability.  *South Bay Chevrolet v.*

28   *Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 316-317 (1999).  Plaintiffs have alleged

1  sufficient facts to support a claim under each prong of the UCL by alleging that Intuit (1)

2  knowingly sold a product that had the ability to access files stored on users' desktop without

3  permission, and (b) knew of the file destruction taking place and failed to warn users or shut

4  down its server to protect against users' losses of important files and data.  *See* FAC ¶81.

5        First, Plaintiffs have adequately alleged an unfair business practice.  "California's unfair

6  competition law, as it applies to consumer suits, is currently in flux."  *Lozano v. AT & T Wireless*

7  *Services, Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).  The *South Bay* case approved in *Lozano*

8  held that "[t]he test of whether a business practice is unfair 'involves an examination of [that

9  practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of

10 the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct

11 against the gravity of the harm to the alleged victim....'  *South Bay*, 72 Cal.App.4th at 316.

12 Although the California Supreme Court rejected the balancing test in *South Bay* in suits involving

13 unfairness to the defendant's competitors, the holding did not apply to actions based on unfairness

14 to consumers.  *See Cel-Tech Comms. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163 (1999).  "The

15 California courts have not yet determined how to define "unfair" in the consumer action context

16 after *Cel-Tech*."  *Id.* (discussing and comparing varying approaches in *Gregory v. Albertson's,*

17 *Inc.*, 104 Cal.App.4th 845, 128 Cal.Rptr.2d 389 2002); *Bardin v. Daimlerchrysler Corp.*,

18 136 Cal.App.4th 1255 (2006); *Scripps Clinic v. Superior Court*, 108 Cal.App.4th 917 (2003);

19 *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457 (2006); *Camacho v. Automobile Club of*

20 *Southern California*, 142 Cal.App.4th 1394 (2006).

21       The Ninth Circuit has determined that in a consumer case it is appropriate to apply either

22 the *Cel Tech* test (showing either a violation of a legislatively declared policy) or the *South Bay*

23 test (showing that the harm was not outweighed by the utility).  *Lozano*, 504 F.3d at 735-36.

24       In this case, Plaintiffs can show both that Intuit violated a legislatively declared policy and

25 that the harm of Intuit's conduct was outweighed by the utility of that conduct.  Intuit violated the

26 legislative policy embodied in the California Commercial Code, which obliges the seller to

27 deliver the product paid for, and which provides that goods sold must be fit for the purpose for

28 which the goods are used.  See Cal. Com. Code §§ 2301, 2314.  Intuit also violated the legislative

1    policy embodied in the Consumer Legal Remedies Act by representing that its goods were of a

2    particular quality when in fact its software was defective and could invade the files stored on

3    users' desktop without permission.  *See* Civil Code §1770(a)(7).  Moreover, Intuit allowed users

4    to continue to believe that Intuit's software was of a particular quality even after it was flooded

5    with complaints about the software's destruction of important data and files.  *See* FAC ¶81.

6    Thus, Plaintiffs can show that Intuit's conduct violated established legislative policies.  Moreover,

7    Intuit's conduct in failing to test its product and failing to warn users or shut down its server when

8    it was flooded with complaints had no apparent utility.  Thus, Intuit's conduct fails the balancing

9    test as well.

10    Second, Plaintiffs have alleged an unlawful business practice.  Intuit incorrectly argues

11    that only statutory violations may serve as the predicate for an "unlawful" practice under the

12    UCL.  A common law violation may also be an unlawful business practice under the UCL.  "The

13    UCL covers a wide range of conduct. It embraces anything that can properly be called a business

14    practice and that at the same time is forbidden by law...."  *Korea Supply Co. v. Lockheed Martin*

15    *Corp.*, 29 Cal.4th 1134, 1143 (2003) (quoting *Cel-Tech*, 20 Cal.4th at 180.  The Ninth Circuit has

16    found a UCL violation could exist where a defendant engaged in intentional interference with

17    employment contracts.  *CRST Van Expedited, Inc. v. Werner Enterprises, Inc*., 479 F.3d 1099,

18    1107 (9th Cir. 2007). "[I]ntentional interference with contract is a tortious violation of duties

19    imposed by law....We conclude CRST adequately alleged a violation by Werner of the UCL by

20    alleging Werner engaged in an 'unlawful' business practice, to wit, intentional interference with

21    existing contracts of employment."  *Id*.; *see also The Missing Link, Inc. v. eBay, Inc*., 2008 WL

22    1994886, *7 (N.D.Cal. May 5, 2008) (noting that "a breach of contract may...form the predicate

23    for Section 17200 claims, provided it also constitutes conduct that is 'unlawful, or unfair, or

24    fraudulent'").

25    In this case, Intuit failed both failed to properly test its product and, when users alerted

26    Intuit that its defective product was wreaking catastrophic destruction to files and folders on users

27    computers, Intuit refused to issue an immediate warning to all users of ht risk, and refused to

28    promptly shut down its server.  FAC ¶81.  This conduct was a breach of its duties to consumers

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CV-07-6452 WHA

1    under the Commercial Code as well as the laws of negligence, strict liability, breach of contract,

2    and breach of warranty.

3        Finally, a business practice is "fraudulent" within the meaning of § 17200 if "members of

4    the public are likely to be deceived." *Committee on Children's Television v. General Foods*

5    *Corp.*, 35 Cal.3d 197, 211 (1983). In order to state a cause of action under the fraud prong of the

6    UCL a plaintiff need not show that he or others were actually deceived or confused by the

7    conduct or business practice in question. *Schnall v. Hertz Corp*., 78 Cal.App.4th 1144, 1167

8    (2000). "The 'fraud' prong of [the UCL] is unlike common law fraud or deception. *Id.*

9    "A violation can be shown even if no one was actually deceived, relied upon the fraudulent

10   practice, or sustained any damage. Instead, it is only necessary to show that members of the

11   public are likely to be deceived." *Id.*

12       In this case, Intuit led consumers to believe, by omission, that its software was safe to use,

13   even after consumers informed Intuit that its software was causing destruction of files. FAC ¶81.

14   This allegation is sufficient to survive Intuit's motion to dismiss, and the Court should therefore

15   deny Intuit's motion.

16                                **CONCLUSION**

17       For the foregoing reasons, Plaintiffs respectfully request that the Court deny Intuit's

18   Motion to Dismiss. In the event the Court finds Plaintiffs' First Amended Complaint deficient in

19   any way, Plaintiffs request leave to amend to correct such deficiencies.

20

21                                Respectfully submitted,

22

23   Dated:  July 3, 2008            By:  _____/s/_____
                                          James A. Quadra

24                                  MOSCONE, EMBLIDGE & QUADRA, LLP
25                                  220 Montgomery Street, Ste. 2100
                                    San Francisco, California 94104
                                    Telephone:  (415) 362-3599
26                                  Facsimile:  (415) 362-2006

27                                  ADDITIONAL COUNSEL ON NEXT PAGE

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Michael W. Sobol
Kristen E. Law, (SBN 222249)
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008


LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Jonathan D. Selbin
780 Third Avenue, 48th Floor
New York, NY  10017-2024
Telephone:   (212) 355-9500
Facsimile:   (212) 355-9592

*Attorneys for Plaintiffs and the Proposed Plaintiff
Class*

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CV-07-6452 WHA