1  James A. Quadra (SBN 131084)
   Rebecca Bedwell-Coll (SBN 184468)
2  MOSCONE, EMBLIDGE & QUADRA, LLP
   Mills Tower
3  220 Montgomery Street, Ste. 2100
   San Francisco, California 94104
4  Telephone:  (415) 362-3599
   Facsimile:  (415) 362-2006
5  Email:  quadra@meqlaw.com
   Email:  bedwell-coll@meqlaw.com
6
   Jonathan D. Selbin (SBN 170222)
7  Michael W. Sobol (SBN 194857)
   Kristen E. Law (SBN 222249)
8  LIEFF, CABRASER, HEIMANN &
      BERNSTEIN, LLP
9  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
10 Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
11 Email:  jselbin@lchb.com
   Email:  msobol@lchb.com
12 Email:  klaw@lchb.com

13 *Attorneys for Plaintiffs and proposed Class*
   *Additional Counsel Listed on Signature Page*
14

                     UNITED STATES DISTRICT COURT
15                  NORTHERN DISTRICT OF CALIFORNIA
                  SAN FRANCISCO / OAKLAND DIVISION
16

17 CREATE-A-CARD, INC.; AGSJ, INC.;        Case No.  CV-07-6452 WHA
   and PHILANTHROPIC FOCUS, LLC, on
   behalf of themselves and all those similarly   **CLASS ACTION**
18 situated,
                                            **MEMORANDUM IN SUPPORT OF**
19              Plaintiffs,                  **MOTION FOR ORDER (1) GRANTING**
                                            **PRELIMINARY APPROVAL TO**
20      v.                                  **PROPOSED CLASS ACTION**
                                            **SETTLEMENT; (2) CONDITIONALLY**
21 INTUIT, Inc.,                            **CERTIFYING SETTLEMENT CLASS (3)**
                                            **APPROVING CLASS NOTICE; (4)**
22              Defendant.                  **APPOINTING CLASS COUNSEL; AND (5)**
                                            **SETTING FINAL APPROVAL HEARING**
23                                          **DATE AND RELATED DATES**

24
                                            Date:        September 11, 2008
25                                          Time:        8:00 a.m.
                                            Courtroom:   9
26                                          Judge:       Hon. William A. Alsup

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1

II.   STATEMENT OF THE FACTS ......................................................4

    A.    Factual Background...............................................................4

    B.    Procedural History.................................................................5

    C.    The Parties Have Thoroughly Investigated the Case ................................7

III.  THE PROPOSED SETTLEMENT...................................................7

    A.    Settlement Class ....................................................................7

    B.    Compensation to Class Members ...........................................8

        1.    Reimbursements for Certain Data-Recovery Efforts.....................8

        2.    Reimbursements for Data-Reconstruction and Other Data-Recovery Efforts ................................................................9

        3.    Free Upgrade ................................................................9

    C.    Attorneys' Fees And Costs ...................................................10

    D.    Settlement Administration And Notice ...................................10

IV.   PRELIMINARY APPROVAL OF THE SETTLEMENT AND PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASS.............11

    A.    Settlement And Class Action Approval Process.......................11

    B.    The Criteria For Settlement Approval Are Satisfied.................12

        1.    The Settlement is the Product of Serious, Informed, and Arm's-Length Negotiations...........................................13

        2.    The Settlement Provides Substantial Relief for Class Members.................................................................14

        3.    The Risks of Continued Litigation and Trial Counsel in Favor of Settlement.....................................................14

        4.    The Settlement Treats All Class Members Fairly........................15

    C.    The Settlement Does Not Suffer from the Deficiencies Present in *Zoran* or *Oracle*...................................................................15

    D.    Provisional Certification Of The Settlement Class Is Appropriate ...........18

        1.    The Proposed Settlement Class Mirrors the Type of Settlement Authorized by the United States Supreme Court .......18

        2.    The Criteria for Class Certification Under Rule 23 are Satisfied....................................................................19

            a.    The Class is So Numerous that Joinder of All Members is Impracticable...............................................19

            b.    There are Numerous Common Issues of Law and Fact ..................................................................20

            c.    The Class Representatives' Claims are Typical...............21

**TABLE OF CONTENTS**
**(continued)**

Page

d.     The Named Plaintiffs And Their Counsel
Adequately Represent the Proposed Class ......................22

3.     The Proposed Settlement Class Meets the Predominance
and Superiority Requirements of Rule 23(b)(3) ...........................22

a.     Common Questions Predominate....................................23

b.     Class Treatment is Superior to Alternative Methods
of Adjudication..................................................23

E.     The Proposed Notice Program Is Constitutionally Sound........................24

F.     Scheduling a Final Approval Hearing Is Appropriate..............................26

V.     CONCLUSION..................................................................................................26

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

## Cases

5

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ................................................................................ 17, 21

6

*Chamberlan v. Ford Motor Co.,*
   402 F.3d 952 (9th Cir. 2005) .......................................................................... 19

7

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ............................................................. 10, 11, 12

8

*Connor v. Automated Accounts, Inc.,*
   202 F.R.D. 265 (E.D. Wash. 2001) ........................................................... 21, 22

9

*Dukes v. Wal-Mart, Inc.,*
   474 F.3d 1214 (9th Cir. 2007) ............................................................. 18, 19, 20

10

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974) ........................................................................................ 23

11

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................. passim

12

13

*In re Napster,*
   2005 U.S. Dist. LEXIS 11498 (N.D. Cal 2005) .............................................. 18

14

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
   244 F.3d 1152 (9th Cir. 2001) ........................................................................ 22

15

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
   244 F.3d 1152 (9th Cir. 2001) ........................................................................ 21

16

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ........................................................................................ 23

17

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ............................................ 23

18

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) .................................................................... 21, 22

19

20

## Statutes

21

California Business & Professions Code
   § 17200, *et seq* ..................................................................................... 1, 4, 5

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Rules**

Federal Rules of Civil Procedure
    Rule 23(a)................................................................................................18
    Rule 23(a)(2).....................................................................................18, 19
    Rule 23(a)(4)...........................................................................................21
    Rule 23(b)(2)...........................................................................................21
    Rule 23(b)(3)..........................................................................17, 21, 22
    Rule 23(e)...............................................................................................25

**Treatises**

4 *Newberg on Class Actions*
    § 11.41 (4th ed. 2002)......................................................................10, 12
    § 11:25.............................................................................................10, 11

*Manual for Complex Litigation*
    § 13.14....................................................................................................11
    § 21.311..................................................................................................23
    § 21.312............................................................................................22, 23
    § 21.63....................................................................................................10
    § 21.632............................................................................................11, 17
    § 21.633..................................................................................................17

1

**MEMORANDUM IN SUPPORT OF MOTION**

2

## I.    INTRODUCTION

3      Plaintiffs respectfully submit for the Court's preliminary consideration a proposed class

4   action settlement ("Settlement") with Defendant Intuit Inc. ("Intuit") that resolves the claims

5   asserted in Plaintiffs' complaint.[1]

6      This is a class action against Intuit for marketing and selling accounting software,

7   QuickBooks for Mac 2006, which deleted files and data on users' desktops, whether related to

8   QuickBooks or not. QuickBooks Pro 2006 for Macintosh and QuickBooks New User Edition

9   2006 for Macintosh (collectively, the "Software") has a built in "automatic update" mechanism

10  that is activated when the program is launched. Plaintiffs allege that the Software contained a

11  defect that was triggered when it searched for updates to download but did not receive the

12  anticipated response. When this happened, the defective program deleted all files on the user's

13  desktop.

