Volume 1

Pages 1 - 48

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

CREATE-A-CARD INC., AGSJ, INC., )
and PHILANTRHOPIC FOCUS, LLC, on )
behalf of themselves and all )
others similarly situated, )
                       )
         Plaintiffs, )
                       )
   vs. )  NO. C 07-06452-WHA
                       )
INTUIT, INC., )
                       )  San Francisco, California
         Defendant. )  Thursday
                       )  September 18, 2008
_____ )  9:27 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**         Lieff, Cabraser, Heimann &
                             Bernstein
                             275 Battery St., 30th Fl.
                             San Francisco, California  94111-3339
                             (415) 956-1000
                **BY:  JONATHAN D. SELBIN**
                      **KRISTEN E. LAW**

**For Plaintiffs:**         Moscone, Emblidge & Quadra, LLP
                             Mills Tower
                             220 Montgomery Street, Suite 2100
                             San Francisco, CA  94104
                             (415) 362-3599
                             (415) 362-2006 (fax)
                **BY:  JAMES A. QUADRA**

(Appearances Continued On Next Page)
**Reported By:  Lydia Zinn, CSR #9223, RPR**
                **Official Reporter - U.S. District Court**

1 | APPEARANCES (CONT'D)
**For Defendant:**          Fenwick & West LLP
2 |                         Silicon Valley Center
                            801 California Street
3 |                         Mountain View, CA  94041
                            (650) 988-8500
4 |                         (650) 938-5200 (fax)
                    BY:  **RODGER R. COLE**
5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1          **THE COURT:**  All right.  Let's hear from the other

2    class case, Create-A-Card.

3          **MR. SELBIN:**  Good morning, your Honor.

4    Jonathan Selbin, on behalf of plaintiffs and the proposed

5    class.

6          **MR. QUADRA:**  Good morning, your Honor.  James Quadra,

7    of Moscone, Emblidge & Quadra, on behalf of the class.

8          **MS. LAW:**  Good morning, your Honor.

9          **THE COURT:**  There is no class yet.

10          **MR. QUADRA:**  Putative class.

11          **MR. SELBIN:**  Proposed class.

12          **MS. LAW:**  Kristen Law, with Lieff, Cabraser, Heimann

13    & Bernstein.  Good morning, your Honor.

14          **THE COURT:**  Good morning.

15          **MR. COLE:**  Rodger Cole, of Fenwick & West, for

16    Intuit.

17          **THE COURT:**  All right.  Well, I've read this.  Let me

18    just -- let me ask you some questions.

19          It sounds like you know the exact names and addresses

20    of every single person who bought this product.  Is that true?

21          **MR. COLE:**  We have registration information for every

22    person who has brought the product.

23          **THE COURT:**  Let me ask you a question.  Why can't we

24    just do the same thing?  You let -- you want to have a

25    claims-made thing, but you want a -- you don't want a

1    claims-made release.  So why can't the release just be

2    coextensive with whoever makes a claim?  They get paid.

3            The people who don't make a claim, they can -- they

4    don't have to give a release.

5            **MR. COLE:**  Your Honor, from Intuit's perspective,

6    there are two options that are fair here.

7            Option one we're perfectly willing to do, which

8    your Honor suggests a claims-made -- only a release of the

9    people who actually submitted claims; but if that's going to be

10   the settlement, your Honor, then notice should only be given to

11   the people who we believe and we know have already been

12   impacted by this issue:  approximately 1,038.

13           Quick digression, your Honor.

14           This problem happened at the end of December.

15           On January -- for the next several weeks, Intuit

16   worked to address the problem, and worked with its customers

17   who were impacted by this.

18           On January 14th of this year, your Honor, we sent an

19   e-mail to the entire registered user base, the purported class

20   of 30,010 people.  That e-mail went out.  There was less than a

21   9 percent failure rate on that e-mail.

22           And remember, these customers, your Honor, are small

23   businesses.  They typically have between 5 and 25 employees.

24   So 91-plus percent of these e-mails were received by these

25   small businesses.

1      In that e-mail we said, "If you were impacted by this

2   data loss temporarily or permanently, please let us know.

3   Contact us.  Here's a dedicated e-mail address.  Here's a

4   dedicated phone number.  And if you've been impacted, we will

5   work with you."

6      Based on that e-mail, in addition to separate

7   information-collecting Intuit has done from its user boards and

8   Macintosh -- independent Apple Macintosh users' boards, we've

9   collected a database of approximately 1,038 people who we

10  believe have been impacted by this problem.

11     With that digression, back to your Honor's question:

12  why not claims-made, if we had given notice to those 1,038?  We

13  can submit a list of them.  Here's the class:  1,038 people.

14  If we give the notice to that group of people, we're perfectly

15  happy to do a claims-made, and only a release for people who

16  have submitted claims; but if your Honor thinks it's required

17  that we give a notice to all 30,000 people who had purchased

18  this product, then it's not fair to Intuit to put that notice

19  out to these registered users, 29,000 of which have not made a

20  peep, and have not said they're impacted by this problem, to

21  give them a chance to make a claim, and -- and have Intuit take

22  the risk and the hit associated with that notice, if we're not

23  going to get something in return.

24     And that's why, if we're going to give the notice to

25  the entire 30,000, then we should get a release from everyone,

1 even those who don't make a claim.

2     **THE COURT:**  Well, what's the point of giving notice

3 to the people who haven't submitted a -- you've already told

4 them, "Is there a problem?"

5     And you say 1,038 say, "Yes," and the rest of them

6 said nothing.

7     **MR. COLE:**  Again, your Honor, I'm happy not giving

8 notice to the 29,000.  If -- and we will do a claims-made

9 settlement if we give notice to a thousand.

10     **THE COURT:**  Let's pursue this for a second.

11     We've got 1,038 who'll get notice.  Then let's say

12 somebody comes in and says, "Yes, and I had $48,000 worth of

13 damage."  Is there some limit on how much you're willing to

14 pay?  How does that part work?

15     **MR. COLE:**  Yes, your Honor, there is a limit on how

16 much we would pay.

17     **THE COURT:**  What is the limit?

18     **MR. COLE:**  We're willing to pay three things,

19 your Honor.

20     Number one, for data-recovery efforts.  So they lost

21 data.  They make efforts to recover that data, which would be

22 purchasing data-recovery software; going to a third-party,

23 Apple Macintosh we-help-Macs company to recover the data; or

24 hardware that's necessary to recover the data.  For that

25 data-recovery expense, we're paying a hundred percent on the

 1   dollar.  We've committed to do that since December 19, 2007.

 2   We remain committed to doing that today.  That's category one.

 3          Category two is data-reconstruction efforts and

 4   in-house data recovery efforts.  So people either hire a third

 5   party, or in house they reconstruct the data.

 6          For example, if they lost their QuickBooks accounting

 7   files, they key in -- re-key in all of that data; or if they

 8   have in-house people who attempted to work on data recovery,

 9   for that category -- that second category -- we have a soft cap

10   of up to $1,500 per small business.