14      Plaintiffs Create-A-Card, Inc., AGSJ, Inc., and Philanthropic Focus, LLC (collectively,

15  "Plaintiffs") filed this action on behalf of themselves and all others similarly situated on

16  December 21, 2007, alleging claims for negligence, strict products liability, trespass to chattels,

17  breach of implied warranty and violations of California Business & Professions Code

18  Section 17200, *et seq.*, and later amended their Complaint and added a claim for breach of

19  contract.

20      Meaningful settlement discussions began shortly after the filing of Plaintiffs' Complaint in

21  December 2007 and culminated in an all-day arm's-length mediation before Judge Edward A.

22  Infante (Ret.) at JAMS on February 21, 2008. Following the mediation, the Parties, with the

23  ongoing assistance of Judge Infante, reached the settlement terms described herein. While

24  settlement negotiations were ongoing, the Parties served and responded to extensive discovery

25  requests. Through the discovery process, the Parties gained valuable insight into the true value—

26  and inherent risks—of the case. The parties reached tentative agreement on all substantive terms

27  _____

[1] The proposed Settlement also resolved the claims of Plaintiffs proceeding in a parallel action in
Ontario, Canada. The Canadian component of the Settlement is subject to approval by the
28  Ontario Court.

1   of the Settlement on July 30, 2008 and signed a Stipulation of Settlement memorializing the

2   agreed upon terms.  The Parties executed the final Settlement Agreement on August 21-22, 2008.

3   As detailed below, the Settlement provides outstanding cash relief to the Class, as well a free

4   upgrade to Quickbooks Pro for Mac 2007.  Intuit is providing <u>100% reimbursement without any</u>

5   <u>cap</u> for (a) all data recovery software, (b) all third-party data-recovery expenses (for computer

6   technician assistance services to recover data), and  (c) all hardware reasonably necessary for data

7   recovery efforts (*e.g.*, external hard drives purchased for use with data recovery software)

8   including shipping, handling, and sales tax.  Intuit is also providing substantial reimbursement for

9   data reconstruction (such as re-entering data) and in-house efforts to recover and reconstruct data

10  up to a $500,000 "soft cap."  If the total amount of the soft cap expenses exceeds $500,000, Intuit

11  can either pay the entire amount owed or advise Class members that their claims will be reduced

12  pro rata.  The Settlement builds in an additional safeguard that Class members have a *second*

13  opportunity to opt out if they do not want their claims reduced.

14      In finalizing the terms of the proposed Settlement, the Parties have heeded carefully the

15  admonitions this Court offered at the hearing August 7, 2008.  While the proposed Settlement is

16  claims-made in structure, the Parties have avoided the pitfalls this Court addressed at the August

17  7 hearing and in its orders denying settlement approval in *In re Zoran Corp. Derivative Litigation*

18  (Case No. C 06-05503) and *Kakani, et al. v. Oracle Corp.* (Case No. C 06-06493).  Here, the

19  Parties have completed discovery sufficient to confirm the scope of the damages and potential for

20  recovery.  In addition, they have limited the release to the claims Plaintiffs alleged in their

21  Complaint.  The release is also limited to members of the Class, who must have suffered lost or

22  damaged files.  Thus, though the parties estimate that while the total number of registered users of

23  the Software is approximately 30,000, only approximately 1,038 users would fall within the

24  proposed Class due to suffering lost or damaged files.[2]  Only those affected users (excluding

25  those who opt out) would be bound by the release.  Moreover, the Class definition extends only to

26  _____

27  [2] Intuit has ascertained the approximate number of affected users who would fall into the Class by
    sending an email to all 30,000 of the Software's registered users, posting information on websites,
    and monitoring responses from registered users. *Quadra Decl.*, Ex. A, pp. 14:15-16:28; 22:25-

28  27.

those consumers who suffered damage as a result of the Software Malfunction—consumers who are savvy, small business owners, perhaps more likely than average consumers to submit a claim to recover cash reimbursement for their business expenses associated with the Software Malfunction.  Furthermore, the parties have ensured 100% reimbursement for all third party data recovery expenses and a significant reimbursement for in-house costs, and have built in the extra safeguard of allowing a second opt out period if claims for in-house costs are reduced pro rata. Finally, the parties have developed a notice plan that is likely to reach every registered user of the product, even though only a small fraction of registered users are included in the Class definition, which is limited to consumers who suffered damage.

Although this is a "claims made" settlement, the parties have been diligent in defining the Class to include only those consumers that were damaged.  Thus, the scope of the Class is limited to approximately 1,038 Class members and the remainder of the registered users of the Software who were not impacted by the Malfunction would not be bound by the release.  Intuit has access to the Class members' contact information and direct notice will be provided via email.  By agreeing to a claims made process, Plaintiffs were able to negotiate with Intuit to maximize the individual awards to Class members who take the time to submit a claim.  In addition, the costs associated with administering an unclaimed fund are avoided.   Finally, the amount of money available to Class members is not reduced by administrative costs or attorneys' fees, as is commonly the case in common fund settlements.

With this motion, Plaintiffs seek preliminary approval of the Settlement Agreement, and provisional certification of a nationwide class for purposes of providing the Class with notice of the Settlement and an opportunity to opt-out, object, or otherwise be heard.  The proposed Settlement satisfies all criteria for preliminary settlement approval under Ninth Circuit law. Accordingly, Plaintiffs move the Court to take the initial steps in the settlement approval process by: (1) granting preliminary approval to the proposed Settlement; (2) provisionally certifying the proposed settlement Class; (3) appointing as Class Counsel Moscone, Emblidge & Quadra, LLP and Lieff Cabraser Heimann & Bernstein, LLP; (4) approving the proposed forms of Notice; (5) appointing The Garden City Group, Inc. as the Independent Claims Administrator; and (6)

1  scheduling the final fairness hearing and related dates as proposed by the parties.

2  **II.    STATEMENT OF THE FACTS**

3      **A.    Factual Background**

4          Plaintiffs brought this action on behalf of themselves and a worldwide class of registered

5  users of Intuit's QuickBooks Pro 2006 for Mac or QuickBooks New User Edition 2006 for Mac

6  (the "Software"), whose files or data became inaccessible or were damaged, corrupted, or lost,

7  whether temporarily or permanently, as a result of opening the Software and receiving an

8  allegedly defective update from Intuit.

9          Plaintiffs allege that the Software has a built-in automatic update mechanism that is

10  activated when the Software is opened by the user.  Upon launch, the Software automatically

11  contacts Intuit's server through the Internet to download any updates to the Software that may be

12  available.  Plaintiffs further allege that on Saturday, December 15, 2007, Intuit sent a faulty signal

13  to all QuickBooks for Macintosh users, including Plaintiffs.  This signal, which was read by

14  users' computers upon opening QuickBooks, caused the wholesale deletion of not only the user's

15  QuickBooks data, but also all other files and data that was stored on the user's desktop.  Plaintiffs

16  allege that beginning on Sunday, December 16, 2007 at 1:40 a.m., postings were made to Intuit's

17  online message board about the problem.  Intuit subsequently sent a "patch" to its users to

18  completely disable the Software's auto-update mechanism, thereby disabling the Software Bug.

19  Nonetheless, Plaintiffs further allege that in January 2008, the Software Bug was again triggered

20  in the case of at least one user who had launched the Software at a restricted Internet "wi-fi

21  hotspot" when the Software did not receive a proper update response as a result of the hotspot's

22  restricted access to the Internet.