11          How was that determined?

12          It's up to 20 hours per claim, $75 per hour,

13   depending on how much people -- what they submit on the claim

14   form, but it's up to $1,500.

15          And then we have a third component of the relief,

16   your Honor, which is a free copy of QuickBooks 2000 [sic],

17   which is the -- which is currently the latest version on the

18   market.

19          **MR. SELBIN:**  2007.

20          **MR. COLE:**  2007.  Thank you, John.  2007.

21          And it is worth $200.  $199.95 resale value.  It's

22   not a coupon, your Honor.  We actually ship them the box.

23          Those are the three components of consideration we're

24   giving to this class.

25          And I might just digress, your Honor, for a moment.

1  We're giving that consideration against a backdrop where we

2  have a motion to dismiss pending, but we have an end-user

3  license agreement with these small businesses.

4          We're not talking about employees, like the previous

5  case.  We're not talking about consumers.

6          We're talking about what everyone agrees are

7  sophisticated, small businesses that have between 5 and 25

8  employees who had an agreement with Intuit.  And that agreement

9  does not provide for a big chunk of this recovery.

10 Nonetheless, Intuit's willing to pay that compensation because

11 these are ongoing customers, and because we'd like to resolve

12 this matter.

13         **THE COURT:**  How many -- what has been the claims

14 history so far?

15         **MR. COLE:**  So far --

16         **THE COURT:**  I mean, just -- in other words, apart

17 from this case, it sounds like you've been trying to assist

18 these customers anyway.

19         **MR. COLE:**  Yes, we have anyway.

20         **THE COURT:**  So what kind of settlements and dollar

21 amounts have been involved so far?

22         **MR. COLE:**  Okay.  No settlements, your Honor.

23         We have voluntarily paid customers.  We have not

24 asked for any release from any of our customers to date.

25         **THE COURT:**  What I'm trying to get at is:  I don't

1  know from real experience what damages these people are likely

2  to suffer.

3      **MR. COLE:**  Yes.  So following those three categories

4  that I outlined as part of the settlement, your Honor, in the

5  first category of uncapped amounts for actual recovery of data,

6  to date the average customer claim had been approximately $208.

7  There have been -- approximately 344 customers have requested

8  that amount, to reach that average of $208.

9      **THE COURT:**  What is the highest amount?

10      **MR. COLE:**  Well, that -- so in -- I don't know the

11  answer to that in the first category, your Honor.

12      Then there's the second category that we have:  the

13  soft cap revision of $500,000.

14      **THE COURT:**  No.  You said "$1,500."

15      **MR. SELBIN:**  There are two pieces.

16      **THE COURT:**  You said $500,000.

17      **MR. COLE:**  500,000 is the aggregate, your Honor.

18  $1,500 is the individual.

19      **THE COURT:**  Oh, I see.  Okay.  All right.

20      **MR. COLE:**  In that category we've had approximately

21  16 people submit claims.  And, to date, the average is

22  approximately $3,700.

23      And then in the third category, your Honor, we've

24  shipped over 900 boxes of QuickBooks 2007 to impacted

25  customers.  QuickBooks 2000 for Mac, we've shipped over 900

1  boxes, your Honor.

2          **THE COURT:**  Well, 3,700 average; but you want to

3  limit it to 1,500 for a small business?

4          **MR. COLE:**  That's right, your Honor.  And, frankly, I

5  think that they're limited to zero under the law.

6          And that's -- that's what the end-user license

7  agreement, a binding agreement Intuit has with these small

8  businesses -- they're not entitled to recover because the

9  category we're talking about, your Honor, is classic

10 consequential damage.  They're re-keying in lost data;

11 intangible property.  And, under both the

12 limitation-of-liability provision we have in the end-user

13 license agreement as well as California's longstanding

14 economic-loss doctrine, those damages are not recoverable as a

15 matter of law.

16         If this were -- if there were an academic discussion,

17 we were having or a debate, I would love to have your Honor

18 rule on the motion to dismiss, to see whether or not those are

19 recoverable.  My competitive instincts say, as your Honor said

20 in the last case, "Let's take this to trial and see if it

21 happens," but that's not good for these consumers, these

22 customers, for Intuit.  And it's not good for Intuit's

23 litigation budget.

24         So, to save the defense costs associated with this

25 case, to do right by their customers -- and they've tried to

1 do -- since the end of December, we've tried to pay them nearly

2 fifty cents, when we think they're entitled to none.

3       **THE COURT:**  Have you been sued by anyone in this

4 case?

5       **MR. COLE:**  One small case pending in Ventura,

6 your Honor.  And actually in that case, your Honor -- an

7 interesting side note -- the small-claims case, it was while we

8 were discussing settlement after we signed the settlement

9 agreement and we submitted to your Honor -- we gave a copy of

10 it or the in-house business people of Intuit gave a copy of it

11 to that plaintiff.  And that plaintiff voluntarily stayed his

12 small-claims case because he was satisfied with the

13 consideration under the settlement agreement, your Honor.

14       **MR. SELBIN:**  Your Honor, I have a few thoughts, as

15 you might imagine, if I may be heard.

16       **THE COURT:**  Wait a minute.  Let me just a second.

17 I'm going to let you speak in just a second.  Before you do

18 that, I want to -- find some notes.

19       All right.  Go ahead.

20       **MR. SELBIN:**  Thank you, your Honor.

21       As you might imagine, your Honor, we have thought

22 quite a bit about the issues you've raised today.  We carefully

23 reviewed your *Oracle* and *Zoran* opinions.  And I think it's fair

24 to say all of us were guided, including Judge Infante, who

25 oversaw the mediation, by an awareness of those.  And I really

do think that here we have done a great job of taking into account those concerns. And I want to address a few of the points that you discussed with Mr. Cole, and also some of the other questions that you've raised in some other cases.

With respect to the 1,038 versus 30,000, we struggled with that. There was, I think it's fair to say, quite a bit of discussion about whether or not we should be sending the notice and defining the class just as that 1,038, or some broader group.

And where we ended up on our side of the table after a good deal of discussion was the feeling that it was more important to get the word out to the entire 30,000 that there was a settlement that was available to them, and that it provided this type of relief.

It is true that Intuit, to its credit, sent out an e-mail to its entire list, and received back word from 1,038 people.

Our concern is that it wasn't a notice of a settlement. It didn't make clear, from our perspective, what all the categories of relief were. And, in fact, this is important in terms of what this settlement accomplished. There are things that this settlement provides -- particularly in that category two -- that were not clearly being provided by Intuit prior to our case. In fact, most of the things in category two were not. And so we think there may be people out

1 there within that 30,000 who didn't respond directly to Intuit

2 in response to its e-mail.

3          So we had to balance:  Do you just send the notice to

4 the 1,038 and make the relief available to them, or is it

5 better, again, to send it again to everybody, to the entire

6 30,000, and say, "If you have been damaged, if you had this

7 happen to you, you are a member of the class.  If you didn't

8 have it happen to you, you're not a member of the class"?