23          Plaintiffs allege that as a result of a malfunctioning of the Software's automatic update

24  mechanism ("Malfunction") caused by, among other reasons, this alleged defect in the Software's

25  automatic update mechanism code (the "Software Bug"), the data or files residing on their

26  Macintosh desktops became inaccessible or were damaged, corrupted, or lost, either temporarily

27  or permanently, and as a result, they suffered damages.  Plaintiffs allege that users of the Software

28  lost customer lists, chapters of books they were writing, photo shoots they had been paid to

- 4 -

1    complete, logos they had designed, months of billing, and other valuable work product.

2         The impact of the Software Malfunction on affected users was uniform—upon opening

3    QuickBooks, users received a message that an update was available, and were asked whether the

4    user wished to download the update.  Regardless of whether the user clicked "yes" or "no," the

5    damage had already been done—the faulty signal had already deleted all files on the user's

6    desktop.  Intuit has represented that there was no update available, and that its server simply sent

7    out the signal.

8         Intuit contends it is not liable for the claims asserted in the Actions, that it has valid

9    defenses to those claims, and that Plaintiffs have not suffered any recoverable damages.

10   Notwithstanding their denial of liability, Intuit has taken certain corrective steps, as outlined in

11   the Settlement Agreement, to assist some customers who lost data as a result of the Software

12   Malfunction.  The Settlement Agreement expands the benefits Intuit has offered voluntarily and

13   provides for comprehensive notice of the available relief to all Class members.

14        **B.**    **Procedural History**

15        On December 21, 2007, Plaintiffs filed a class action complaint against Intuit, alleging

16   claims for negligence, strict products liability, trespass to chattels, breach of implied warranty and

17   violations of California Business & Professions Code Section 17200, *et seq*.  On March 31, 2008,

18   Plaintiffs filed their First Amended Complaint, adding a breach of contract claim against Intuit.

19        On April 17, 2008, Intuit filed its Motion to Dismiss, seeking dismissal of each and every

20   claim for relief.  Intuit claims that the Software License Agreement ("Agreement") between Intuit

21   and each Plaintiff is binding and enforceable and contains a valid disclaimer of warranties,

22   limitation of liability and exclusive limited remedy, thereby precluding any claim for breach of

23   implied warranty, or recovery of consequential damages (including those arising from any claim

24   of negligence).  Intuit also asserts that the breach of contract claim is subject to dismissal because

25   Plaintiffs could not allege any provision in the Agreement breached by Intuit nor how Intuit

26   breached it.  Intuit further claims that the Agreement precludes any tort recovery—specifically

27   negligence, strict products liability and trespass to chattels—under the economic loss doctrine.

28   Moreover, Intuit argues that because Plaintiffs cannot allege physical loss to property, but only

1    intangible data loss, Plaintiffs could not recover under a theory of strict products liability.  Intuit

2    likewise argues that the trespass to chattels is subject to dismissal because Plaintiffs consented to

3    the alleged incursion.  Finally, Intuit asserts that Plaintiffs' claim for violation of California

4    Business & Professions Code Sections 17200, *et seq.*, fails to state a claim upon which relief may

5    be granted.  Intuit believes the Motion to Dismiss may be dispositive of the U.S. Action as the

6    terms of the Agreement, together with the facts as alleged, permit the Court to determine whether

7    or not the damages asserted by Plaintiffs are recoverable as a matter of law.

8            Plaintiffs filed their Opposition to the Motion to Dismiss on July 3, 2008.  In their

9    Opposition, Plaintiffs assert that the disclaimer of warranties in the Agreement is unconscionable,

10   the limited remedy failed its essential purpose, and the bar on consequential damages is

11   unenforceable and unconscionable.  Plaintiffs further argue that the economic loss doctrine does

12   not bar their negligence, strict products liability and trespass to chattels claims because the loss of

13   computer files constitute damage not only to physical property, but also to "other" property.

14   Plaintiffs also argue that they have stated a claim for relief for negligence, strict products liability,

15   trespass to chattels and a violation of California Business & Professions Code Sections 17200, *et*

16   *seq.*

17          The motion to dismiss was scheduled for hearing on August 7, 2008.  In light of the

18   Settlement negotiations, the hearing on that motion was continued to September 25, 2008 to

19   afford the Parties an opportunity to finalize the Settlement Agreement and present this motion for

20   preliminary settlement approval.

21          On June 6, 2008, Plaintiffs served their first set of interrogatories, requests for admissions

22   and requests for production of documents on Intuit.  On June 18, 2008 Intuit served its first set of

23   interrogatories and requests for production on each Plaintiff.  In light of the Settlement

24   Agreement, the Parties stipulated that Intuit would produce verified responses to certain of

25   Plaintiffs' first set of interrogatories and produced the data from its "QuickBooks Mac Update

26   Escalations" QuickBase database, wherein Intuit has stored, *inter alia*, information regarding all

27   users affected by the alleged Software Bug known to Intuit.  Intuit served those verified responses

28   on July 28, 2008.  Plaintiffs served their responses to Intuit's discovery requests on August 4,

1  2008.

2  **C.     The Parties Have Thoroughly Investigated the Case**

3  Plaintiffs' Counsel was first contacted about this matter in December 2007, when multiple

4  QuickBooks users complained of suffering a sudden loss of their data and files.  In light of the

5  urgency of the situation and the ongoing damage that was resulting from Intuit's inaction,

6  Plaintiffs acted quickly to draft their Complaint and file it, just 6 days after the Software

7  Malfunction manifested.  Throughout the investigation and litigation of this matter, Plaintiffs'

8  Counsel have been in contact with more than 50 Class members, who have shared valuable

9  information regarding the nature and scope of the harm suffered as a result of the Software

10  malfunction. *Quadra Decl.*, ¶ 9  Based on the feedback Plaintiffs' Counsel has received,

11  Plaintiffs are confident that the relief offered pursuant to the Settlement—namely, cash

12  reimbursement for data recovery and reconstruction costs, as well as a free upgrade to

13  Quickbooks Pro for Mac 2007—will make the vast majority of Class members whole.

14  Intuit has also provided discovery responses describing the mechanism of the malfunction,

15  its efforts to identify affected users, and its methodology of calculating the number of users

16  affected. *Quadra Decl.*, Exs. A, B, and C.

17  While Intuit took some limited, voluntary corrective action to address consumers' losses

18  as early as December 17, 2007, Intuit was under no binding legal obligation to provide complete

19  relief to every damaged customer.  This lawsuit—and the proposed Settlement—guarantees

20  substantial and timely relief for all affected Class members.

21  **III.    THE PROPOSED SETTLEMENT**

22  The Settlement's details are contained in the Settlement Agreement signed by the parties,

23  a copy of which is attached as Exhibit 1 to this memorandum.  For purposes of preliminary

24  approval, the following summarizes the Settlement Agreement's terms:

25  **A.     Settlement Class**

26  The "Settlement Class" includes all registered users of QuickBooks Pro 2006 for Mac or

27  Quickbooks New User Edition 2006 for Mac (the "Software") whose data or files became

28  inaccessible or were damaged, corrupted, or lost, whether temporarily or permanently, as a result

1  of a malfunction of the Software's auto-update mechanism (the "Malfunction") who do not timely

2  opt out of this settlement.  Excluded from the Class are: (i) all persons who properly and timely

3  opt out pursuant to the settlement agreement in this matter; (ii) the judge to whom this action is

4  assigned and any member of the judge's immediate family; (iii) government entities; and (iv) all

5  claims for personal injury, wrongful death, or emotional distress.  While the forms of notice,

6  discussed in detail below, will be provided to the entire universe of registered users of the

7  Software, the Class definition—and thus the release of claims—is limited to the subset of

8  registered users who suffered damage as a result of the Software Malfunction.  It is estimated

9  approximately 1,038 of the approximately 30,000 registered users experienced damage, and thus,

10  are Class members. *See Quadra Decl.*, Ex. A, pp. 14:15-16:28; 22:25-27.