9          And so we didn't -- there's not a release here for

10 all 30,000 people in this class.  The class is defined as only

11 those who were damaged.  So it's not -- it's not a

12 30,000-person release here.  So I think we've narrowly tailored

13 the class definition.  I think we've narrowly tailored the

14 release.  And the notice here is very important.

15          Your Honor has directly -- I heard your comments

16 earlier.  And it's an issue that we always struggle with in

17 these cases:  how do you get notice to people in a consumer

18 case, in an employee case with former employees?

19          As you've noted, it may well be that people don't get

20 the notice, or it falls behind the radiator.  People may have

21 other things they're doing here.

22          You're talking about small businesses who registered

23 this product with Intuit.  None of the e-mail addresses are

24 older than three years -- I believe, is correct.  Everybody's

25 going to get an e-mail.  If the e-mail isn't deliverable,

they're going to get direct male. If the direct male isn't

available, they're automatically opted out.

Something your Honor mentioned in the last case, and

that's built in here already, is an automatic opt-out if we

can't get to you. I think you've got a notice that's going to

accomplish a hundred percent direct notice here.

This isn't a publication notice to a class of

millions of people across the country.

These are also sophisticated class members who, if

they were damaged -- and again, that's the only people who are

in the class. If they were damaged, they know it. They lost

time. They lost money. And we've been in touch with a number

of these people. I think some 50 of them we've been in regular

contact with. They know that they've been damaged. And they

also know that they're entitled to cash recovery here.

This isn't a coupon settlement. It's not a

pennies-on-the-dollar settlement. It's real cash. A

hundred percent for those in that first category; a hundred

cents on the dollar.

For the second category, it's a rate that was hotly

negotiated. And for a number of hours it was hotly negotiated,

but -- but we think that the $1,500 is more than adequate for

most of those folks who we've talked to.

And so, from our perspective, we've addressed the

concerns that your Honor has. We share many of them in many of

these cases.

I would also say I heard your Honor discuss -- and I know you've spoken on this before -- the issue of:  why not just a have a common fund of money that these people could come in and get a piece of?

The problem with that -- and I think that counsel in the prior case alluded to it -- is that if you had a common fund, they would insist on a number that's so low, that it's possible that that we would run out of money in that case.  And I've had cases that were done as common fund cases -- in consumer cases, for example, where there was a common fund, because that was what we decided was the best way to go.  And there were so many claims, that the fund was overwhelmed, and people ended up getting --

**THE COURT:**  You got a $500,000 cap here.

**MR. SELBIN:**  It's a soft cap here, your Honor.  What that means is if it's exceeded, if the claims come in and they exceed $500,000, Intuit has two options.

Option number one is it can just pay all the claim.  And, in fact, in the settlement that I just mentioned, that's what the defendant ended up doing.

The second option Intuit has is a pro rata reduction in all the claims.  So, in other words, if there are $600,000 in claims, everybody will take a pro rata reduction; but here's the thing.  Everybody who gets a pro rata reduction gets

1 another opportunity to opt out.

2     **THE COURT:** All right. So let's say certain number

3 opt out. Then you got to go back and redo the math.

4     **MR. SELBIN:** That's right.

5     **THE COURT:** And then the people who opted out based

6 on the their earlier math say, "Wait a minute. I would have

7 stayed in if I had known it was going to go back up."

8     **MR. SELBIN:** At some point, your Honor, you have to

9 obviously draw the line here. We were trying to accommodate

10 your exact concern, which is exceeding a soft cap, and having

11 people get pro rata reductions. And we thought it was fair --

12 and Intuit, to its credit, agreed -- that if we were going to

13 reduce people pro rata, then they ought to have the opportunity

14 to opt out.

15     I -- but your Honor's concern is a good point,

16 because with every tinkering that you do with a peace of a

17 settlement agreement, with every attempt to accommodate

18 competing concerns, there are additional consequences. And we

19 have to try to balance all of those consequences. And we think

20 that this settlement -- I have done many class cases; some all

21 the way through to trial; many that have settled. We think

22 that here, we have addressed all of the concerns that

23 your Honor has expressed, and that this is a terrific

24 settlement.

25     We think that we would prevail on the motion to

dismiss; but to say that the law is unsettled in this area, and that it's a difficult issue, I think, is a fair point. I'm not confident that we win -- that we defeat that motion to dismiss.

And I think this is a terrific settlement. And it's one that we're proud of, and that we think comports with your concern.

**THE COURT:** Let me raise a different point. The *Phillips Petroleum* case the Supreme Court addressed. Two issues. First-class mail can deal with the -- one issue; but the other issue is the choice of law, and whether -- well, first let's go back to the personal jurisdiction.

Take somebody in Florida. What is our -- of course, we've got jurisdiction over the parties immediately here; but say there was a small business that bought this in Florida. What is my authority, under the *Phillips Petroleum* case, to say to that person, "Sorry. You're out of luck. You didn't submit a claim. You've lost your" --

Do I have personal jurisdiction over that individual?

**MR. SELBIN:** You do, your Honor, for two reasons; both, obviously, choice-of-law related.

The first is that in the licensing agreement that every single one of these users signed, it calls for application of California law. So if you bought this product, you agreed to have your claim decided under California law in California. In fact, the contract --

1          THE COURT:  Well, I didn't see -- I've read it.  It

2    doesn't say -- does it say "in California"?

3          MR. SELBIN:  I don't believe it has a choice of

4    forum, but it has a choice of law.

5          THE COURT:  Governed by California law.

6          MR. SELBIN:  So you've made the agreement to have

7    California law applied.

8              Number two is:  based on California choice-of-law

9    analysis, which is what would apply here -- and in particular,

10   I'm thinking of the *Northwest Mutual* case from the California

11   Supreme Court, which says that California courts have

12   jurisdiction over and can apply California law to transactions

13   that are conducted with a business that's in California, as

14   long as there's a connection.

15             So in that case there was, I think, three subclasses,

16   two of which involved -- one subclass involved California

17   residents.  One involved non California residents who, I

18   believe, bought stock from the California company, if I

19   remember that case correctly.  And then the third group were

20   wholly unrelated to California.

21             And what the California Supreme Court said in that

22   case is, as to group number one.  The California folks, group

23   number two, who had a transaction that related to California,

24   we do have jurisdiction.  You can apply California law.  As to

25   group number three, who were wholly unrelated to California,

1  you can't do that.

2          And so that's my understanding of California law.

3  And so, under our analysis, that number in Florida who bought a

4  product from a California company, who signed a licensing

5  agreement with that company that says not only that California

6  law applies, but I believe it says the contract is deemed

7  entered into in Mountain View -- so you've got the contractual

8  agreement entered into in Mountain View, regardless of where

9  the person is.

10          And perhaps Mr. Cole has the actual --

11          **THE COURT:**  Well, I have it.  It does say "deemed

12  entered into in Mountain View."