11      **B.      Compensation to Class Members**

12      Class Members will be entitled to make claims through an Independent Claims

13  Administrator (ICA) for compensation of documented and verifiable damages.  The Claims

14  Period shall be ninety (90) days.  Under the terms of this Settlement Agreement, Intuit shall make

15  the following compensation available on a claims-made basis to the Class:

16          **1.      Reimbursements for Certain Data-Recovery Efforts**

17      With respect to certain data-recovery efforts undertaken by Class Members, the

18  Settlement Agreement provides that Intuit shall provide <u>100% reimbursement</u> for the following

19  properly documented and verifiable expenses incurred on or before April 15, 2008 (or April 30,

20  2008 for Canadian Class Members), directly related to the following efforts to recover

21  inaccessible, damaged, corrupted, or lost data or files:

22      - Data recovery software (*e.g.*, ProSoft Engineering's Data Rescue II software)
23        including shipping, handling, and sales tax.

24      - Third-party data-recovery expenses (*e.g.*, for the services of the Apple Genius Bar,
25        DriveSavers, or other third-party data-recovery vendors); and

26      - Hardware reasonably necessary for data recovery efforts (*e.g.*, external hard drives
27        purchased for use with data recovery software) including shipping, handling, and

28        sales tax.

2. **Reimbursements for Data-Reconstruction and Other Data-Recovery Efforts**

With respect to data-reconstruction and other data-recovery efforts undertaken by Class Members, the Settlement Agreement provides that Intuit will reimburse Class Members for the following documented and verifiable costs directly related to efforts to reconstruct or recover inaccessible, damaged, corrupted, or lost data or files, subject to an aggregate soft cap of five hundred thousand dollars ($500,000 USD) ("Soft-Cap Expenses"):

- Third-party data-reconstruction expenses (*e.g.*, data re-entry) capped at 20 hours at $75 USD per hour per Class Member; and

- If incurred on or before April 15, 2008 (or April 30, 2008 for Canadian Class Members), in-house data reconstruction and data recovery expenses (e.g., reimbursement for time Class Members' employees spent recovering and reconstructing lost data) capped at 20 hours at $75 USD per hour per Class Member.

- If the total amount of Soft-Cap Expenses from all Class Members exceeds $500,000 USD, Intuit will have two options to exercise in its sole discretion within fifteen (15) business days of its receipt of the ICA's Final Report of Settlement Claims:

  o Increase the amount of the Soft Cap to equal the amount of all claimed Soft-Cap Expenses; or

  o Instruct the ICA to calculate payments to all Settlement Class Members with any Soft-Cap Expenses on a pro-rata basis such that the $500,000 USD Soft Cap amount is not exceeded and then offer each Settlement Class Member with any Soft-Cap Expenses a second opportunity to opt out of the Class within thirty (30) days of being notified of the amount of their claim that would be paid under this pro-rata distribution.

3. **Free Upgrade**

The Settlement Agreement provides that Intuit will also provide a free upgrade to

1  QuickBooks Pro 2007 for Mac (retailing at approximately $199.95 USD) to all Class Members

2  who have any damages claims that are approved by the ICA.

3      **C.**    **Attorneys' Fees And Costs**

4      Intuit has agreed that Plaintiffs' Counsel are entitled to an award of fees and costs for their

5  work on behalf of the Class, but the Parties have not negotiated the appropriate amount of such an

6  award.  Any Court-approved payment of attorneys' fees and/or costs will be additional to

7  amounts paid pursuant to the Settlement and shall be sought by Plaintiffs pursuant to a separately

8  noticed motion that will be subject to review and approval by the Court.  Plaintiffs' Counsel will

9  seek an amount not to exceed $800,000 for attorney's fees and reimbursement of costs, combined.

10  The enforceability of the Settlement Agreement is not contingent on the amount of attorneys' fees

11  or costs awarded.

12      **D.**    **Settlement Administration And Notice**

13      As set forth in the Settlement Agreement, all costs of notice and claims administration will

14  be paid by Intuit.  Subject to the Court's approval, the Parties have agreed to engage claims

15  administration experts The Garden City Group, Inc. to perform the duties of Independent Claims

16  Administrator.  *See* Keough Declaration.  The ICA's duties will include:  (1) preparing and

17  emailing the Canadian Notice and Class Notice, attached hereto as Exhibits A and C and

18  providing access to the Full Notice and Claim Form attached hereto as Exhibits B and D, as well

19  as a copy of the Settlement Agreement and related court filings, to the Class Members;

20  (2) receiving, and reviewing the Claim Form and accompanying documentation submitted by

21  Class Members to determine eligibility for payment as a Settlement Class Member and the

22  amount of any such payment (including crediting Intuit with compensation already provided to

23  the Settlement Class Member, if any); (3) keeping records of the total amounts in claims received

24  by Class Members, including the total amounts claimed against the Soft Cap, and making

25  submitted records and documentation available to Intuit for inspection and review; (4) keeping

26  records of Class Members who opt out of the Settlement Agreement; (5) carrying out its

27  obligations to oversee the claims and dispute resolution process; (6) preparing and

28  communicating the Second Exclusion Notice (if any) to Settlement Class Members in the event

MEMORANDUM IN SUPPORT OF PRELIMINARY
SETTLEMENT APPROVAL
CV-07-6452 WHA

that Intuit chooses to exercise its rights; (7) communicating with Settlement Class Members their respective Settlement Awards and distributing the same; and (8) such other tasks as the Parties mutually agree that the ICA should perform.

## IV.    PRELIMINARY APPROVAL OF THE SETTLEMENT AND PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASS

### A.    Settlement And Class Action Approval Process

As a matter of "express public policy," federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting that "strong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned"); *see also* 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases). The traditional means for handling claims like those at issue here— individual litigation—would unduly tax the court system, require a massive expenditure of public and private resources, and given the relatively small value of the claims of the individual Class members, would be impracticable. The proposed Settlement therefore is the best vehicle for Class members to receive the relief to which they are entitled in a prompt and efficient manner.

The *Manual for Complex Litigation* describes a three-step procedure for approval of class action settlements:

(1)    Preliminary approval of the proposed settlement at an informal hearing;

(2)    Dissemination of mailed and/or published notice of the settlement to all affected class members; and

(3)    A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

*Manual for Compl. Lit.*, at § 21.63. This procedure, used by courts in this Circuit and endorsed by class action commentator Prof. Newberg, safeguards class members' due process rights and enables the court to fulfill its role as the guardian of class interests. 4 *Newberg* § 11:25.

With this motion, Plaintiffs request that the Court take the first step in the settlement approval process by granting preliminary approval of the proposed Settlement. The purpose of

1    preliminary evaluation of proposed class action settlements is to determine whether the settlement

2    is within the "range of reasonableness," and thus whether notice to the class of the settlement's

3    terms and the scheduling of a formal fairness hearing is worthwhile.  *Id.*  The decision to approve

4    or reject a proposed settlement is committed to the Court's sound discretion.  *See City of Seattle*,

5    955 F.2d at 1276 (in context of class action settlement, appellate court cannot "substitute [its]

6    notions of fairness for those of the [trial] judge and the parties to the agreement," and will reverse

7    only upon strong showing of abuse of discretion).