13          **MR. SELBIN:**  I think under California choice of law,

14  there's clearly jurisdiction here.  Your Honor clearly has

15  jurisdiction over those absent class members here in the

16  Northwest Mutual case.

17          **THE COURT:**  Where is your proposed notice?

18          **MR. SELBIN:**  It is attached to our papers.  Give me a

19  moment.  I think it's Exhibit 2 or Exhibit 1, Part 2.

20          **MR. COLE:**  Exhibit 1 is to the brief.  Exhibit D,

21  your Honor, is the summary notice that we propose e-mailing to

22  the impacted users.  And then we have -- because there was

23  also --

24          **THE COURT:**  I don't have any tabs on what I've got,

25  so it's hard for me to find.

1          MR. COLE:  And the e-filing, your Honor, starts on

2     page 24.

3          THE COURT:  Twenty-four.

4          MR. SELBIN:  Of which document?

5          MR. COLE:  Sorry.  Document 39 -- three page --

6     Exhibit D starts at page 24.  The notice itself is on page 25.

7          THE COURT:  I'm going to have to hand it down to you

8     and ask you to find it.

9          MR. SELBIN:  I could hand it up, your Honor, if you

10    would like.

11         THE COURT:  Let me work off my copy.  If you would,

12    hand this to (indicating).

13         MR. SELBIN:  Okay.

14         THE CLERK:  (indicating).

15         THE COURT:  This is just one page long?

16         MR. SELBIN:  This is just a summary, your Honor,

17    that's going to be e-mailed out.  Then there is a more detailed

18    notice that you will see as Exhibit E.

19         MR. COLE:  Next page, your Honor.

20         MR. SELBIN:  Next page is the full notice.  That's

21    available for download on the Web site.

22         MR. COLE:  Add one thing that's not clear in the hard

23    copy, in the summary, is notice.  Your Honor, you'll notice

24    that there are two things that are identified.  One is the

25    element notice.  The other is claim forms.  In the e-mail,

1 those will be hyperlinks that will take you to the notice.

2         **MR. SELBIN:**  So, in other words, somebody can just --

3         **THE COURT:**  First-class mail.  I thought you were

4 going to use first-class mail.

5         **MR. SELBIN:**  The first-class mail is for e-mails that

6 bounce back, your Honor.  So in the first instance, the notice

7 is going out by e-mail to these people.

8         **THE COURT:**  I want e-mail.  I'm going to insist on

9 first-class mail.

10         **MR. SELBIN:**  In addition to the e-mail?

11         **THE COURT:**  Correct, because I don't trust e-mail.  I

12 think that goes into the ether, and half of them never arrive.

13 And people erase them.  They don't -- it's just too informal.

14         **MR. COLE:**  Your Honor, if I can explain the rationale

15 of our thinking on that --

16         **THE COURT:**  I want you to do e-mail, but I want -- if

17 this gets approved, people are going to -- if they're going to

18 forfeit their rights -- and I promise you're going to get a

19 lower response rate here  -- it ought to come to them in every

20 possible way.  And the ones that come back as undeliverable on

21 first-class mail -- those people get automatically excluded.

22         **MR. COLE:**  That's built in, your Honor.

23         **MR. SELBIN:**  Yeah, that's already built in,

24 your Honor.

25         **THE COURT:**  So, in other words, all 30,000 would have

1   to go out by first-class mail.

2          And if it came back and you could then do a trace,

3   try it again, that came back, that person gets excluded, even

4   if the e-mail actually got through.

5          Now, if somebody e-mailed back and said, "Hey, I want

6   to participate," of course, you know, they can participate and

7   be included; but if there's just silence, they get excluded.

8   You protect those people.

9          Well, here's what I don't like about your -- you

10  know, it says "worldwide."  I haven't given any worldwide

11  approval to anything.  I don't know where that comes from, but

12  the -- I want on the very first page of every single notice, in

13  bold print:  your rights will be forfeited if you do not timely

14  respond to this notice.

15         See, you've kind of concealed that here.

16         In my judgment, somebody picking this up would not be

17  aware that their rights are going to get forfeited on the

18  altar, wiping Intuit's books clean, which -- you know, that's

19  not my problem.

20         My problem is protecting these people.  And I want to

21  make sure that they know that if they don't respond to this in

22  a timely way, they forfeit their rights to sue Intuit.  That's

23  got to be in bold print.

24         It doesn't say this on your notice anywhere.  It

25  says -- and the closest you come to it is, "your rights will be

1  affected whether you act or not."  Well, that doesn't say

2  you're going to forfeit your rights.  It just says they're

3  going to be affected.  Forfeiture is what I want to know.

4      **MR. COLE:**  At the bottom in the table on page one of

5  the notice, it says, "Your legal rights and options in this

6  settlement."  And the last line is, "do nothing, get no

7  payment, give up rights."

8      **MR. SELBIN:**  That's in the detailed notice.

9      **THE COURT:**  Put that in big print several times.  It

10 says that.  It does say that:  do nothing, get no payment, and

11 give up rights.

12     I would say, "Get no payment."  And then say, "This

13 will be a forfeiture of all of your rights."  I think they need

14 to be able to come to the court and object, and to exclude

15 themselves in case the objection is overruled.

16     Do you understand what I'm getting at?

17     **MR. SELBIN:**  Yeah, I do, your Honor.  And I should

18 say I haven't spoken to Mr. Cole about this.  As a practical

19 matter, in every case that I've ever done, for people who have

20 objected, we've then offered them, with the defendants, an

21 opportunity to opt out if their objection is overruled.

22     I can't say that Intuit would agree to that here, but

23 that is, as a practical matter, what we --

24     **THE COURT:**  Somebody shouldn't be put on the horns of

25 a dilemma.

1          **MR. SELBIN:**  I think that makes good sense,

2     your Honor.

3          **THE COURT:**  So we would be sending by first-class

4     mail this detailed notice, as well as the short notice?

5          **MR. COLE:**  Your Honor, if I may be heard on that, the

6     people were -- were -- in this purported class are small

7     businesses who are using QuickBooks.  QuickBooks is an on-line

8     software -- software program to maintain their books and

9     records.

10          When they purchase the product, one of the first

11     things they have to do is go on line to Intuit's Web site and

12     provide their registration information.  All of Intuit's

13     communications with its customers are by e-mail.  And, frankly,

14     we think that the e-mail notice is the one that they're going

15     to read, and not the one that's going to get thrown behind the

16     radiator.

17          So I still would ask that your Honor reconsider not

18     letting us just give the summary notice by e-mail, and then, if

19     the e-mail is undeliverable, following that up with first-class

20     mail.

21          **THE COURT:**  No, but I'll go this far.  You've got to

22     do this.  Do the e-mail notice.  And do a first-class notice of

23     the summary:  the one-page thing that says, in neon print that

24     is very large that they're going to forfeit their rights if

25     they don't do something, and that they ought to go click on

1  this -- this link, and get the more detailed information.

2       This ought to -- the summary ought to tell them --

3  oh, you do have in here? -- what the deadlines are.  All right.