8         The Court's grant of preliminary approval will allow all Class members to receive notice

9    of the proposed Settlement's terms and the date and time of the "formal fairness hearing," or final

10   Settlement approval hearing, at which Class members may be heard regarding the Settlement, and

11   at which further evidence and argument concerning the fairness, adequacy, and reasonableness of

12   the Settlement may be presented.  *See Manual for Compl. Lit.*, at §§ 13.14, 21.632.  Although the

13   parties have requested a hearing with oral argument, neither formal notice nor a hearing is

14   required at the preliminary approval stage; the Court may grant such relief upon an informal

15   application by the settling parties, and may conduct any necessary hearing in court or in

16   chambers, at the Court's discretion.  *Id.* at § 13.14.

17        **B.    The Criteria For Settlement Approval Are Satisfied**

18        The purpose of preliminary evaluation of proposed class action settlements is to determine

19   whether the settlement is within the "range of reasonableness," and thus whether notice to the

20   class of the terms and conditions of the Settlement, and the scheduling of a final approval hearing,

21   are worthwhile.  4 *Newberg* § 11.25.

22        A proposed Settlement may be finally approved by the trial court if it is determined to be

23   "fundamentally fair, adequate, and reasonable."  *City of Seattle*, 955 F.2d at 1276.  While

24   consideration of the requirements for *final* approval is unnecessary at this stage, all of the relevant

25   factors weigh in favor of the Settlement proposed here.[3]  In affirming the settlement approved by

26   the trial court in *City of Seattle*, the Ninth Circuit Court of Appeals noted that it "need not reach

27

28   _____

[3] Plaintiffs will address in detail each of the factors required for final settlement approval in their Motion for Final Approval of the Settlement, to be submitted at the close of the Notice period.

1  any ultimate conclusions on the contested issues of fact and law which underlie the merits of the

2  dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and

3  expensive litigation that induce consensual settlements." *Id.* at 1291 (internal quotation and

4  citation omitted).  The district court's ultimate determination "will involve a balancing of several

5  factors" which may include:

6            the strength of plaintiffs' case; the risk, expense, complexity, and
             likely duration of further litigation; the risk of maintaining class
7            action status throughout the trial; the amount offered in settlement;
             the extent of discovery completed, and the stage of the proceedings;
8            the experience and views of counsel . . . and the reaction of the
             class members to the proposed settlement.

9

10  *Id.*

                **1.    The Settlement is the Product of Serious, Informed, and Arm's-Length**
11                      **Negotiations**

12          The Court's role is to ensure that "the agreement is not the product of fraud or

13  overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a

14  whole, is fair, reasonable and adequate to all concerned."  *Hanlon*, 150 F.3d at 1027 (internal

15  quotes and citations omitted).  Where, as here, a proposed class settlement has been reached after

16  meaningful discovery and arm's length bargaining, conducted by capable counsel, and the

17  proponents of the settlement are counsel experienced in similar litigation, the settlement should

18  be entitled to a presumption of fairness*. See, e.g.,*  4 Newberg on Class Actions § 11:41 (4th ed.)

19  ("There is usually an initial presumption of fairness when a proposed class settlement, which was

20  negotiated at arm's length by counsel for the class, is presented for court approval.").

21          The Settlement here is the result of intensive, arm's-length negotiations between

22  experienced attorneys who are familiar with class action litigation in general and with the legal

23  and factual issues of this case in particular.  Counsel for both parties are particularly experienced

24  in the litigation, certification, trial, and settlement of nationwide class action cases involving

25  allegedly defective products like the product at issue here.  In negotiating this Settlement,

26  Plaintiffs' counsel had the benefit of years of experience combined with their familiarity with the

27  facts of this case.

28          Settlement negotiations in this case began shortly after the Complaint was filed in

1    December 2007 and continued in the months that followed while the litigation proceeded apace.

2    *Quadra Decl.*, ¶ 14.  The negotiations culminated in an all-day arms-length mediation before

3    Judge Edward A. Infante (Ret.) at JAMS on February 21, 2008.  *Id.*  With the continued

4    assistance of Judge Infante, the Parties on July 30, 2008 reached an agreement-in-principle,

5    subject to client approval, on all substantive terms of the global settlement, including resolution

6    of all claims presented in the actions pending in this Court and in Canada.  *Id.*  After July 30, the

7    parties continued to negotiate the details of the Settlement Agreement itself, heeding closely the

8    admonitions provided by this Court on August 7, 2008.  The final Settlement Agreement was

9    executed on August 21-22, 2008.  Plaintiffs' Counsel supports the resulting Settlement as fair,

10   and as providing reasonable relief to the members of the class.  *Id.*; *Law Decl.*, ¶ 6.

11                **2.**    **The Settlement Provides Substantial Relief for Class Members**

12        The Settlement provides relief for all Class members whose data or files became

13   inaccessible or were damaged, corrupted, or lost, whether temporarily or permanently, as a result

14   of the Software's malfunction.  The relief includes cash reimbursement of 100% of out-of-pocket

15   expenses associated with data recovery and 100% reimbursement (up to a $500,000 soft cap) of

16   certain expenses associated with data reconstruction and in-house data recovery efforts.  In

17   addition, all Class Members are eligible to receive, if they have not already, a free copy of Intuit

18   Quickbooks Pro 2007 for Mac.  Class members may submit a simple claim to request the relief

19   available under the Settlement.

20                **3.**    **The Risks of Continued Litigation and Trial Counsel in Favor of**
                            **Settlement**
21

22        The Settlement also provides Class members with benefits that they would not enjoy if the

23   case were to proceed to trial.  First, the Settlement provides Class members with prompt and

24   efficient relief.  Proceeding to trial would add years to the resolution of this case and could be

25   further delayed by appeals.  Second, the Settlement enables Class members to avoid the risks of

26   going to trial at all.  Although Plaintiffs and the Class believe they would prevail at trial, the

27   outcome of a trial is uncertain, particularly where, as here, Plaintiffs raise the novel question of

28   whether data files stored on one's computer desktop constitute property for purposes of trespass

1   claims and the economic loss rule.  The Settlement ensures that Class members will be granted

2   relief if they submit timely qualified claims.  Third, the Settlement negates the extraordinary time

3   and expense that would be incurred if this case were to proceed to trial.  Even if the Class were

4   successful in winning at trial, it would not see any relief until after many potential appeals and

5   many years, if at all.  As a result, the relief provided to Class Members in accordance with this

6   Settlement, which provides 100% reimbursement for many of the expenses associated with the

7   alleged Malfunction, and capped relief for a host of other expenses, is more than adequate.

8              **4.    The Settlement Treats All Class Members Fairly**

9          The proposed Settlement provides cash compensation for all eligible Class members

10  according to a uniform claims protocol that requires the same level of proof from all Class

11  members to qualify for relief.  In addition, all Class members are equally eligible for the free

12  upgrade to QuickBooks Pro 2007 for Mac (retailing at approximately $199.95 USD).  Class

13  members are not treated differently or unfairly.

14     **C.    The Settlement Does Not Suffer from the Deficiencies Present in *Zoran* or**

15           ***Oracle***

16         The Parties have taken care to review this Court's orders denying preliminary approval of

17  class action settlements in *In re Zoran Corp. Derivative Litigation* (Case No. C 06-05503) and

18  *Kakani, et al. v. Oracle Corp.* (Case No. C 06-06493) and avoid the problems presented in either

19  case.

20         In *Zoran*, this Court was understandably concerned about issues with the relief offered,

21  the release suggested, and the candor of the attorneys.  None of those issues is present here.