4  Good.

5       I had another point.  I had a question, but now I've

6  lost it.  All right.

7       Oh.  There ought to be at least a 60-day period from

8  the time the mailing takes place to submit claims.

9       **MR. SELBIN:**  We have 90 days, your Honor.

10       **THE COURT:**  That's even better.  The more time, the

11  better, so that they can get their act together and submit

12  their claims, and object, and so forth.

13       All right.  I want to go back to something on the

14  merits of this.

15       Mr. Cole, you said that the company had notified

16  30,000 people.  And how many of them -- you said you heard from

17  1,038?

18       **MR. COLE:**  1,038 people, your Honor, is what we

19  believe have potentially been impacted by this.  And I say

20  "potentially" because we collected that -- the information

21  that's in our database, the 1,038 names -- in two ways.

22       One is this January 14 e-mail I mentioned, and the

23  responses to that.

24       The second thing we did is -- this happened over the

25  weekend of December 15/16 of last year, your Honor.  Starting

on Monday, December 17, we went to user boards and forums that
are on line, both on Intuit's QuickBooks sites, as well as
Apple Macintosh cites, looking for users who posted about this
problem.  Any user who we identified as posting about this
problem, we also dropped into our database.

For approximately 117 of the 1,038, your Honor, we
had tried to contact and see if they have a problem.  And they
have not responded one way or the other.  After making three
attempts at contacting those 117 people, we've assumed that
they did not have a problem.  And that they just posted on the
board because they were upset with the issue or upset at Intuit
about the issue; but again, our database and the best
information we have from the January 14 e-mail and the
independent collection of information is that approximately
1,038 were impacted.

**THE COURT:**  How do you know that these users are
small businesses?

**MR. COLE:**  QuickBooks, your Honor, is an accounting
program that is designed for small businesses.

Intuit has a range of products.  It has everything
from Quicken, which is for the home, for individual users, to a
QuickBooks Enterprise Solutions product, which is for companies
that have 500 or even more users.  And they have a range of
products in between.

This particular product -- and they're different

1   price points for those products.  The home products -- Quicken

2   has less functionality, obviously.  It retails for around $69.

3         The QuickBooks Enterprise Solutions product, which

4   can be for an entire enterprise of 500 or 5,000 employees, has

5   a much higher price point:  $3- to $5,000.

6         This particular program, your Honor -- your Honor, is

7   QuickBooks 2006 for Macintosh.  It had a price point of around

8   $200.  And it is designed for small businesses, between 5 and

9   25 employees.

10        **THE COURT:**  Well, that gives some comfort that the

11  people who had received notice are sophisticated enough to deal

12  with it, rather than your typical consumer, who might not get

13  around to it.

14        **MR. SELBIN:**  Your Honor, further to that point, not

15  only are these sophisticated class members, but they're

16  sophisticated class members who'll know whether they've been

17  injured or not.  In many consumer cases, it's at least arguable

18  as to whether somebody knows whether they've been hurt or not.

19  They may have paid $27 for something that may have -- should

20  have cost them $20.

21        If someone's in the class, their files were damaged

22  by this event here.

23        **THE COURT:**  Do you have mailing addresses for all

24  30,000?

25        **MR. COLE:**  Your Honor, when people register -- the

1    short answer is "Yes," but let me make give a longer answer.

2          When people register for the program, they -- it's a

3    forced registration process, which means you can use the

4    software up to 15 times, and by the 15th time, you have to

5    register, or the software program is does not work anymore.

6    And forced registration information includes name, address, and

7    e-mail address.

8        **MR. SELBIN:**  And again, all of these registrations

9    would have taken place in the last three years, because it's

10   the QuickBooks 2006 product.  So these are not old home

11   addresses, for example, or old home e-mail addresses.  These

12   are current business addresses and current business e-mail

13   addresses.

14       **MR. COLE:**  That's right.  This product was released

15   in October 2005, your Honor.  And so the purchases of the

16   product are no more than three years old.

17       **MR. QUADRA:**  And, your Honor, by that point there

18   would not have been a program that would not have registered,

19   so it would not be in use.

20       **MR. SELBIN:**  Right.  In other words, the forced

21   registration would have happened for everybody by this point --

22   the 15 times used.

23       **THE COURT:**  So all 30,000 got your original -- well,

24   or -- except for people who have changed their e-mail address.

25   At least, an e-mail was sent to all 30,000.

1      **MR. COLE:**  30,010, your Honor.  Yes.  And again, we

2  had a 90 -- a less than 9 percent failure rate on that e-mail.

3      **THE COURT:**  Is there some publication that these

4  people would read -- the 30,000?  Some -- some kind of magazine

5  or newspaper?

6      **MR. COLE:**  The issue with that, your Honor, is

7  there's not one industry that this product services, so there's

8  not a construction-industry product or a beauty-industry

9  product or -- one of the plaintiffs has a local bar down on the

10  Peninsula.  So the industries that serve -- that the -- that

11  use this product are so vastly different, that there's not an

12  industry publication, for example, that that type of notice

13  makes sense.

14      **THE COURT:**  Is there any kind of Intuit Web site

15  that -- or, you know, some of these Web sites that -- not that

16  the company has set up, but that the users have set up to

17  exchange ideas on how to solve problems?  Is there any kind of

18  Web site like that?

19      **MR. COLE:**  Intuit does maintain a forum or a place

20  where users can post about some of its products.

21      **THE COURT:**  Does that cover this product?

22      **MR. COLE:**  There is a QuickBooks forum.  My

23  hesitation, your Honor, is I don't know if it's specific to the

24  QuickBooks for Macintosh, because, remember, this only happened

25  for Apple Macintosh users; not the 90 percent of the world that

1  uses PCs; but if we're e-mailing to these folks and it's --

2  91 percent get through, and we're going to do first-class mail

3  to addresses of small businesses, not individuals -- small

4  businesses that we know are less than three years old.  I think

5  that that satisfies the due-process requirements of notice,

6  your Honor.

7         **MR. SELBIN:**  And if both are nondeliverable, they're

8  automatically opted out.  I would hazard to say, your Honor,

9  that -- that publication notice is useful in cases where you

10  don't have this kind of information; but from our perspective,

11  this is the better way of giving notice than some publication

12  that people may or may not see, or may or may not see until

13  well after the claims period.  We didn't think it was important

14  here to stress publication notice, given what we have.

15         **THE COURT:**  Let's go back to the issue of whether --

16  it should just be a release made on a claims-made basis.

17         Tell me again what the advantage is of -- we know of

18  1,038 people.  We could send this to them.  And if it's 600

19  submitted a claim, fine.  The other 438 would still have their

20  claim, and we wouldn't be forcing a release on 29,000 other

21  people.

22         **THE COURT:**  So what is the -- what is the advantage

23  of forcing a release on 29,000 people?