22  Unlike *Zoran*, which offered no cash recovery to Class members even though the potential cash

23  value of the case was approximately $16 million, the proposed Settlement here provides

24  unlimited 100% cash reimbursement of actual data recovery expenses Class members incurred as

25  a direct result of the Software Malfunction at issue.  In addition, the proposed Settlement provides

26  100% cash reimbursement—up to a reasonable cap—for expenses incurred for data

27  reconstruction efforts and in-house data recovery efforts undertaken as a result of the Software

28  Malfunction.  The parties are satisfied that this cap will be adequate to compensate the claims of

1   the entire class, based on their information about the number of people who were "damaged" and

2   therefore will fall within the Class.  Moreover, even if the soft cap is insufficient to cover all

3   claims, class members are allowed a second opportunity to opt out in the event their claims for

4   data reconstruction efforts and in-house data recovery efforts must be reduced pro rata.  Finally,

5   the proposed Settlement offers a free upgrade to improved Quickbooks Pro for Mac 2007

6   software, which retails for approximately $199.95.

7           This Court also expressed concern in *Zoran* that there had been no showing of a real risk

8   that Plaintiffs would not succeed in securing a sweeter recovery for the Class at trial.  *Zoran*

9   Order at 17.  Here, by contrast, the proposed Settlement provides for 100% cash reimbursement

10  of data recovery costs, 100% reimbursement (up to a soft cap) for certain data reconstruction

11  expenses and in-house data recovery efforts, and a free product upgrade.  It is hard to imagine a

12  more successful result at trial, especially where Plaintiffs raise the novel issue of whether data

13  files contained on one's computer desktop constitute property for purposes of trespass and the

14  economic loss rule.

15          In *Zoran*, this Court also criticized the Parties for characterizing actions taken prior to

16  filing as consideration in the Settlement.  *Id.* at 1, 14.  The Parties do not have that problem here.

17  As the Parties have tried to make clear in the Settlement Agreement and the present motion, Intuit

18  undertook some voluntary corrective action to limit the damage caused by the Software

19  Malfunction, including sending a Software "patch" to all registered users of the Software that

20  would prevent future occurrences of the Malfunction.  In addition, Intuit voluntarily reimbursed

21  some of its customers for expenses incurred as a result of the Software Malfunction.  None of

22  those efforts or reimbursements are treated as Settlement consideration here.  To the contrary, the

23  Settlement Agreement makes Intuit's limited voluntary reimbursement available on a uniform,

24  classwide basis.

25          This Court also noted with concern the broad scope of the release of claims included in

26  the Zoran settlement.  *Id.* at 15.  Unlike *Zoran*, where the release extended to claims arising in a

27  year not included in the complaint and where the release included all claims related to all stock

28  options as opposed to the limited number of claims alleged in the complaint, the proposed

1   Settlement here includes a narrowly tailored release that extends only to the claims alleged in

2   Plaintiffs' Complaint.  In addition, the Class definition is drafted to limit the Class to the subset of

3   registered users who suffered damage as a result of the Software Malfunction.  As discussed

4   above, it is estimated that the Class compromises approximately 1,038 of the approximately

5   30,000 registered users of the Software.  Although notice is being provided to all registered users

6   of the software, the vast majority of the class members lost data due to opening the Software on

7   their desktops over a thirty-six hour period in December 2007.  Intuit successfully eliminated the

8   risk of data loss before most registered users were affected.

9        The Parties here have also avoided the troublesome issues in the proposed settlement in

10  *Kakani, et al. v. Oracle Corp.* (Case No. C 06-06493).  A primary concern with the proposed

11  settlement in *Oracle* was the expansion of the Class definition and claims for settlement purposes.

12  *Oracle* Order at 3.  The proposed settlement in *Oracle* purported to include (and release) myriad

13  employment claims for former employees in 10 different positions extending over five years in a

14  geographic area including 35 states. *Id.* at 4.  The Court expressed its doubts that mailed notice

15  would reach a significant portion of the Class and that, even where Notice was received,

16  relatively unsophisticated Class members would appreciate the affect of the settlement on their

17  rights and act accordingly. *Id.* at 9.  Here, the Class is limited to registered users of two discreet

18  2006 software programs.  The Class includes only registered users of the Software, all of whom

19  were required to provide email and mailing addresses to Intuit at the time of registration, and is

20  further limited to only users who suffered damage or loss. Since the Software at issue is relatively

21  new, is used almost exclusively by small businesses, and most small businesses do not alter their

22  email addresses on a regular basis, the contact information in Intuit's records is likely to be highly

23  accurate.  Thus, email and mailed Notice is likely to reach a very high percentage of the Class.

24  Finally, unlike an employment case where the Class is comprised of ordinary citizens, the Class

25  members here are savvy business owners who are more likely to comprehend the Notice

26  documents and take proactive steps to recover the expenses they incurred as a result of the

27  Software Malfunction.

28       Yet another problem with the *Oracle* settlement was that the Parties were still debating the

1    issue of the applicable release of claims at the preliminary approval stage. *Id*. at 6.  By contrast,

2    the Parties here have agreed to a carefully-tailored release that extends to a very specifically-

3    defined Class of consumers who used a single product. More importantly, the release proposed

4    here extends only to claims alleged in Plaintiffs' Complaint.

5          In view of the narrow Class definition, the limited release, the substantive relief provided,

6    the scope of notice, and the sophistication of the Class members, the proposed Settlement avoids

7    the pitfalls of *Zoran* and *Oracle* and satisfies the criteria for preliminary approval.

8          **D.    Provisional Certification Of The Settlement Class Is Appropriate**

9          Finally, Plaintiffs request that the Court provisionally certify a nationwide class for

10   settlement purposes.  At this point in the approval process, provisional certification permits notice

11   of the proposed Settlement to issue to the class to inform class members of the existence and

12   terms of the proposed Settlement, of their right to be heard on its fairness, of their right to opt out,

13   and of the date, time and place of the formal fairness hearing. *See Manual for Compl. Lit.*, at

14   §§ 21.632, 21.633.  Provisional certification of a nationwide class is appropriate in part because

15   Intuit waives its challenges to class certification in the context of this Settlement.  In such

16   circumstances, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), provides the roadmap

17   for the Court's consideration of certification issues.

18         **1.    The Proposed Settlement Class Mirrors the Type of Settlement
                   Authorized by the United States Supreme Court**
19

20         The United States Supreme Court's opinion in *Amchem Prods., Inc. v. Windsor*, 521 U.S.

21   591, 620, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997), confirmed the propriety, and recognized the

22   necessity, of settlement class certification in cases involving identifiable and easily identified

23   class members, and relatively small, essentially identical, and objectively calculable economic

24   damages.  Noting that Federal Rule of Civil Procedure 23(b)(3) aims primarily at vindicating "the

25   rights of groups of people who individually would be without effective strength to bring their

26   opponent into court at all," the Supreme Court declared cases like this one to be the paradigm for

27   class treatment:

28

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. The class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

The present action, which involves a single defendant, a single alleged course of conduct common to all Class members, and economic (rather than personal injury) damages, is precisely the type of "core" class action endorsed in *Amchem*. Without this class action—and without this settlement—most Class members would be "without effective strength to bring their arguments into court at all." *Amchem*, 521 U.S. at 617. Unlike the class disapproved in *Amchem*, which presented individualized personal injury issues and future-injury classes, the proposed Class here seeks only economic damages, and Class members' injuries have already occurred. Under these circumstances, class certification, has long been held proper. *See, e.g., Hanlon*, 150 F.3d at 1019-23.