24         **MR. SELBIN:**  Well, your Honor, I think for starters,

25  because the class is defined as those people who have been

1  injured, I don't think anyone thinks -- in other words, people

2  who have suffered damages as a result of this malfunction -- no

3  one thinks -- we certainly don't think -- that anything close

4  to 30,000 people suffered this problem.  It's somewhere, in our

5  mind, potentially greater than a 1,038.  And that's our

6  concern, is that if we limited the recovery to just the 1,038

7  people who they know about as a result of their e-mail and

8  their going to some boards, there are other people out there

9  who we think would want to take advantage of this settlement.

10      THE COURT:  All right.  Let's see.  How many are

11  there in that category?

12      MR. SELBIN:  That's the problem.  No one can know for

13  sure.  That's what we struggle with.  Is it better to say,

14  "Okay.  We'll take you at the 1,038.  We'll just deal with

15  those people, and anybody else is not part of this litigation,

16  one way or the other," or, because we think it's a very good

17  deal, do we make it available to everybody, and if there are

18  additional people beyond those 1,038 which -- we simply don't

19  know if, or how many -- they're entitled to come in and take

20  advantage of this settlement as well?

21      But only those people who had the malfunction are

22  class members.  So it's not -- the whole 30,000 aren't class

23  members.

24      THE COURT:  Well, how could it be that it would

25  malfunction in some, but not others?

1    **MR. SELBIN:**  Because it -- well, I defer to Mr. Cole

2 to explain that.  I don't understand from a technical basis how

3 this is, but not everybody suffered the damage from the

4 software-code malfunction.

5    **MR. QUADRA:**  Do you want me to address that?  Because

6 we did investigate on the plaintiffs' side, your Honor.  I

7 don't want you to think we hadn't looked at it.  The issue was

8 simply that the way in which the malfunction that is built into

9 this program -- it has to do with the auto-update feature of

10 the program.  It has to be triggered by an outside influence.

11 And in this case, it was the server from Intuit that caused

12 that to occur on this occasion.

13    Intuit then took steps to shut that down.  And it was

14 shut down so the signal was not sent to the program that

15 triggered it to overwrite the data on the program.

16    **THE COURT:**  All right.  I understand.

17    **MR. SELBIN:**  The problem is we don't know which of

18 the 30,000 had it happen before the signal was shut down, and

19 which didn't.  If we did, we could define it.  If Intuit could

20 say, "This group of people got it before -- had the triggering

21 event happen on their computer before we stopped extending the

22 signal," then we would know precisely who the class members

23 are.

24    The problem is we don't know that; but a class member

25 will know whether or not they had the triggering event.  And

1 whether their files were damaged or not.  Either your files

2 were overwritten, or they were not overwritten.  If they were

3 overwritten, you're a class member.  If they weren't, you're

4 not a class member.

5      Our concern is that beyond the 1,038 who responded to

6 Intuit directly, there may be other people who had the problem

7 and simply didn't contact Intuit.  That's our concern.  And we

8 want to make this relief available to those people.

9      **MR. COLE:**  Your Honor, I could address the technical

10 malfunction and explain it in detail, if you'd like.

11      The problem started on a Saturday night, December 15,

12 and was sovled by 10:00 a.m. on Monday the 17th.

13      And, since this is an accounting program for small

14 businesses, fortunately, not a lot of them were doing their

15 books in the approximately 34 hours that this problem could

16 have occurred.

17      **MR. QUADRA:**  Your Honor, another point, though, is

18 that because the malfunction is built into the program and it

19 could be triggered, we do not want to limit it to that universe

20 of people that may have been injured during that date, because

21 there is another occasion on which we know it occurred, which

22 was through a use at a Starbucks when they accessed the

23 Internet.  An improper signal was sent back.  That then

24 triggered and overwrite.

25      Because there is a possibility that this may have

occurred, and people did not respond to that e-mail that was
sent on the eve of it having occurred in December, limiting
ourselves to a universe of 1,038 would be, in our view,
inappropriate, as class counsel representing the interests of
all injured parties.

        **THE COURT:** Well, what happens, then, if this happens
to somebody in the future?

        **MR. QUADRA:** Well, there have been steps taken to
prevent that.

        **MR. SELBIN:** It can't happen. So they've downloaded
a patch to people that prevents it from happening again. It
can't happen as a result of this. I mean, presumably, there
could be some future software bug, but that's not this case.
There is no one, as I understand it from the technical
perspective, who can still be harmed by this and wouldn't know
it at this point.

        **THE COURT:** I'm still not getting this part. We
would be forcing a release upon the 1,038 -- whatever part of
the 1,038 did not respond.

        Let's say it's half. So 500 people lose their
rights.

        And we're doing that in order that another handful of
people will get the benefit of this deal?

        **MR. SELBIN:** Well, your Honor, from --

        **THE COURT:** That, to me, doesn't add up, because

1  they've made a -- sounds to me like 1,038 is the probable

2  number, you know.  Maybe it's -- let's say it's 1,200, but you

3  would be adding a few dozen more to get the benefit of the

4  deal, but at the same time, we'd be forcing a release on people

5  against their will.  They may -- they may not just respond in

6  time, and then something happens.  They realize they should

7  have responded.  They -- too late.

8         That just bothers me; that we would be doing --

9  why -- the company -- Mr. Cole is willing to do a claims-made

10  basis just on the 1,038.

11         **MR. SELBIN:**  We struggled with this issue,

12  your Honor.  And from our perspective, given the nature of the

13  claim, that it involves a discrete event that occurred over two

14  days -- this isn't some years and years of practice; that it

15  involves a discrete number of people who are sophisticated

16  class members who we're going to reach with direct notice, and

17  who are going to get cash.

18         It's not -- again, it's not a situation where a

19  consumer may get a coupon and decide it's not worth doing

20  anything about it.

21         On the facts of this case, this is the best way to

22  go.

23         Now, again, we struggled with it.  We had a lot of

24  back and forth on it, but our view is that it's more

25  important --

1    **THE COURT:** The people who put in a claim will get

2 all of those benefits. So why shouldn't we protect the people

3 who don't put in a claim, and let them keep their claim?

4 That's the part I don't -- that's the negative.

5    **MR. SELBIN:** Again, your Honor, from our perspective,

6 anybody who had the damage is going to make a claim, because

7 it's not a complicated process. They're going to get notice.

8 They know that they were hurt. It's real cash. It's not, you

9 know, some cents on the dollar. It's a real value to these

10 people. And so they're going to make the claims that they were

11 injured.

12    And our concern -- and perhaps it's not a legitimate

13 concern to override your Honor's concern, but our concern was

14 that there is some number -- and we don't know what it is -- of

15 additional people. And, with all due respect to Intuit, one

16 could imagine a situation where somebody is so mad at Intuit

17 that all their files just got wiped out, that they don't

18 respond to an e-mail that Intuit sends them saying, "Hey, we

19 know this happened to you. Contact us if you want to talk

20 about it."

21    It is entirely conceivable that -- and this is what

22 we struggled with -- that there is some number of people out

23 there who simply didn't do that. We want to make sure these

24 people have the benefit of this settlement, because we do think

25 it's a good settlement.