**2.     The Criteria for Class Certification Under Rule 23 are Satisfied**

In order to merit class certification under Rule 23(a), Plaintiffs must show that: (1) the Class is so numerous that joinder is impracticable; (2) questions of law or fact are common to the Class; (3) the claims of the representative Plaintiffs are typical of the claims of the Class; and (4) the Class representatives will fairly and adequately protect the interests of the Class. These prerequisites are met here.

**a.     The Class is So Numerous that Joinder of All Members is Impracticable**

The parties estimate that the population of registered users, all of whom had to provide contact information at the time of registration, is approximately 30,000 and that approximately 1,038 of those registered users were damaged as a result of the Malfunction. Only registered users who suffered damage as a result of the Software Malfunction are Class Members. Thus, it is estimated that the Class comprises approximately 1,038 consumers. Given the large number of potentially affected individuals, the numerosity requirement is easily satisfied here.

b.    **There are Numerous Common Issues of Law and Fact**

Rule 23(a)(2) requires that there are questions of law or fact common to the class.  This rule "has been construed permissively." *Hanlon*, 150 F.3d at 1019.  It "does not mandate that each member of the class be identically situated." *In re Napster*, 2005 U.S. Dist. LEXIS 11498, at *13 (N.D. Cal 2005), *see also Hanlon*, 150 F.3d at 1019.  Rather, this test for common questions of law and fact is "qualitative rather than quantitative—one significant issue common to the class may be sufficient to warrant certification." *See Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1177 (9th Cir. 2007)).  "[P]laintiffs may demonstrate commonality by showing that class members have shared legal issues by divergent facts or that they share a common core of facts but base their claims for relief on different legal theories." *Id.*  In the absence of class certification and settlement, each individual class member would be required to litigate a long list of common issues of law and fact, all relating to Intuit's common course of conduct of involving the manufacture and sale of the allegedly defective furnaces .  Here, common questions of law and fact include, but are not limited to, the following:

        A.      Whether Intuit took proper steps to avoid significant data losses for its customers.

        B.      Whether Intuit trespassed by creating and allowing its faulty signal to enter users' computers and destroy data and files.

        C.      Whether Intuit breached warranties of merchantability and fitness for a particular purpose.

        D.      Whether Intuit's failure to warn its users to avoid opening QuickBooks or Intuit's failure to shut down its server before significant losses constituted an unfair business practice.

        E.      Whether Intuit's creation of a faulty signal that destroyed data on users' desktops, its allowing such signal to intrude into users' computers without the consent of the users, its failure to warn its users to avoid opening QuickBooks or its failure to shut down its server before significant losses, constituted negligence.

F.    Whether Intuit is liable under a theory of products liability for its creation of a faulty signal that destroyed data on users' desktops, its allowing such signal to intrude into users' computers without the consent of the users, its failure to warn its users to avoid opening QuickBooks or its failure to shut down its server before significant losses.

The Ninth Circuit relied upon a similar listing of common questions to find that commonality was satisfied in a case in which consumers alleged violations of the state consumer law arising from the sale of automobiles containing a known defective engine part. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005).  Because Plaintiffs have identified numerous questions of law and fact common to all members of the class, Rule 23(a)(2)'s commonality requirement is fully satisfied.

c.    **The Class Representatives' Claims are Typical**

Representative claims are typical of the class claims if they are "reasonably coextensive with those of the absent class members." *Dukes,* 509 F.3d at 1184 (citing *Hanlon*, 150 F.3d 1011, 1020).  The class representatives' claims "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Rather, "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) (internal quotation omitted).

Here, Plaintiffs have precisely the same claims as Class members, and must satisfy the same elements of each of those claims, as must other Class members.  Supported by identical legal theories, Plaintiffs and all Class members share claims based on the same event; namely, that Intuit's defective Quickbooks software allowed a faulty signal and/or defective software to interact with the Class Members' computers without permission and interfere with Plaintiffs' possessory interest in their computer systems and data, deleting data and files from all parts of the computer desktop, whether related to QuickBooks or not.  Plaintiffs and all Class members have been injured in the same manner.

1

#### d.    **The Named Plaintiffs And Their Counsel Adequately Represent the Proposed Class**

2

3    The adequacy of representation requirement is satisfied if: (1) Plaintiffs are represented by

4    qualified and competent counsel; and (2) Plaintiffs' interests do not conflict with the interests of

5    the proposed class members. *See, e.g., Dukes*, 509 F.3d at 1185; *Hanlon*, 150 F.3d at 1020.

6    Plaintiffs satisfy both prongs of the adequacy requirement.

7    First, Plaintiffs' claims are co-extensive with those of the Class.  Plaintiffs and each Class

8    member have an identical interest in establishing Intuit's liability.  Plaintiffs and each Class

9    member have been injured in the same manner by Intuit.  Plaintiffs assert the same legal claims

10    and theories as those of all Class members.  Plaintiffs seek the identical relief that would be

11    sought by all members of the Class.  There is no conflict between Plaintiffs' claims and those of

12    the proposed Class.  Each Named Plaintiff has agreed to assume the responsibility of representing

13    the Class, including responding to discovery requests, testifying at a deposition or trial and

14    diligently pursuing this action in cooperation with this counsel.  Plaintiffs have taken seriously

15    their obligations to the Class.  Nothing more is required.

16    Second, Class Counsel is well qualified and have extensive experience and expertise in

17    prosecuting complex class actions, including consumer and product defect actions. *Quadra Decl.*,

18    ¶¶ 1-8; *Law Decl.*, ¶¶ 2-3, Ex. A.

19    In pursing this litigation vigorously, Plaintiffs have advanced and will continue to advance

20    and fully protect the common interests of all members of the Class.  Accordingly, Rule 23(a)(4)'s

21    requirement of adequate representation is satisfied.

22

#### 3.    **The Proposed Settlement Class Meets the Predominance and Superiority Requirements of Rule 23(b)(3)**

23

24    This action is well-suited for certification under Rule 23(b)(3) because, particularly in the

25    context of this Settlement, questions common to the Class members predominate over questions

26    affecting only individual Class members, and the class action device provides the best method for

27    the fair and efficient resolution of the Class's claims.  Indeed, Intuit does not oppose provisional

28    class certification for the purpose of effectuating the proposed Settlement.  When addressing the

1    propriety of class certification, the Court should take into account the fact that, in light of the

2    settlement, trial will now be unnecessary, and that the manageability of the Class for trial

3    purposes is not relevant to the Court's inquiry. *Amchem, supra*; *Hanlon v. Chrysler Corp.*,

4    150 F.3d 1011 (9th Cir. 1998).

5                        a.        **Common Questions Predominate**

6            In addition to Rule 23(b)(2), a class action is appropriate under 23(b)(3) if "questions of

7    law or fact common to the members of the class predominate over any questions affecting only

8    individual members . . . ." Fed. R. Civ. P. 23(b)(3). "When common questions present a

9    significant aspect of the case and they can be resolved for all members of the class in a single

10   adjudication, there is clear justification for handling the dispute on a representative basis rather

11   than on an individual basis." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las*

12   *Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (citing *Hanlon*, 150 F.3d 1011, 1022).

13   Even a single issue "of central importance to the case and common to all class member claims . . .

14   can cause class litigation to be appropriate." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

15   1231-32 (9th Cir. 1996). Here, common questions of law and fact overwhelm individual issues.