And just from a sort of more philosophical
perspective, your Honor, I mean, the problem here is that --
that if you can't resolve a case like this in this way,
especially on these facts, where you've got such a narrowly
tailored release and all the other factors I've already talked
about, then the risk you have is that your Honor rules on the
motion to dismiss and decides that all these people -- that
there is no claim.  And then all these people get zero.  They
wouldn't be bound by it if you hadn't certified the class.
Certainly if your Honor had ruled on a motion to dismiss that
there is no claim under California law for this, these people
will get zero cents on the dollar.

So I think it's important to keep in mind the option.

And your Honor mentioned earlier about taking it to
trial, and seeing if we're right.  Well, we think we're right,
but --

**THE COURT:**  That would only be true if a class were
certified.

**MR. SELBIN:**  It would only be binding if a class were
certified.

**THE COURT:**  It would be, just as against
Mr. Create-A-Card --

**MR. SELBIN:**  That's right.  These three plaintiffs --

**THE COURT:**  They can go into court in Tennessee or
Hancock County, Mississippi, and bust Intuit wide open.  They

1  could hold up the decision.  I'm sure it will have zero weight

2  in some other state.  I'm not too worried about that.

3          **MR. SELBIN:**  I wouldn't want to be in that position.

4          **THE COURT:**  If it was a class action, they -- then,

5  arguably, it would be binding; but then you get into these

6  issues of personal jurisdiction that --

7          **MR. COLE:**  May I make a clarification?  I don't want

8  there to be a mistake on the record due to my omission.

9          Your Honor asked, "Could this problem happen in the

10  future?"

11          And Counsel correctly represented that we have issued

12  a patch for this problem.  And we've disabled the auto-update

13  mechanism, so current users -- the problem is completely

14  solved.

15          There is one hypothetical situation where it could

16  happen in the future, which is if this product which was

17  released in October 2005 was never opened by a user.  And

18  tomorrow, for the very first time, they open up the QuickBooks,

19  download the program, go to a Starbucks.  The issue could

20  repeat itself there.  And we think that is a --

21          **THE COURT:**  What do you mean, "go to a Starbucks"?

22  Does -- it only works in Starbucks?

23          **MR. COLE:**  I was taking Mr. Selbin's example:  free

24  wireless.

25          **THE COURT:**  What?

1      **MR. COLE:**  Let me explain the malfunction.  And this

2 issue -- I wanted to make sure the record -- I didn't omit to

3 make this point, to make sure I was up front with your Honor.

4          This is the technical problem.  The software has an

5 auto-update mechanism, your Honor.  So every time you launch

6 it, it goes to Intuit's servers to find out if there is an

7 update to the program.  Intuit regularly does updates for bug

8 fixes.  Sometimes to add --

9      **THE COURT:**  I see those old windows on the bottom of

10 the screen all the time:  update available.

11          And always say, "No."  I am happy with the one I've

12 got.

13      **MR. COLE:**  That's right.

14          So in this particular situation with this QuickBooks

15 2006 for Macintosh product, if the person using the product --

16 that auto-update mechanism was launched, it went to Intuit's

17 servers and received an unexpected response, so the place where

18 it thought the file would be, to have the auto-update

19 mechanism -- if it went there and received an unexpected

20 response here, that happened because Intuit was optimizing or

21 migrating some servers, so it received the unexpected response.

22          What happens is the auto-update mechanism then thinks

23 that their actually is an update available, and it starts

24 downloading.  When it realizes that actually there was no

25 update available, the program tries to delete what it was

1   trying to download.

2          And in this unfortunate situation where you have a

3   Macintosh operating system, the OSX, instead of deleting the

4   program it was trying to download, it deleted this folder

5   called the "desktop" folder on Macintosh.

6          Now, this problem could occur in one of two ways.

7   One is the December 15 Saturday night to Monday morning, the

8   34-hour period.  Anybody who launched a QuickBooks program in

9   that 34-hour period, this problem could have happened to them.

10          There's a separate way that we discovered that this

11  problem could also happen.  And that's in an Internet

12  environment that's called a "walled garden," your Honor.  And

13  in places like Starbucks or SFO or other airports, you can

14  launch your computer, launch your Internet; but you can only

15  get onto one site.  For example, at Starbucks, it's T-Mobile;

16  but you can't generally surf the Internet.  You can only go

17  though that one particular site.  So it's -- it's a captive --

18  what they call in the industry a "walled garden."

19          So you can get on the Internet in that place, in a

20  walled-garden environment.  It triggers a similar response from

21  the auto-update mechanism, as if the file is missing at the

22  server.  The user is at Starbucks.  Auto-update says there is

23  an update available.  It reaches out.  It's blocked by this

24  walled-garden effect, and you could have the same issue.  We're

25  aware of this happening to a couple of users.  They are part of

1  the class.

2          Your Honor asked the question:  could this ever

3  happen in the future?

4          I was thinking about that question here.  And I

5  wanted to say there's an extremely remote chance that it could

6  happen in the future, but we don't believe that's likely.  So I

7  just want to clarify that, and not think --

8          **THE COURT:**  No.  You were right to bring it up.

9  Thank you.

10          Well, so what basically happened is Intuit sabotaged

11  all these people.  You sent in the wrong file, and it's like an

12  exploding bomb that goes in there and wipes out their data.

13          And you're saying that that would be -- there's some

14  kind of exclusion in this agreement for that.

15          **MR. COLE:**  Respectfully, your Honor, I disagree with

16  that characterization.

17          **THE COURT:**  Well, you didn't do it on purpose.  It

18  was a mistake, but still you sent this missile into everybody's

19  computer that blew up their data.

20          **MR. COLE:**  Again, respectfully, your Honor, that's

21  not the technical explanation of what happened.

22          **THE COURT:**  Well, all right.

23          **MR. SELBIN:**  It certainly was our allegation and our

24  argument on the motion to dismiss, your Honor, but regardless

25  of the power of the facts, the legal issues are complex; I

1 think it's fair to say.

2     **MR. COLE:** I agree with that.

3     **THE COURT:** How could you have racked up $800,000 in

4 this case?

5     **MR. SELBIN:** We haven't racked up $800,000, and we

6 haven't said we're going to seek $800,000. I believe we

7 indicated to your Honor at the status conference last time we

8 have not negotiated fees. We do not have an agreement on fees.

9 We chose that number as a number that we would inform the Court

10 and class members we would not seek more than.

11     The only agreement we have with Intuit at this point

12 is that we're entitled to some fee, but we have not reached any

13 agreement on a fee.

14     **THE COURT:** All right. Fair enough.

15     Here's what we're going to do. I'm going to defer to

16 you lawyers on something, but it's a close call, in my mind,

17 whether this should go to the 30,000 versus the 1,038, and just

18 do a claims-made basis; but I am going to go with your idea of

19 30,000.

20     And we will require -- this is just preliminary, but

21 if we go all the way with this course, I'm going to require

22 release for those people who don't respond and who got notice.