16   Thus, the predominance requirement is satisfied.

17                       b.        **Class Treatment is Superior to Alternative Methods of**
                                   **Adjudication**
18

19           The Court should certify the Class if it finds that a "class action is superior to other

20   available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

21   Courts in this Circuit have found a class action may be superior if class litigation of common

22   issues will reduce litigation costs and promote greater efficiency. *See e.g.*, *Connor v. Automated*

23   *Accounts, Inc.*, 202 F.R.D. 265, 271 (E.D. Wash. 2001) ("A class action may be superior if class

24   litigation of common issues will reduce litigation costs and promote greater efficiency, or if no

25   realistic alternative exists."). Likewise, where an issue is of central importance to the case and

26   common to all class member claims, it can cause class litigation to be appropriate. *See*

27   *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th Cir. 1996). Moreover, "if a

28   comparative evaluation of other procedures reveals no other realistic possibilities, this

1   [superiority] portion of Rule 23(b)(3) has been satisfied." *Local Joint Executive Bd. of*

2   *Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001)

3   (internal quotations and citations omitted).

4       Class treatment here, in the context of the Settlement, will facilitate the favorable

5   resolution of all Class members' claims.  Given the large numbers of Class members and the

6   multitude of common issues present, use of the class device is also the most efficient and fair

7   means of adjudicating the claims that arise out of Intuit's alleged misconduct.  Class treatment in

8   the settlement context is superior to multiple individual suits or piecemeal litigation because it

9   greatly conserves judicial resources and promotes consistency and efficiency of adjudication.  For

10  these reasons, the superiority requirement is satisfied.

11      **E.**       **The Proposed Notice Program Is Constitutionally Sound**

12      "Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class

13  members who would be bound by a proposed settlement, voluntary dismissal, or compromise'

14  regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for*

15  *Compl. Lit., supra*, at § 21.312.  Many of the same considerations govern both certification and

16  settlement notices.  In order to protect the rights of absent class members, the Court must provide

17  the best notice practicable to class members.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797,

18  811–12, 70 S. Ct. 652, 94 L. Ed. 865 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174–

19  175, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974); *Mullane v. Central Hanover Bank & Trust Co.*,

20  339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 2d 865 (1950).  As the *Manual for Compl. Lit.*

21  observes: "Rule 23 . . . requires that individual notice in [opt-out] actions be given to class

22  members who can be identified through reasonable efforts.  Those who cannot be readily

23  identified must be given the 'best notice practicable under the circumstances.'" *Manual for*

24  *Compl. Lit., supra*, at § 21.311.  According to the *Manual for Complex Litigation, supra*, at

25  § 21.312, the settlement notice should:

26      •   Define the class;

27      •   Describe clearly the options open to the class members and the deadlines for
            taking action;

28

- • Describe the essential terms of the proposed settlement;

- • Disclose any special benefits provided to the class representatives;

- • Provide information regarding attorneys' fees;

- • Indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to or opting out of the settlement;

- • Explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations;

- • Provide information that will enable class members to calculate or at least estimate their individual recoveries; and

- • Prominently display the address and phone number of class counsel and the procedure for making inquiries.

The proposed forms of Notice, attached as Exhibits to the Settlement Agreement, satisfy all of criteria above. In addition, the Parties have agreed to a notice dissemination plan that is highly likely to reach nearly 100% of Class members. The Class Notice will be sent via email to every registered user of Software. To register the Software, consumers had to provide a current email address to Intuit. As a result, Intuit has complete records of email addresses that are no more than three years old. Thus, the emailed Notice will reach nearly all registered users in the first instance. In the event that an emailed Notice is returned undeliverable, the Notice will be sent to the registered user's mailing address, which was also provided to Intuit at the time of registration. Given the quality of Intuit's records, it is almost certain that every registered user will receive the Notice. In the unlikely event that the email notice and mailed notice are both returned as undeliverable, the intended recipient registered user will be excluded automatically from the Class, thus preserving that Class member's right to pursue his or her own claim. However, should any such automatically excluded Class Member learn of the Settlement and timely submit a claim, his or her claim will be treated like any other claim.

Another strength of the Notice program is its reach. The Parties have agreed to send the notice to all registered users of the Software (some 30,000 consumers), even though the Class is limited to registered users whose data or files became inaccessible or were damaged, corrupted, or lost, whether temporarily or permanently, as a result of a malfunction of the Software's auto-update mechanism. It is anticipated that approximately 1,038 registered users suffered damage.

1   The Class includes only the subset of damaged individuals (and the Release of Claims applies

2   only to that smaller subset).  Intuit sent an email to all 30,000 registered users and asked them to

3   contact Intuit if they were impacted.  *Quadra Decl.*, Ex. A [Responses to Interrogatories], p.

4   22:25-27  Intuit also posted information on its website and attempted to ascertain affected users

5   by monitoring message boards and contacting apparently affected users.  *Id.* at 15:25-16:24.

6   After those efforts, approximately 1,038 consumers contacted Intuit to report damages as a result

7   of the Software Malfunction.  *Id.* at 14:7-10.  While the Parties believe that the Class comprises

8   only those 1,038 or so consumers, the Parties agreed to disseminate the notice to all registered

9   users to maximize the likelihood of reaching every damaged user.  In addition, the Software at

10   issue is primarily used by small business owners who may be more savvy and proactive than

11   ordinary consumers.

12       In addition to the email and mailed notice described above, the Notice and other

13   documents will also be available online at a website maintained by the Independent Claims

14   Administrator.  The website will be registered with hundreds of search engines to ensure that it is

15   easy to find on the web.

16       **F.    Scheduling a Final Approval Hearing Is Appropriate**

17       The last step in the Settlement approval process is a final fairness hearing at which the

18   Court may hear all evidence and argument necessary to make its Settlement evaluation.

19   Proponents of the Settlement may explain the terms and conditions of the Settlement, and offer

20   argument in support of final approval.  In addition, Settlement Class Members, or their counsel,

21   may be heard in support of or in opposition to the Settlement Agreement.  The Court will

22   determine after the final approval hearing whether the Settlement should be approved, and

23   whether to enter a final order and judgment under Rule 23(e).  Plaintiffs request that the Court set

24   a date for a hearing on final approval at the Court's convenience on or after February 26, 2009.

25   **V.    CONCLUSION**

26       For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant

27   preliminary approval of the proposed Settlement; appoint as Class Counsel Moscone, Emblidge &

28   Quadra, LLP and Lieff, Cabraser, Heimann, & Bernstein, LLP; provisionally certify the proposed

1    settlement class; approve the proposed Notice Plan and forms of notice; appoint The Garden City

2    Group, Inc. as the Independent Claims Administrator; and schedule a formal fairness hearing on

3    final settlement approval as the Court's calendar permits.

4

5                                            Respectfully submitted,

6
     Dated:  August 22, 2008              By: _____
7                                              Kristen E. Law

8                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                           Michael W. Sobol
9                                          Kristen E. Law
                                           275 Battery Street, 30th Floor
10                                         San Francisco, CA  94111-3339
                                           Telephone:  (415) 956-1000
11                                         Facsimile:  (415) 956-1008

12
                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
13                                         Jonathan D. Selbin
                                           780 Third Avenue, 48th Floor
14                                         New York, NY  10017-2024
                                           Telephone:   (212) 355-9500
15                                         Facsimile:  (212) 355-9592

16
                                           MOSCONE, EMBLIDGE & QUADRA, LLP
17                                         James A. Quadra
                                           220 Montgomery Street, Ste. 2100
18                                         San Francisco, California 94104
                                           Telephone:  (415) 362-3599
19                                         Facsimile:  (415) 362-2006

20                                         *Attorneys for Plaintiffs and the Proposed Plaintiff Class*

21

22

23

24

25

26

27

28