23     I have a strong suspicion of that type of

24 arrangement, but there is a couple of circumstances here that I

25 think help. One is: these are not ordinary consumers. These

1  are small businesses.  And they ought to be sophisticated

2  enough to pick up a notice and understand what they're required

3  to do.  So that helps this circumstance that --

4          And the second consideration is that you have pretty

5  good information about how to deliver the notices.  And by

6  that, I mean addresses.

7          So what I want you to do is revise that notice, so

8  that it is blazingly clear that forfeiture is involved if they

9  don't respond.  So you work that language up, and resubmit it.

10         Then I want it to be first-class mail.  And that can

11 just be the short version --

12         **MR. SELBIN:**  Okay.

13         **THE COURT:**  -- as long as they can go on the Web site

14 and get the other version, and then by e-mail.

15         And then, if it comes back from the first-class

16 mail -- comes back undelivered -- then you can either exclude

17 them then, or try again with some other form of -- there's the

18 National -- National --

19         **MR. SELBIN:**  National Address Database.  I'm not sure

20 an update.

21         **THE COURT:**  There's a way to trace it, remarkably

22 good:  90 percent or better success rate.  So you can try

23 again.

24         And this ought to be done on a name or

25 individual-company-by-individual-company basis.  So we will at

1   least on a preliminary basis approve it.  And sufficient, I

2   think, to probably warrant final approval, but I want to see

3   how the numbers come out.

4          Now, if this thing comes out that I think a lot of

5   people are being screwed on it because they didn't submit

6   claims, or some kind of snafu -- I don't know what -- then I'm

7   not going to approve it.  So I want to see it done.

8          I want to also say I think counsel are doing a decent

9   job here to address the issues in a responsible way.  And I

10  don't think that this is a buy-off of counsel.  I think this is

11  a legitimate attempt to solve a problem with small businesses

12  that, at least in many cases, are going to have a continuing

13  connection to Intuit.  So the -- I think that's another

14  consideration that warrants --

15         So I am deferring in this case to -- if I was doing

16  this, I would not, myself, go along with this idea.  I would

17  say, "If you make a claim, it's released.  If you don't, you

18  get to keep it," but for the reasons stated, I'm going to defer

19  to counsel, at least for this preliminary purpose.  So you have

20  a bit of homework to do.

21         I guess I should ask this question.  I never heard of

22  Create-A-Card in my life.  I have no idea if they're adequate

23  or not.  And there's no way they're going to get a nickel more

24  than anybody else.  I hope you didn't try that one.

25         **MR. SELBIN:**  No, we --

1          THE COURT:  Submit a claim, like anyone else.

2          Why are they an adequate representative?

3          MR. SELBIN:  Your Honor each of the three

4    plaintiffs -- and a one is from California; one from Florida;

5    one from New York.  They're all small businesses.  They all

6    suffered exactly -- again, this isn't a case where people have

7    varying factual circumstances, other than the amount of their

8    damages.  Each one of these small businesses suffered a failure

9    here.  Each one of them incurred expenses as a result of that.

10          THE COURT:  Are each one of them going to live with

11    this exact settlement, with no sweeteners?

12          MR. SELBIN:  Each one of them will live with this

13    exact settlement.  We did build into the agreement the right of

14    us, as class counsel, to seek on their behalf the incentive

15    award; but it's not a material term of the settlement.

16          THE COURT:  Well, they won't get it.  So you tell

17    them they're not going to get anything, other than

18    out-of-pocket expenses.

19          If they came the reason for -- that is a very

20    important policy reason.  If these people want to come forward

21    as good citizens, great.  They've got to stand, shoulder to

22    shoulder, with the victims of the deal.  And if it's not good

23    enough for them, it's not -- if they don't want to release

24    their claims unless they get more, why should the rest of the

25    class do that?  So it's not a very strong test, but a test of

1　how good a deal it is if the plaintiff's willing to take it.

2　　　　　**MR. SELBIN:**　Understood, your Honor.

3　　　　　**THE COURT:**　If they won't take it unless they get a

4　sweetener, there is something wrong with it.

5　　　　　**MR. SELBIN:**　We especially provided it was not a

6　material term of the settlement.　There's a countervailing

7　policy interest.　I understand, your Honor disagrees.　These

8　people did undertake to step forward.　They committed time.

9　　　　　I heard your Honor say earlier people's actual

10　out-of-pocket -- small business people who took the time to

11　step forward, took the time to review the complaint, took the

12　time to respond to discovery and the policy rationales

13　articulated by the courts is that that warrants some additional

14　compensation, I understand.

15　　　　　**THE COURT:**　Some courts.

16　　　　　**MR. SELBIN:**　That's right, your Honor.　Not this

17　Court.

18　　　　　**THE COURT:**　Some folks, like me, who think that this

19　is just buying off the named plaintiff --

20　　　　　**MR. SELBIN:**　Understood, your Honor.

21　　　　　**THE COURT:**　If they want to be a good citizen --

22　　　　　Look.　We had plenty of class actions before anybody

23　ever thought of the idea of an incentive.　And that just --

24　that -- I just think that was a bad step in the wrong

25　direction.　We -- it's a -- class actions will thrive without

1  incentive fees.

2        **MR. QUADRA:**  Your Honor, these three plaintiffs have

3  signed the settlement agreement.  Irrespective of anything

4  else, they're standing shoulder to shoulder.

5        **THE COURT:**  Okay.  Good.

6        **MR. SELBIN:**  That's right.

7        **THE COURT:**  Okay.  So would you revise that notice

8  and the order to capture what we've said here today, and

9  resubmit it?  And then I'll -- also, an order that says

10  "preliminary approval"?  And then I'll approve that.  All

11  right?

12        **MR. SELBIN:**  Very good, your Honor.  Thank you.  We

13  could probably have that by -- today's Thursday.  Probably by

14  Monday or Tuesday.  Is that --

15        **MR. COLE:**  A week from today.

16        **THE COURT:**  I will look for it a week from today or

17  sooner.  Okay?

18        **MR. COLE:**  One housekeeping matter, your Honor.  We

19  have our motion to dismiss scheduled for next Thursday.  I

20  assume the Court will vacate that date.

21        **THE COURT:**  Let's vacate that for the time being.  I

22  think you're going to go forward with this, so we're going to

23  vacate the -- this was one where I -- we would have to decide

24  if you had sent a missile into their computers?

25        **MR. COLE:**  Your Honor, if we had sent a missile into

1 their computers, for better or worse, they signed an agreement

2 that limits our liability.  And under the economic-loss

3 doctrine of California, they would not have been able to

4 recover.

5       I'd love to get your Honor's ruling on that one, but

6 this is better for the class.

7       **THE COURT:**  All right.

8       **MR. COLE:**  Thank you, your Honor.

9       (At 10:34 a.m. the proceedings were adjourned.)

10                 -   -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C07-6452-WHA, Create-A-Card v. Intuit, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, September 18, 2008